# Exhibit B

LCIA Arbitration No. 153077

IN THE MATTER OF AN ARBITRATION UNDER THE
2014 RULES OF ARBITRATION OF THE
LONDON COURT OF INTERNATIONAL ARBITRATION

BETWEEN

VimpelCom Ltd

Claimant

and

Orascom TMT Investments S.à.r.l

Respondent

FINAL AWARD

*Members of the Tribunal*
Jean Kalicki, Presiding Arbitrator
Philip Allen Lacovara
Kenneth Kramer

30 September 2017

CONTENTS

I.    INTRODUCTION:  PARTIES AND CLAIMS ..................................................... 1

II.   PROCEDURAL HISTORY ............................................................................... 4

III.  AGREEMENTS ON ARBITRATION, SEAT AND GOVERNING LAW ..................... 7

IV.  VIMPELCOM'S CLAIMS FOR INDEMNIFICATION ......................................... 9

    A.   Background Facts ................................................................................... 9

    B.   The Relevant SSEA Provisions ............................................................... 10

         (1)  SSEA Provisions on OTMTI's Indemnification Obligations .............................. 10

         (2)  SSEA Provisions Related to "Indemnification Procedures" ................................. 11

    C.   The Parties' Obligations Arising from the SSEA and New York Law ...................... 13

         (1)  Indemnification Obligations Under the SSEA ..................................................... 14

         (2)  New York Law Principles of Analysis ................................................................. 15

         (3)  SSEA Provisions Regarding Notice ..................................................................... 19

         (4)  SSEA Provisions Regarding Participation .......................................................... 21

         (5)  SSEA Provisions Regarding Consequences of Inadequate Notice ...................... 24

         (6)  SSEA Provisions Regarding Mitigation of Loss .................................................. 27

         (7)  Conclusion ........................................................................................................... 31

    D.   The Wind Telecom Indemnification Claim ............................................................. 32

         (1)  Background on the Transactions and the Audit .................................................... 32

         (2)  Whether the Audit Falls Within the Scope of Indemnification Obligations ......... 34

         (3)  Good Faith ............................................................................................................ 37

         (4)  The Adequacy of Notice and Opportunity to Participate ..................................... 45

         (5)  The Issue of Prejudice .......................................................................................... 55

         (6)  Reasonableness of Settlement .............................................................................. 64

         (7)  Mitigation of Loss ............................................................................................... 67

    E.   The WAHF Audit Claim ........................................................................................ 74

         (1)  Background on the Transactions and the Audit .................................................... 74

         (2)  Whether the Audit Falls Within the Scope of Indemnification Obligations ......... 75

         (3)  Good Faith ............................................................................................................ 78

         (4)  The Adequacy of Notice and Opportunity to Participate ..................................... 86

         (5)  Reasonableness of Settlement .............................................................................. 95

      (6)  Mitigation of Loss ........................................................................................ 98

  F.  Wind Telecomunicazioni Indemnification Claim .................................................... 100

      (1)  Background on the Transactions and the Audit ............................................ 100

      (2)  Good Faith ................................................................................................... 102

      (3)  The Adequacy of Notice and Opportunity to Participate................................ 107

      (4)  Reasonableness of Settlement ...................................................................... 112

      (5)  Mitigation of Loss ....................................................................................... 115

  G.  Quantification of Damages ....................................................................................... 116

      (1)  OTMTI's "Losses" for Audit Settlement Amounts and Related Costs ............. 117

      (2)  The Tax Savings Issue ................................................................................. 118

      (3)  Pre-Award and Post-Award Interest ............................................................ 127

V.   OTMTI'S COUNTERCLAIM REGARDING NAME RIGHTS ...................................... 131

  A.  Background Facts Related to OTMTI's Counterclaim .............................................. 131

  B.  The Relevant Contract Provisions ........................................................................... 133

     Change of Business Name; Use of Retained Name and Marks. ............................... 133

  C.  The Parties' Obligations Arising from These Contract Provisions ........................... 135

      (1)  Scope of Name Rights ................................................................................. 135

      (2)  The Material Loss Provision ........................................................................ 136

      (3)  The Obligation of Good Faith Negotiation of Appropriate Modifications......... 139

      (4)  The Applicable Burdens of Proof ................................................................ 147

  D.  Breach of Contract by Use Without Right to Invoke Material Loss Provision .......... 148

      (1)  Egypt .......................................................................................................... 148

      (2)  Algeria ........................................................................................................ 155

  E.  Breach of Contract by Not Negotiating Appropriate Modifications in Good Faith ... 161

  F.  Potential Non-Contractual Claims ........................................................................... 165

VI.  ARBITRATION COSTS AND LEGAL COSTS ......................................................... 167

VII.  AWARD ................................................................................................................. 172

ABBREVIATIONS

| *Parties* | |
|---|---|
| VimpelCom | Claimant VimpelCom Ltd. |
| OTMTI | Respondent Orascom TMT Investments S.à r.l. |
| | |
| *Parties' Submissions* | |
| RFA | VimpelCom's Request for Arbitration, dated 8 July 2015 |
| Response | OTMTI's Response to Request for Arbitration and Counterclaim, dated 3 September 2015 |
| Counterclaim | The separately numbered paragraphs in the Counterclaim section of OTMTI's Response to Request for Arbitration and Counterclaim, dated 3 September 2015 |
| SoC | VimpelCom's Statement of Claim, dated 4 December 2015 |
| SoDC | OTMTI's Statement of Defense and Counterclaim, dated 4 March 2016 |
| Reply | VimpelCom's Amended Reply on Indemnification Claims and Statement of Defense to Counterclaim, dated July 8, 2016 |
| Rejoinder | OTMTI's Rejoinder on Indemnification Claims and Reply on Counterclaim, dated 22 August 2016 |
| Rejoinder-CC | VimpelCom's Rejoinder on Counterclaim, dated 3 October 2016 |
| V-PHB | VimpelCom's Post-Hearing Brief, dated 20 January 2017 |
| O-PHB | OTMTI's Post-Hearing Memorial, dated 20 January 2017 |
| V-TS | VimpelCom's Opening Submission on Tax Savings and Submission on Allocation of Costs, dated 24 March 2017 |
| O-TS | OTMTI's Memorial on the Application of Article 10.7(d) of the SSEA to VimpelCom's Indemnification Claims, and the Cost Allocation Principles Governing Any Award of Costs, dated 24 March 2017 |
| VR-TS | VimpelCom's Reply Submission on Tax Savings, dated 14 April 2017 |
| OR-TS | OTMTI's Second Memorial on the Application of Article 10.7(d) of the SSEA to VimpelCom's Indemnification Claims, dated 14 April 2017 |

| V-Costs | VimpelCom's Statement of Costs, dated 26 May 2017 |
|---|---|
| O-Costs | OTMTI's Summary of Costs and Fees Incurred by Respondent OTMTI, dated 26 May 2017 |
| CLA | Claimant's Legal Authority |
| CE | Claimant's Exhibit |
| RLA | Respondent's Legal Authority |
| RE | Respondent's Exhibit |
| Abouali I | Witness Statement of Gamal Abouali, dated 4 March 2016 |
| Abouali II | Second Witness Statement of Gamal Abouali, dated 21 August 2016 |
| Cisternino I | Witness Statement of Christian Cisternino, dated 4 December 2015 |
| Cisternino II | Second Witness Statement of Christian Cisternino, dated 6 June 2016 |
| Dobbie I | Witness Statement of David Dobbie, dated 6 June 2016 |
| Dobbie II | Second Witness Statement of David Dobbie, dated 30 September 2016 |
| Hubert I | Witness Statement of Michel Hubert, dated 4 March 2016 |
| Hupert II | Second Witness Statement of Michel Hubert, dated 22 August 2016 |
| Kuper | Witness Statement of Bart Kuper, dated 6 June 2016 |
| Lemke I | Witness Statement of Alexander Lemke, dated 4 December 2015 |
| Lemke II | Second Witness Statement of Alexander Lemke, dated 6 June 2016 |
| Lemke III | Third Witness Statement of Alexander Lemke, dated 30 September 2016 |
| Maisto I | Expert Report of Guglielmo Maisto, dated 6 June 2016 |
| Maisto II | Second Expert Report of Guglielmo Maisto, dated 24 March 2017 |
| Maisto III | Third Expert Report of Guglielmo Maisto, dated 14 April 2017 |
| Malackowski I | Expert Report of James E. Malackowski, dated 4 March 2016 |
| Malackowski II | Second (Amended) Expert Report of James Malackowski (Royalty), dated 7 September 2016 |
| Malackowski III | Second (Amended) Expert Report of James Malackowski (Interest), dated 7 September 2016 |

| Manzitti I | Expert Report of Andrea Manzitti, dated 4 March 2016 |
|---|---|
| Manzitti II | Second Expert Report of Andrea Manzitti, dated 20 August 2016 |
| Manzitti III | Third Expert Report of Andrea Manzitti, dated 23 March 2017 |
| Manzitti IV | Fourth Expert Report of Andrea Manzitti, dated 14 April 2017 |
| Meyer I | Expert Report of Paul K. Meyer on Indemnification Claims, dated 6 June 2016 |
| Meyer II | Amended Expert Report of Paul K. Meyer on Counterclaim, dated 8 July 2016 |
| Meyer III | Third Expert Report of Paul K. Meyer (on Counterclaim), dated 30 October 2016 |
| Nasr | Witness Statement of Karim-Michel Nasr, dated 18 August 2016 |
| G. Petrella | Expert Report of Giovanni Petrella, dated 4 March 2016 |
| V. Petrella I | Witness Statement of Vania Petrella, dated 4 March 2016 |
| V. Petrella II | Second Witness Statement of Vania Petrella, dated 22 August 2016 |
| Soliman | Witness Statement of Ayman Soliman, dated 3 March 2016 |
| Suchak | Witness Statement of Ravi Suchak, dated 6 June 2016 |
| ***Defined Terms and Other Abbreviations*** | |
| Agenzia | Agenzia delle Entrate, the Italian Revenue Agency |
| Arbitration Costs | As defined in Article 28.1 of the LCIA Rules |
| Closing Memorandum | Memorandum of Closing between VimpelCom, OTH, Wind Telecom S.p.A., Weather Investments II S.à r.l., and Orascom Telecom Media and Technology Holding S.A.E., dated 15 November 2012 |
| CSPs | Third-party lenders, known as Credit Support Providers, that entered into Credit Support Agreements with certain Italian banks in September 2005, in transactions connected to a 26 May 2005 Credit Facilities Agreement through which those banks lent funds to Wind Telecomunicazione |
| EFSA | Egyptian Financial Supervisory Authority |
| EGM | Extraordinary General Meeting |

| | |
|---|---|
| 49/51% Rule | An Algerian law that was understood to limit foreign ownership of Algerian companies to 49%, requiring 51% Algerian ownership |
| Gide | Gide, Loyrette Nouel |
| Global Telecom | Global Telecom Holding S.A.E. |
| Guardia | Guardia di Finanza, the Italian Financial Police |
| Hellas I | Hellas I Telecommunication S.à r.l. |
| IBLOR | Italian Bank Lender of Record |
| Italian Tax Authorities or Authorities | The Agenzia delle Entrate and the Guardia di Finanza, collectively |
| LCIA Rules | 2014 Rules of Arbitration of the London Court of International Arbitration |
| Legal Costs | As defined in Article 28.2 of the LCIA Rules |
| Material Loss Provision | The provision in Article 11 of the Closing Memorandum, containing a reference *inter alia* to a "material Loss" |
| Name Rights | As defined in Article 11 of the Closing Memorandum |
| Orascom Telecom | Orascom Telecom Holding S.A.E. |
| Orascom TMT | Orascom Telecom Media & Technology S.A.E. |
| OTA | Orascom Telecom Algérie S.p.A. |
| PVC | *Processo verbale di constatazione*, an audit report issued by the Agenzia |
| SSEA | Amended and Restated Share Sale and Exchange Agreement between VimpelCom and OTMTI, dated 15 April 2011 |
| Separation Agreement | Separation Agreement, dated 15 April 2011 |
| Tellas | Tellas Telecommunications S.A. |
| WACC | Weighted Average Cost of Capital |
| WAHF | Wind Acquisition Holding Finance S.p.A. |
| WAHF Audit | The Italian Tax Authorities' audit of WAHF in 2013–2014 |
| WAHF Luxembourg | Wind Acquisition Holdings Finance S.A. |
| Weather II | Weather Investments II S.à r.l., now known as OTMTI |
| Wind Group | Wind Telecom and its subsidiaries and affiliates |
| Wind Hellas | Wind Hellas Telecommunications S.A. |

| | |
|---|---|
| Wind Hellas Spin-Off (also "Spin-Off") | The spin-off from or other disposal by the Weather Group of the Wind Hellas Group and all related assets and liabilities (SSEA, Art. 1.1) |
| Wind Telecom | Wind Telecom S.p.A. (*see also* "Weather I") |
| Wind Telecom Audit | The Italian Tax Authorities' audit of Wind Telecom in 2013 |
| Wind Telecomunicazioni | Wind Telecomunicazioni S.p.A. |
| Wind Telecomunicazioni Audit | The Italian Tax Authorities' audit of Wind Telecomunicazioni in 2013–2014 |
| 2006 PIK Loans | Payment-in-kind loans obtained by WAHF, through WAHF Luxembourg, in December 2006 |
| 2007 Shareholders Agreement | Shareholders agreement between Wind Telecom, Wind Telecomunicazioni and Wind Hellas, dated 26 October 2007 |
| 2009 PIK Loans | Payment-in-kind loans obtained by WAHF, through WAHF Luxembourg, in December 2009 |

The undersigned Arbitrators, having been designated pursuant to the agreement of Claimant VimpelCom Ltd ("**VimpelCom**") and Respondent Orascom TMT Investments S.à.r.l ("**OTMTI**"), set forth in Article 13.7 of the Amended and Restated Share Sale and Exchange Agreement dated 15 April 2011 (the "**SSEA**," Ex. CE-1 and RE-1),[1] and proceeding in accordance with the 2014 Rules of Arbitration of the London Court of International Arbitration (the "**LCIA Rules**"); having received on behalf of VimpelCom and OTMTI written submissions, documentary evidence and witness and expert testimony, and having heard oral arguments, as described below; and having duly reviewed and considered the Parties' submissions, documents, testimony and arguments, do hereby FIND and AWARD as follows:

## I.   INTRODUCTION:  PARTIES AND CLAIMS

1.   VimpelCom is a company organized under the laws of Bermuda, with its registered address at Claude Debussylaan 88, 1082 MD, Amsterdam, the Netherlands. VimpelCom is a provider of telecommunications services in emerging markets.[2]   Throughout these proceedings it has been represented by Debevoise & Plimpton LLP.

2.   OTMTI is a company incorporated under the laws of Luxembourg, with its registered address at 1, Boulevard de la Foire, L-1528 Luxembourg, Grand Duchy of Luxembourg.[3] Throughout these proceedings it has been represented by Cleary, Gottlieb, Steen & Hamilton LLP.   OTMTI was previously known as Weather Investments II S.à r.l. ("**Weather II**").

---

[1] The provisions of the SSEA, as well as the Separation Agreement and Closing Memorandum as defined *infra*, are cross-referenced inconsistently between those documents (and referred to variously by the Parties as "Articles," "Sections" and "Clauses."   The Tribunal reads no distinctions among those descriptors.   For convenience, it adopts the word "Article" in this Award, except where directly quoting a passage that contains a different descriptor.

[2] Request for Arbitration, dated 8 July 2015 ("**RFA**"), ¶ 2.

[3] Response to Request for Arbitration and Counterclaim, dated 3 September 2015 ("**Response**"), ¶ 2.   Citations to the separately numbered paragraphs of the Counterclaim section of this document are referred to as "**Counterclaim**."

3.      The Parties are signatories to the SSEA, by which VimpelCom acquired OTMTI's shares in Wind Telecom S.p.A. ("**Wind Telecom**"), and thereby also of its subsidiary businesses in Italy (collectively, the "**Wind Group**").[4] VimpelCom did not acquire the Wind Group's Greek businesses, which were held and operated through Wind Hellas Telecommunications S.A. ("**Wind Hellas**");[5] these were spun off to other buyers before closing.[6] VimpelCom also acquired a majority of OTMTI's emerging markets assets, through Wind Telecom's indirect ownership of an Egyptian holding company, Orascom Telecom Holding S.A.E. ("**Orascom Telecom**").

4.      In this arbitration, VimpelCom contends[7] that OTMTI has breached its obligations under the SSEA by refusing to indemnify VimpelCom for a share of the liabilities VimpelCom incurred in settling three separate audits initiated by Italian tax authorities in 2013, into transactions designed and executed by OTMTI prior to the SSEA.[8] VimpelCom contends that pursuant to the SSEA, OTMTI was obligated to indemnify it for 72.65% of the amounts paid to settle these audits, a percentage corresponding to OTMTI's shareholding in Wind Telecom at the time of the SSEA.[9] VimpelCom seeks recovery of OTMTI's alleged share of the payments made to the Italian authorities, amounting in total to more than €130 million, plus interest, attorneys' fees and costs.[10]

5.      OTMTI denies VimpelCom's claims.  It contends as a threshold matter that two of the three settlements were not within the scope of OTMTI's indemnity obligations under the SSEA.[11] It also contends that VimpelCom is not entitled to indemnification with respect to any of the audits because VimpelCom did not comply with its duties, under the SSEA and New York law, related to timely notice to OTMTI about the audits, consultation or

---

[4] RFA ¶¶ 5, 16.

[5] RFA ¶ 5.

[6] RFA ¶ 16.

[7] References herein to the Parties' contentions are not intended as an exhaustive recapitulation of their respective assertions, and no inferences should be drawn from the fact that the Tribunal mentions some but not all arguments raised by the Parties.  The Tribunal emphasizes that it has reviewed and considered all of the arguments presented by the Parties.

[8] RFA ¶ 4.

[9] RFA ¶¶ 22, 69(a).

[10] V-PHB Appendix A.

[11] Response ¶¶ 5, 76-79.

cooperation with OTMTI in defense of the audits, and mitigation of loss.[12] As a result, the settlements themselves were "unjustified" and VimpelCom's indemnity claims are "baseless."[13]

6.    OTMTI counterclaims against VimpelCom for a breach of contract that is unrelated to the Italian tax audits.   It contends that under a Separation Agreement executed contemporaneously with the SSEA on 15 April 2011 (the "**Separation Agreement**"), VimpelCom was required to cease using the "Orascom" name in early 2012, a date that was subsequently extended to 31 December 2012 for certain geographic markets, through a Memorandum of Closing dated 15 November 2012 (the "**Closing Memorandum**").[14] VimpelCom nonetheless continued to use the name – principally in Egypt and Algeria – after this period expired, allegedly without permission and without negotiating in good faith a modification of the name rights to include a reasonable payment.[15]   OTMTI originally sought a permanent injunction against VimpelCom's continued use of the Orascom name, and damages to compensate for the unauthorized use of the name after 1 January 2013, in the form of a license fee or royalty.[16] By the close of these proceedings, the injunction request was agreed to be moot as the use of the name had ended.[17] OTMTI's final request for relief was for monetary damages exceeding €84 million, together with interest, attorneys' fees and costs.[18]

7.    VimpelCom denies OTMTI's counterclaims.  It contends that it was permitted under the Closing Memorandum to continue using the Orascom name in Algeria and Egypt after 2012, because terminating such use was "reasonably expected to result in … [a] material Loss" within Article 11 of the Closing Memorandum, based on conditions then prevailing in those countries.  It contends that it complied with requirements to negotiate in good faith,

---

[12] Response ¶¶ 4, 6-8.
[13] Response ¶¶ 4, 10-11.
[14] Counterclaim ¶¶ 2-3.
[15] Response ¶ 13 and Counterclaim ¶¶ 5, 9.
[16] Response ¶ 13 and Counterclaim ¶ 11.
[17] Rejoinder ¶ 374 (OTMTI alleging that VimpelCom "continued to use [the] name *into 2015*") (emphasis added); V-PHB ¶ 278 (VimpelCom alleging that "VimpelCom stopped using the Orascom name" in September 2013 in Egypt and in January 2015 in Algeria).
[18] O-PHB ¶¶ 258, 343.

but OTMTI did not do so by insisting that the only appropriate modifications to the name rights would involve financial payments.

## II.     PROCEDURAL HISTORY

8.     On 8 July 2015, VimpelCom filed a Request for Arbitration ("**RFA**"), invoking the arbitration agreement in Article 13.7 of the SSEA and nominating Mr. Philip Allen Lacovara as the first arbitrator in these proceedings.

9.     On 20 August 2015, OTMTI nominated Mr. Kenneth Kramer as the second arbitrator. On 3 September 2015, OTMTI filed a Response to Request for Arbitration and Counterclaim ("**Response**").

10.    On 10 September 2015, the LCIA confirmed the appointment of Messrs. Lacovara and Kramer to the Tribunal.

11.    On 2 October 2015, Messrs. Lacovara and Kramer notified the Parties that they had nominated Ms. Jean E. Kalicki as the third and presiding arbitrator. On 14 October 2015, the LCIA confirmed the appointment of Ms. Kalicki, and the Tribunal was duly constituted. No Party has objected to the constitution of the Tribunal.

12.    On 29 October 2015, following certain prior correspondence regarding procedural issues, the Parties and the Tribunal held a first procedural meeting in person in New York. On 24 November 2015, the Tribunal issued the Procedural Order No. 1, following circulation of a prior draft upon which the Parties had provided certain comments.

13.    Procedural Order No. 1 confirmed that pursuant to Article 13.7(a)(ii) of the SSEA, the legal seat of this arbitration is London, England. The Parties nonetheless agreed for reasons of convenience that hearings would be held in New York, without prejudice to the legal seat remaining in London. Procedural Order No. 1 established a timetable and procedures for further proceedings in this case.

14.    Pursuant to the agreed timetable, the Parties made the following principal pre-hearing submissions: (a) VimpelCom's Statement of Claim, dated 4 December 2015 ("**SoC**"), (b)

OTMTI's Statement of Defense and Counterclaim, dated 4 March 2016 ("**SoDC**"), (c) VimpelCom's Reply on Indemnification Claims and Statement of Defense to Counterclaim, dated 8 June 2016 and amended on 8 July 2016 ("**Reply**"), (d) OTMTI's Rejoinder on Indemnification Claims and Reply on Counterclaim, dated 22 August ("**Rejoinder**"), and (e) VimpelCom's Rejoinder on Counterclaim dated 3 October 2016 ("**Rejoinder-CC**").  These pleadings were accompanied by various documentary exhibits and authorities, along with witness statements and expert reports.

15.   The Parties also made various applications prior to the hearings, upon each of which the Tribunal received submissions from both Parties and thereafter rendered rulings.[19]  This included OTMTI's application of 14 January 2016 regarding certain documents VimpelCom had redacted, which the Tribunal addressed in Procedural Order No. 2 dated 23 February 2016; applications by both Parties on 5 April 2016 for orders compelling further production of documents, which the Tribunal addressed by rulings on 13 April 2016; and further applications by OTMTI on 20 June 2016 and 30 June 2016, regarding certain documents, which the Tribunal addressed by rulings on 27 June 2016 and 1 July 2016, respectively.

16.   On 17 October 2016, the Parties notified each other that they wished to cross-examine certain of each other's fact and expert witnesses who had submitted written statements and expert reports in support of and opposition to the substantive pleadings previously filed.

17.   On 17 October 2016, the Tribunal held a prehearing status conference with the Parties by telephone, to address certain issues related to the upcoming hearing.  On 20 October 2016, the Tribunal issued Procedural Order No. 3 resolving such issues.

18.   The Tribunal thereafter considered and resolved certain additional pre-hearing applications, including VimpelCom's application of 20 October 2016 to preclude a certain OTMTI defense and OTMTI's application of 25 October 2016 regarding a particular witness, which the Tribunal addressed in Procedural Order Nos. 4 and 5, respectively.

---

[19] The procedural history relevant to each application is set forth in the relevant ruling, and is not repeated here.

19. On 7-10 and 15-17 November 2016, the Tribunal held seven days of hearings in New York. During the hearings, the parties presented opening statements and oral testimony from certain fact and expert witnesses. The preponderance of oral testimony was in the form of cross-examination and re-direct examination relating to direct testimony previously filed by written statements and expert reports. Other witnesses and experts were not called for examination, but their statements and reports equally were taken under consideration as reflecting their direct testimony. The witness and expert evidence included, on behalf of VimpelCom, the testimony (in alphabetical order) of (a) Christian Cisternino, b) David Dobbie, (c) Bart Kuper, (d) Alexander Lempke, (e) Guglielmo Maisto, (f) Paul Meyer, and (g) Ravi Suchak; and on behalf of OTMTI, the testimony (in alphabetical order) of (a) Gamal Abouali, (b) Michel Hubert, (c) James Malackowski, (d) Andrea Manzitti, (e) Karim-Michel Nasr, (f) Giovanni Petrella, (g) Vania Petrella, and (h) Ayman Soliman.

20. At the close of the oral hearings, the Parties agreed to submit simultaneous post-hearing briefs on 20 January 2017, addressing the issues presented up through the hearings. These submissions were duly made ("**V-PHB**" and "**O-PHB**").

21. The Parties also indicated at the close of the hearings that they would consult regarding procedures to address certain "tax savings" issues that arose late in the proceedings and had been deferred for subsequent briefing. Following certain additional correspondence and a procedural telephone call on 6 March 2017, the Parties agreed to two rounds of simultaneous written submissions on these issues, followed by a potential one-day hearing on 2 May 2017. The written submissions were duly made, with simultaneous opening submissions on 24 March 2017 ("**V-TS**" and "**O-TS**") and reply submissions on 14 April 2017 ("**VR-TS**" and "**OR-TS**"). The Parties submitted additional expert evidence in support of these submissions. On 12 April and 18 April 2017 respectively, VimpelCom and OTMTI communicated that they no longer saw a need for a further hearing on this issue.

22. The Parties' first-round submissions on the "tax savings" issues, filed 24 March 2017, were also accompanied by the Parties' observations on the legal and factual principles relevant to the allocation of costs in this case, with the issue of cost quantum deferred until the close

of proceedings.  On 17 May 2017, the Parties communicated their agreement to submit final cost schedules on 26 May 2017, which they thereafter did ("**V-Costs**" and "**O-Costs**," respectively).  This completed the Parties' submissions in this proceeding.

23.     All documents offered as exhibits, all witness statements and expert reports presented in this case, and all oral testimony in furtherance of such statements and reports have been admitted into evidence and duly considered by the Tribunal.  The Tribunal also has considered the arguments raised by both Parties in their respective written submissions and in oral argument, and the various legal authorities submitted in support of such submissions and arguments.

## III.   AGREEMENTS ON ARBITRATION, SEAT AND GOVERNING LAW

24.     As relevant to VimpelCom's claims, Article 13.7(a) of the SSEA provides, in relevant part, as follows:

> Any and all disputes, controversies and claims between or among the parties and arising under, relating to or in connection with, this Agreement, in any manner whatsoever, whether in contract, in tort, or otherwise, and including any dispute or controversy regarding the existence, validity, enforceability or breach of this Agreement, shall be settled by arbitration by a tribunal of three (3) arbitrators constituted and acting under the LCIA Rules then in force (the "*Rules*"), save that any provision of the Rules which imposes any restriction on the nationality of any arbitrator or is otherwise invalid, void or unenforceable under English law shall not apply, in accordance with the following terms and conditions….

25.     Article 13.7(a)(ii) of the SSEA provides as follows:

> The seat of arbitration shall be London, England, unless otherwise agreed by the parties, and the fact that hearings are held elsewhere shall not affect the seat of arbitration.

26.     Article 13.4 of the SSEA provides in relevant part as follows:

> This Agreement, and any dispute, controversy or claim arising out of, relating to or in connection with this Agreement, or for the breach or alleged breach thereof, whether in contract, in tort or otherwise, shall be governed by, and construed in accordance with, the laws of the State of New York,

7

without giving effect to any conflicts of laws or other principles thereof that would result in the application of the laws of another jurisdiction.

27.     As relevant to OTMTI's counterclaim, Clause 33(a) of the Settlement Agreement provides, in relevant part, as follows:

> Following the consultation period … any and all disputes, controversies and claims between or among the parties and arising under, related to or in connection with this Agreement, in any manner whatsoever, whether in contract, in tort, or otherwise, and including any dispute or controversy regarding the existence, validity, enforceability or breach of this Agreement, shall be settled by arbitration by a tribunal of three (3) arbitrators constituted and acting under the LCIA Rules then in force (the "Rules"), save that any provision of the Rules which imposes any restriction on the nationality of any arbitrator or is otherwise invalid, void or unenforceable under English law shall not apply, in accordance with the following          terms          and          conditions.…

28.     Clause 33(a)(ii) of the Settlement Agreement provides as follows:

> The seat of arbitration shall be London, England, unless otherwise agreed by the parties, and the fact that hearings are held elsewhere shall not affect the seat of arbitration.

29.     Clause 32 of the Settlement Agreement provides as follows:

> This Agreement, and any dispute, controversy or claim arising out of, relating to or in connection with this Agreement, or for the breach or alleged breach thereof, whether in contract, in tort or otherwise, shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any conflicts of laws or other principles thereof that would result in the application of the laws of another jurisdiction.

30.     Paragraph 15 of the Closing Memorandum provides that many of the provisions of the Settlement Agreement, including Clauses 32 and 33 regarding governing law and arbitration, "shall apply to this Memorandum as if set forth herein .…"

## IV.   VIMPELCOM'S CLAIMS FOR INDEMNIFICATION

### A.   Background Facts

31.   The Tribunal assumes the Parties' familiarity with the underlying facts pleaded by both sides.  It describes in this section only such background facts (essentially undisputed) as are a useful predicate to the discussion of the issues in dispute.

32.   VimpelCom's claims arise out of three audits by the Italian Tax Authorities in 2013.[20]  The first audit involved a tax deduction claimed by Wind Telecom in 2009 in connection with OTMTI's restructuring its Greek business related to Wind Hellas (the "**Wind Telecom Audit**").  The Italian Tax Authorities first served notice of this audit on 14 February 2013,[21] and VimpelCom agreed to settle the audit on 31 July 2013,[22] for €31.3 million (a principal amount of €24 million, penalties of €4 million, and approximately €3.3 million in interest).[23]

33.   The second audit concerned the Wind Group's non-application of withholding taxes on the interest paid in 2009 in connection with inter-company loans to Wind Acquisition Holdings Finance S.p.A. ("**WAHF**"), a Wind Telecom subsidiary (the "**WAHF Audit**").  The Guardia first notified WAHLF of this audit on 17 September 2013,[24] and VimpelCom agreed to settle the audit on 19 May 2014 for approximately €83.77 million.[25]

34.   The third audit concerned the non-application of withholding taxes in 2008, 2009 and 2010 on interest paid in connection with syndicated loans to Wind Telecomunicazioni S.p.A. ("**Wind Telecomunicazioni**"), another Wind Telecom subsidiary (the "**Wind Telecomunicazioni Audit**").[26]  The Italian Tax Authorities commenced this audit on 28

---

[20] The phrase "**Italian Tax Authorities**" (or for repeat references, the "**Authorities**") is used herein to refer collectively to the *Agenzia della Entrate* (the Italian Revenue Agency, or "**Agenzia**," and the *Guardia di Finanza* (the Italian Financial Police, or "**Guardia**"), unless otherwise necessary to distinguish between the Agenzia and the Guardia.

[21] RFA ¶ 23; Response ¶ 39.

[22] RFA ¶ 31.

[23] RFA ¶ 28.

[24] RFA ¶ 34.

[25] RFA ¶ 43; Response ¶ 62.

[26] RFA ¶ 7; Response ¶ 64.

November 2013,[27] and VimpelCom agreed to settle the audit on 22 May 2014, for approximately €61.76 million.[28]

35.   By the close of these proceedings, Wind Telecom, WAHF and Wind Telecomunicazione had paid all twelve installments of their respective settlement amounts.

36.   It is undisputed that VimpelCom demanded indemnification by OTMTI of 72.65% of these settlement amounts, reflecting the contractually specified formula for indemnification of any covered losses, and that OTMTI has refused these demands.

### B.   The Relevant SSEA Provisions

#### (1)   SSEA Provisions on OTMTI's Indemnification Obligations

37.   Article 10.2(a) of the SSEA provides as follows:

> Following the Closing, Weather II[29] shall indemnify, defend and hold VimpelCom and its respective officers, directors, employees, agents, Subsidiaries and Affiliates harmless from and against any and all liabilities, losses, damages, claims, fines, penalties, costs and expenses, including, without limitation, reasonable attorneys' and accounting fees (collectively, "**Losses**") incurred by VimpelCom or any of its respective officers, directors, employees, agents, Subsidiaries or Affiliates, arising out of or resulting from (i) any breach of any representation or warranty made by Weather I or Weather II contained in Article III, Article IV or Article IX, as the case may be, of this Agreement or (ii) any breach by Weather I or Weather II of any covenant or obligation of Weather I or Weather II under this Agreement; provided, however, the indemnification set forth in this Section 10.2(a) shall not apply to any Loss sustained solely by a Spin-Off Asset to the extent such Loss is retained by such Spin-Off Asset at the time it is spun-off pursuant to the Spin-Off Plan.

38.   Article 10.2(b) of the SSEA provides as follows:

> Following the Closing, Weather II shall indemnify, defend and hold VimpelCom and its respective officers, directors, employees, agents, Subsidiaries and Affiliates harmless from and against any and all Losses incurred by VimpelCom or any of its respective officers, directors,

---

[27] RFA ¶ 45; Response ¶ 64.

[28] RFA ¶ 52; Response ¶ 63.

[29] As noted above, the references to "Weather II" are understood to refer to OTMTI.

employees, agents, Subsidiaries or Affiliates, arising out of or resulting from (i) claims or residual liabilities related to Weather I's ownership of Wind Hellas prior to the completion of the Wind Hellas Spin-Off,[30] (ii) the Wind Hellas Spin-Off or (iii) claims related to Wind Hellas after the Wind Hellas Spin-Off.

39.     Article 10.2(d) of the SSEA provides as follows:

> Following the Closing, Weather II shall indemnify, defend and hold VimpelCom and its respective officers, directors, employees, agents, Subsidiaries and Affiliates harmless from and against any and all Losses incurred by VimpelCom or any of its respective officers, directors, employees, agents, Subsidiaries or Affiliates arising out of or resulting from any Italian Withholding Tax Liability.[31]

40.     Article 10.2(g) of the SSEA provides as follows:

> Without prejudice to the provisions of Section 10.5, Weather II shall only be liable to pay an indemnity equal to 72.65% of the amount of any Loss to be indemnified hereunder.

### (2)     SSEA Provisions Related to "Indemnification Procedures"

41.     In a section of the SSEA entitled "Indemnification Procedures," Article 10.7(a) of the SSEA provides as follows:

> If VimpelCom, on one hand, or any of Weather II or the Weather I Shareholders, on the other hand, shall receive notice of any matter which such party, or any of its officers, directors, employees, agents, Subsidiaries or Affiliates (any of the foregoing, an "Indemnitee"), has determined has given, or is reasonably likely to result in, a right of indemnification under this Agreement, the Indemnitee shall promptly give the indemnifying party (the "Indemnitor") written notice of such claim, stating the amount of the

---

[30] The phrase "Wind Hellas Spin-Off" is defined in Article 1.1 as "the spin-off from or other disposal by the Weather Group of the Wind Hellas Group and all related assets and liabilities and the termination of all intercompany agreements between the Weather Group and the Wind Hellas Group." The Tribunal also refers to this more briefly below as the "**Spin-Off.**"

[31] The phrase "Italian Withholding Tax Liability" is defined in Article 1.1 as "any assessment of any deficiency in, or claim for, Italian withholding taxes made by the Italian Taxing Authority (other than with respect to Italian withholding taxes, including related interest, penalties and fines, covered by the Excluded PVCs) including all interest, penalties, fines, or additional amounts attributable to such deficiency or claim with respect to any interest or other amounts accrued, paid or treated as paid, directly or indirectly, by any member of the Weather Group during any fiscal year through 2010. For these purposes, a member of the Weather Group shall include any Person in which Wind Acquisition Holdings Finance S.P.A., or any of its Subsidiaries, owns, directly or indirectly, 25% or more equity interest."

11

Losses, if known, and method of computation thereof, all with reasonable particularity and including documentary proof, if available, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises; provided, however, that failure to so notify the Indemnitor shall not relieve the Indemnitor from any liability which it may have on account of the claim, except to the extent the Indemnitor shall have been prejudiced by such failure.

42.      Article 10.7(b) of the SSEA provides, in relevant part, as follows:

If an Indemnitee shall receive notice of any claim or proceeding initiated by a third party which is or may be subject to indemnification (other than any claim or proceeding related to Taxes) (each, a "Third Party Claim"), the Indemnitee shall promptly give the Indemnitor written notice of such Third Party Claim; provided, however, that failure to so notify the Indemnitor shall not relieve the Indemnitor from any liability which it may have on account of the Third Party Claim, except to the extent the Indemnitor shall have been prejudiced by such failure. In such event the Indemnitee shall permit the Indemnitor, at its option, to participate in the defense of such Third Party Claim by counsel of its own choice and at its own expense. If, however, the Indemnitor acknowledges in writing its obligation to indemnify the Indemnitee hereunder against all Losses that may result from such Third Party Claim, subject to the limitations set forth in this Article X, then the Indemnitor shall be entitled, at its option, to assume and control the defense of such claim by counsel of its own choice and at its own expense, provided that the Indemnitor and its counsel shall proceed with diligence and good faith with respect thereto….

43.      Article 10.7(d) of the SSEA provides as follows:

For purposes of this Article X, a Loss shall be eligible for indemnification to the extent and only to the extent such Loss has effectively been sustained by the Indemnitee. Any indemnification due by the Indemnitor shall be calculated taking into account the value of (i) any Tax savings obtained by the Indemnitee Group and/or (ii) any increase in the amount of Tax losses available to them for carry-forward or carry-back and, in each case, resulting from the tax deductibility of the relevant Loss.

44.      Article 10.7(f) of the SSEA provides as follows:

The Indemnitor shall not be held liable for indemnification with respect to a Loss or the increased portion of a Loss, as the case may be, to the extent such Loss, or increased portion of the Loss, for which indemnification is sought is attributed to (A) any willful misconduct on the part of the Indemnitee after Closing, or (B) any change in accounting methods

(including consolidation methods) or policies of the Indemnitee after Closing, or (C) to the extent the Indemnitee Group had not, upon learning of the situation giving rise or likely to give rise to a Loss, used or caused entities of its Group to use, all reasonable efforts to mitigate the corresponding Loss; or (D) any breach of representation, warranty or covenant to the extent that the liability for such breach occurs or is increased as a result of any Tax-related or other Law enacted after the Closing with retroactive effect.

45.     Article 10.7(h) of the SSEA provides, in relevant part, as follows:

In the event of a Tax audit or inquiry by any Taxing Authority that may lead to an Italian Withholding Tax Liability and without prejudice to the provisions of Section 10.7 and provided that the following actions are not restricted by any obligation of confidentiality or by applicable Law:

(i)   VimpelCom shall notify Weather II of such event as soon as reasonably practicable but in any event within ten (10) Business Days after VimpelCom or any of its Subsidiaries has been informed in writing of the beginning of such procedure.

(ii)  VimpelCom shall coordinate, or cause its Subsidiaries to coordinate, with Weather II in the taking of any action relating to the conduct of such Tax audit or inquiry actions and provide to Weather II and its professional advisors such information and access to personnel, premises, documents and records as Weather II may reasonably request, subject to appropriate confidentiality undertakings.  VimpelCom will use its reasonable efforts to include a representative appointed by Weather II in any meeting or material telephone call arranged by VimpelCom and/or the relevant Subsidiary with a representative of the relevant Taxing Authorities….

C.     **The Parties' Obligations Arising from the SSEA and New York Law**

46.     The Tribunal begins by noting that it construes the SSEA in accordance with general principles of New York law regarding contract construction.  These include the principle that "words and phrases … should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."[32]  The corollary is that distinctions in language among provisions are presumed to have been intentional, such that those distinctions should be given meaning and effect.  A further corollary is that while general principles of New York law regarding indemnification may be relevant as an

---

[32] RLA-31, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

aid to contract interpretation, *i.e.,* in the event of ambiguity or to fill gaps, they should not be used to alter or displace contractual terms to which the Parties specifically have agreed, lest those agreed terms thereby be rendered without meaning and effect. Neither Party has suggested that this case involves any mandatory public policy provisions of New York law that should be deemed to override particular provisions of the SSEA.

### (1)   Indemnification Obligations Under the SSEA

47.   The SSEA provides a series of indemnification rights and obligations to both Parties, separately identified as "Indemnification by [OTMTI]" (Article 10.2) and "Indemnification by VimpelCom" (Article 10.4). While this arbitration involves a dispute only about indemnification by OTMTI, it is worth noting that some of the "Indemnification Procedures" under Article 10.7 (addressed further below) apply reciprocally regardless of which Party may be the indemnitee and which the indemnitor, while others were crafted only to apply to the indemnifications obligations of one Party.

48.   With respect to OTMTI, Article 10.2 requires it to indemnify VimpelCom for various potential categories of "Losses." As relevant to this case, these include those "arising out of or resulting from" certain types of claims or residual liabilities associated with ownership of Wind Hellas or the Wind Hellas Spin-Off transaction (detailed in Article 10.2(b)), and those "arising out of or resulting from any Italian Withholding Tax Liability" (detailed in Article 10.2(d)). As to both of these categories, the SSEA defines indemnifiable "Losses" broadly; the duty to indemnity covers "any and all liabilities, losses, damages, claims, fines, penalties, costs and expenses, including, without limitation, reasonable attorneys' and accounting fees."[33]

49.   There are three relevant carve-outs to this otherwise sweeping definition of indemnifiable Losses. The first is that the Losses must have been ones that "have effectively been sustained" by VimpelCom, meaning that they are not offset by any tax savings or carry-forward deductible tax losses.[34] The second is that the Losses must not be ones for which

---

[33] SSEA Article 10.2(a) (definition of "Losses").
[34] SSEA Article 10.7(d).

VimpelCom failed to use "all reasonable efforts to mitigate the corresponding Loss," after "learning of the situation giving rise or likely to give rise to a Loss."[35]  The third is that OTMTI's indemnification obligation in any event covers only 72.65% of any covered Losses, leaving VimpelCom in all circumstances responsible for carrying the remaining 27.35% of its Losses.[36]

### (2)   New York Law Principles of Analysis

50.     In the context of settlements of potential liability to third parties, New York law establishes certain principles regarding common law indemnification, as well as enforcement of contractual indemnification agreements absent particular provisions specifying otherwise.[37]  These include the general proposition that so long as the indemnitor was provided *notice* of the underlying claim, the settlement will be covered by the indemnity, provided that it was made *in subjective good faith* and was *objectively reasonable*.[38] Regarding the former, courts presume a settlement was entered into in good faith where the indemnitee retains cognizable exposure from its decision to settle, including situations in which the indemnitor already has given notice that it intends to contest any obligation to contribute.  In such circumstances, courts reason that the indemnitee presumptively (albeit rebuttably by other evidence) shares the indemnitor's interest in settling only for reasons taken in good faith.[39]  The indemnitee's understanding in these circumstances that it risks

---

[35] SSEA Article 10.7(f).

[36] SSEA Article 10.2(g).

[37] With respect to contractual indemnification, the threshold issue is whether a claim otherwise falls within the scope of the indemnity.  As discussed further below, New York courts require an agreement to indemnify to be "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." RLA-18, *Hooper Assoc. v. AGS Computer*, 74 N.Y.2d 487, 491-492 (1989).

[38] *See, e.g.,* CLA-49, *Freehill v. ITT Sheraton Corp.*, 74 A.D.3d 876, 877 (N.Y. App. Div. 2d Dep't 2010); CLA-8, *Deutsche Bank Trust Co. of Americas v. Tri-Links Inv. Trust*, 74 A.D.3d 32, 39 (N.Y. App. Div. 1st Dep't 2010); CLA-12, *Koch Industries, Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 219, 225 (S.D.N.Y. 2010); CLA-41, *Casey v. Ryder Truck Rental, Inc.*, 2005 WL 1150228, at *8, 21 (E.D.N.Y. 2005); CLA-22, *Waltz v. MRC Management, LLC*, 378 F. Supp. 2d 440, 442 (S.D.N.Y. 2005); CLA-47, *Fidelity Nat'l Title Ins. Co. of N.Y. v. First N.Y. Title & Abstract Ltd.*, 269 A.D.2d 560, 561 (N.Y. App. Div. 2d Dep't 2000); CLA-6, *Conopco, Inc. v. Imperial Chem. Indus. PLC*, 1999 WL 1021077, at *5 (S.D.N.Y. 1999); CLA-10, *Goldmark Industries Ltd. v. Tessoriere*, 256 A.D.2d 306, 307 (N.Y. App. Div. 2d Dep't 1998); CLA-43, *Coleman v. J.R.'s Tavern Inc.*, 212 A.D.2d 568 (A.D. 2d Dep't 1995).

[39] *See, e.g.,* CLA-12, *Koch Industries*, 727 F. Supp. at 225 (presuming good faith "where the indemnitee's self-interest would require it to seek a favorable settlement, and noting that indemnitee "had every incentive to minimize the amount it paid in settlement because … [the indemnitor] repeatedly denied its indemnity obligation" and the indemnification in any event did not extend to the full amount of the liability); CLA-18, *Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 203-204 (E.D.N.Y. 2011) (same); CLA-22, *Waltz*, 378 F. Supp. 2d at 443 (noting that indemnitee

bearing the full burden of the settlement is considered to be a powerful check on rash or imprudent settlement decisions. These cases are specifically distinguished from those where the indemnitee has no residual incentive to try to reduce the underlying liability, and therefore adequate notice of the claim to the indemnitor is particularly important to enable it to protect itself from settlements that may not be in good faith.[40]

51.    Particularly in the cases where the presumption of good faith applies, however, the burden is on the indemnitor to prove an *absence* of good faith. To do so, it must demonstrate more than simply questionable judgment, or even negligence in failing to adequately investigate possible defenses; the cases instead suggest that some kind of active bad faith is required, such as fraud or collusion.[41]

52.    As for the second requirement – reasonableness of the settlement – the question is an *objective* one, but it too is generally deferential to the indemnitee under New York law, provided that notice of the claim was provided to the indemnitor. In particular, the indemnitee is not required to prove that the underlying third-party claims necessarily *would* have succeeded absent the settlement,[42] or even that the third-party claims were objectively strong. Rather, the question is whether "there was [a] *possibility* that litigating the case to the end would result in a judgment ... in an amount greater than the settlement,"[43] meaning that the settlement was within the range of possible exposure the indemnitee *might* have

---

"was not in the position of an indemnitee that agrees to an inflated settlement amount knowing that it will be able to obtain full reimbursement from the indemnitor. Instead, [it] faced ... potential liability for some or all of the plaintiffs' damages.").

[40] *See, e.g.,* CLA-9, *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 300 (1st Dep't 1959) (expressing concern that where "an indemnitee knows or believes that any financial responsibility he undertakes is likely to fall ultimately on the indemnitor, he is not inhibited, except by the barest self-restraint. This is an insufficient protection for an indemnitor; and as a consequence, the indemnitee acts at his own risk that later he will be able to establish that the payment he made was one he had to make."); *cf.* CLA-22, *Waltz*, 378 F. Supp. 2d at 443 (expressly distinguishing *Feuer* on this basis, where the indemnitee in *Waltz* "faced ... potential liability for some or all of the plaintiffs' damages").

[41] *See, e.g.,* CLA-15, *Peerless Ins Co. v. Talia Constr. Co.*, 272 A.D.2d 919, 919 (N.Y. App. Div. 4th Dep't 2000) ("proof that plaintiff failed to investigate the claim fully would not impugn the good faith of plaintiff in making the payment," in absence of "evidence that plaintiff acted in bad faith, i.e., that plaintiff engaged in fraud or collusion"); CLA-51, *General Accident Ins. Co. of Am v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 516, 518 (S.D.N.Y. 1997) ("A decision to proceed [to settle] claims despite possible defenses ... is not evidence of bad faith.").

[42] *See, e.g.,* CLA-8, *Deutsche Bank*, 74 A.D.3d at 34; CLA-12, *Koch Industries*, 727 F. Supp. 2d at 222-223.

[43] CLA-8, *Deutsche Bank*, 74 A.D.3d at 43 (upholding indemnity because this "cannot be said, notwithstanding the apparent weakness of [the third party's] claims") (emphasis added).

faced.[44]   Nor is the indemnitee required to prove that there was no way it could have

bolstered its chances of defeating the third-party claims, or reducing the magnitude of its

potential exposure, by adopting different litigation or negotiation strategies.[45]   To the

contrary, New York law recognizes that such second-guessing of good faith settlement

decisions, inevitably in hindsight, would be tantamount to requiring the indemnitee to re-

litigate at the indemnification stage the very third-party claims it settled in good faith.  This

would undermine one of the core objectives of an indemnification agreement, which is to

provide for a predictable allocation of future risk.[46]

53.     By contrast, New York cases provide for far less deference where the indemnitee settled

the third party claim without prior notice to the indemnitor, and in so doing deprived it

either of a *contractually stipulated right* or an *equitably implied right* (in the absence of a

contractual arrangement otherwise) to assume the defense of the action or to consent to any

settlement.  In consequence of the thwarting of these important rights, the cases provide a

substitute check on unreasonable indemnitee settlements, by requiring the indemnitee to

demonstrate that it would have been liable on the underlying claim – and therefore that the

indemnitor was not *substantively prejudiced* by the unilateral settlement.[47]   Notably, even

in these cases, the *procedural prejudice* of having been denied notice does not *itself* qualify

as substantive prejudice; absent a finding that the procedural deficiency resulted in the

indemnitee settling a case for which it had no real liability, the failure to provide notice

---

[44] *See, e.g.,* CLA-12, *Koch Industries*, 727 F. Supp. at 222-223, 225; CLA-18, *Tokio Marine*, 803 F. Supp. 2d at 203; CLA-22, *Waltz v. MRC Management, LLC*, 378 F. Supp. 2d 440, 442 (S.D.N.Y. 2005); *see also* CLA-13, *OneBeacon Ins. Co. v. Forman Int'l*, Ltd., 2006 WL 3771010, at *10 (S.D.N.Y. 2006) ("the reasonableness of a settlement generally rests on the size of the possible recovery and the degree of probability of the claimant's success").

[45] *See, e.g.,* CLA-6, *Conopco*, 1999 WL at *5 (indemnitor "cannot object to a settlement merely because it believed it could have driven a tougher bargain, or been a tougher litigator").

[46] *See similarly* RLA-29, *N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 141 (2d Cir. 2004) (discussing these considerations in the analogous context of the follow-the-settlements doctrine in reinsurance contracts).

[47] *See, e.g.,* RLA-15, *Atlantic Richfield Co. v. Interstate Oil Transportation Co.*, 784 F.2d 106, 109, 111-13 (2d Cir. 1986) (addressing implications of absence of notice, in the context of a contractual indemnification by which indemnitee was expressly obliged to cooperate with indemnitor in the defense of third party actions, but instead settled without giving it the choice of approving the settlement or assuming the defense); CLA-9, *Feuer*, 8 A.D.2d at 298-300 (addressing implications of absence of notice, on the assumption that the provision of notice would have triggered an entitlement by the indemnitor to "elect to defend the action").

does not relieve the indemnitor of its obligation to share the burden of a reasonable settlement.[48]

54.     These general New York law principles are relevant background to the dispute, among other things because they help frame the Parties' respective arguments. At the same time, their relevance to the analysis is somewhat limited by the fact that the Parties in this case did not leave such issues to be resolved solely through application of default propositions of New York law. To the contrary, they included very specific agreements in the SSEA regarding each of these key issues. These included the parameters of VimpelCom's obligation to notify OTMTI of different types of potential exposures, and the nature of OTMTI's participation, coordination or consultation rights with respect to the underlying claims, following its receipt of such notice. Importantly, the Parties also agreed on the specific *consequences* of VimpelCom's potential non-compliance with its notice obligations, including the circumstances under which this might (or might not) relieve OTMTI of its otherwise broad indemnification obligations. In these circumstances, the Parties' contractual agreements take precedence over the default presumptions of New York law. The Tribunal therefore examines the contractual provisions in some detail below, with respect to issues of notice, participation, and consequences. It also examines the SSEA's general requirement regarding mitigation of "Losses," as relevant to the specific issue of settlement of third party claims.

---

[48] *See, e.g.,* CLA-65, *Owens-Illinois, Inc. v. BTR plc,* 2010 WL 2607146, at *5-7 (S.D.N.Y. 2010) (denying indemnitor's summary judgment motion despite untimely notice, because there were factual issues about whether there was any material and non-speculative prejudice); CLA-75, *U.S. Bank Nat'l Assn v. Stewart Title Ins. Co.,* 37 A.D.3d 822, 825 (N.Y. App. Div. 2d Dep't 2007) (accepting plaintiff's arguments regarding untimely notice, but rejecting as "purely speculative" defendant's claim that earlier notice enabling it to participate in foreclosure action would have mitigated its liability); CLA-67, *Schweizer v. Sikorsky Aircraft Corp.,* 2014 WL 5460504, at *8-9 (W.D.N.Y. 2014) (upholding indemnification obligation even if there was a deficiency in notice, in the absence of any demonstration that indemnitors were "actually and materially prejudiced"); *see also* CLA-20, *Unigard Sec Ins. Co. v. N. River Ins. Co.,* 4 F.3d 1049, 1068-69 (2d Cir. 1993) (finding in an analogous context that "more" is required to show prejudice than the procedural "loss of the right" to participate in the defense of a claim, namely a "tangible economic injury" in the form of "actual proof that the results of the litigation would have been different" otherwise).

### *(3)* *SSEA Provisions Regarding Notice*

55. With respect to the issue of notice, the SSEA sets forth three different descriptions of an indemnitee's obligations. The distinctions between these provisions must be taken as intentional and given meaningful effect.

56. Two of the provisions relate to exposures defined with reference to subject matter. The most specific obligations attach under Article 10.7(h)(i), "[i]n the event of a Tax audit or inquiry by any Taxing Authority that may lead to an Italian Withholding Tax Liability." In this context, VimpelCom is identified as the potential indemnitee and OTMTI as the potential indemnitor. VimpelCom is required to notify OTMTI "as soon as reasonably practicable but in any event within ten (10) Business Days after VimpelCom or any of its Subsidiaries has been informed in writing of the beginning of such procedure," except to the extent it is restricted from doing so by "any obligation of confidentiality."[49] According to this provision, the trigger for VimpelCom's obligation to OTMTI is *its own receipt of written notice* about the beginning of a "procedure," defined as a "Tax audit or inquiry." The only qualifier is that this audit or inquiry must be one that "*may lead*" to an Italian Withholding Tax Liability. In other words, the mere potential for an indemnifiable loss ("*may* lead") triggers the duty to provide notice. Upon occurrence of this trigger, VimpelCom's deadline for notifying to OTMTI is defined with specificity, namely *no later than 10 business days*.

57. This very specific deadline – applicable only to VimpelCom and only to Italian Withholding Tax issues – contrasts with *both* Parties' obligations to each other under Article 10.7(b). This provision governs in the event that either Party "receive[s] notice of any claim or proceeding initiated by a third party which is or may be subject to indemnification (*other than any claim or proceeding related to Taxes*) (each, a 'Third Party Claim')."[50] For these non-tax related claims, the trigger for the indemnitee's obligation is (similarly to Article 10.7(h)(i)) its own receipt of notice of a claim, and similarly extends to any claim with the mere potential for an indemnifiable loss (a non-tax claim "which is

---

[49] SSEA Article 10.7(h)(i).

[50] SSEA Article 10.7(b) (emphasis added).

or *may be* subject to indemnification"). But the indemnitee's deadline is defined with less specificity than with respect to a potential Italian Withholding Tax Liability; it is required to "*promptly*" give the indemnitor notice of the non-tax claim.[51] How long a period qualifies as "prompt" is left undefined. It may be more than 10 business days, or conceivably could be less than 10 business days, depending on the circumstances.

58.     In addition to these notice obligations that apply to some but not all types of exposure, the SSEA contains a general or catch-all notice provision – Article 10.7(a) – that applies only to VimpelCom, and applies regardless of the specific subject matter of claims. Under this provision, when VimpelCom "receive[s] notice of any matter which [it] … has determined has given, or is reasonably likely to result in, a right of indemnification" under the SSEA.[52] Under this provision, the trigger for VimpelCom's obligation of notice to OTMTI has two parts: it not only must have *received* notice of a potential source of exposure, but also already have "*determined*" (in the past tense) that the threat is real and not merely theoretical, in the sense that the matter "*has* given, or is *reasonably likely* to result in," a loss to itself which would give rise to a right of indemnification by OTMTI.

59.     This combination of the requirement of a "determin[ation]," and that the determination be based on an assessment of the "likel[ihood]" of loss and not the mere possibility of loss, distinguishes Article 10.7(a) from Articles 10.7(b) and 10.7(h)(i), which attach simply upon receipt of notice of a claim that "*may*" lead to VimpelCom's liability (for Italian Withholding Taxes) or "*may be*" subject to indemnification (as a non-tax related Third Party Claim). In particular, the textual differences imply an awareness that Article 10.7(a)'s duties of "prompt" notice attach only after it has undertaken some form of internal evaluative process. While this internal process is subject to certain implied requirements of a reasonable timetable – VimpelCom could not unreasonably ignore its own receipt of notice of a potential exposure, or unreasonably delay evaluating such notice to determine if it is "*reasonably likely* to result in" an indemnifiable loss – nor is VimpelCom's

---

[51] SSEA Article 10.7(b).
[52] SSEA Article 10.7(a).

determination regarding likelihood required to be instantaneous with its learning of any even theoretical exposure.

60.    In any event, once VimpelCom *itself* has made a determination regarding likelihood of loss, it is required to "promptly" so notify OTMTI; it cannot sit on its own conclusions without sharing them with OTMTI.  But under the distinct language of Article 10.7(a) – and in clear contrast with the other SSEA provisions – OTMTI has no right to receive notice of a potential third party claim prior to this time.  The reasons for allowing some additional time for VimpelCom to conduct an assessment of "likel[ihoods]," leading to a "determin[ation]" that an indemnifiable loss is "reasonably likely" and not simply demanded (perhaps unreasonably) by a third party, become clearer when the *different content* of the Parties' post-notice rights and obligations under the three SSEA provisions are examined and compared.  The Tribunal turns to this issue next.

### (4)    *SSEA Provisions Regarding Participation*

61.    The provision of notice by an indemnitee to an indemnitor, in accordance with the SSEA provisions addressed above, triggers certain further rights and obligations with regard to the underlying third party claim.  As with the issue of notice, the SSEA distinguishes between the rights and obligations applicable to different types of claims, and the distinctions between these provisions must be taken as intentional and given meaningful effect.

62.    First, with regard to non-tax related Third Party Claims against *either Party* under Article 10.7(b), that Party is required to "permit [the other Party], at its option, to *participate in the defense*" of the claim, through the appearance of its own counsel in the proceedings.  Alternatively – if it acknowledges its indemnification obligations – the other Party may even "*assume and control the defense* of such claim" in its entirety.[53]  These are very important prerogatives, as they permit the indemnitor to play a direct role in, and even the possibility of complete control over, the defense of the Third Party Claims.

---

[53] SSEA Article 10.7(b) (emphasis added).

63.     Notably, these direct rights of participation and/or control are *not* extended to the defense of tax claims.  Such claims are expressly carved out from the definition of "Third Party Claims" otherwise covered by Article 10.7(b).  The Parties agree that this carve-out was specifically negotiated, with OTMTI proposing that it could "assume and control the conduct of the Tax audit or inquiry and the defense of any related claim by counsel of its own choice," and VimpelCom rejecting this proposal.[54]

64.     But the SSEA goes on to create a *sub-category* of tax claims – those with respect to a "Tax audit or inquiry … that may lead to an Italian Withholding Tax Liability" – for which different (though lesser) rights attach.  As to these claims, VimpelCom must "*coordinate*" with OTMTI "in the taking of any action relating to the conduct of such Tax audit or inquiry actions," and to provide OTMTI "such *information and access* to personnel, premises, documents and records" as OTMTI may reasonably request.  VimpelCom is also obliged to "use its *reasonable efforts to include* a representative appointed by [OTMTI] in any meeting or material telephone call arranged by VimpelCom … with a representative of the relevant Taxing Authorities."[55]   These are fairly specific obligations, but by the terms expressly agreed, they extend rights only to *coordination, information,* and *reasonable efforts of inclusion*, not to *participation* or *control*.  They aim at enabling OTMTI to be informed and within reason to be present, but not to dictate or to control the ultimate strategy selected by VimpelCom to address the potential Italian Withholding Tax Liability. Indeed, the very fact that these rights are distinguished from those granted to OTMTI regarding non-tax related claims underscores that neither coordination, information or inclusion (the rights identified in Article 10.7(b)) themselves imply actual "participation" in the defense, a right which is separately identified in Article 10.7(h)(ii) and for which tax claims are specifically excluded.

65.     Finally, Article 10.7(a), which applies across subject matters but only after VimpelCom "has determined" that a matter is "reasonably likely to result in, a right of indemnification"

---

[54] *See* SoDC ¶¶ 24, 149-150, 152; Reply ¶ 26; *compare* CE-74 (OTMTI proposal), CE-75 (VimpelCom proposal), and CE-1, Article 10.7(b) (final SSEA text).

[55] SSEA Article 10.7(h)(ii) (emphasis added).

against OTMTI under the SSEA,[56] is worded quite differently.  By its plain terms, it makes no reference either to rights of participation in or control of the defense (as in Article 10.7(h)(ii), *or* to coordination and reasonable efforts of inclusion in meetings and material telephone calls with the third party presenting the underlying claim (as in Article 10.7(b)).  Rather, OTMTI's rights under Article 10.7(a) are defined simply in terms of the *degree of information* that VimpelCom must provide it about a "reasonably likely" loss for which it will seek indemnification.  Specifically, OTMTI is entitled to be promptly informed of "the *amount* of the Losses, if known, and *method of computation* thereof, all with reasonable particularity and including documentary proof, if available, and containing a *reference to the provisions of this Agreement* in respect of which such right of indemnification is claimed or arises."[57]  All of this information undoubtedly is relevant to OTMTI's ability to evaluate its duty of indemnification, but it is not relevant to OTMTI's role in discussions with the third party.  Nothing in Article 10.7(a) even purports to address such a role, whether defined as "participation," "coordination," or "inclusion" in meetings or phone calls.

66.     OTMTI suggests that regardless of the textual differences between Article 10.7(a) and the two other provisions, the notice requirements in Article 10.7(a) must be considered implicitly to provide "an opportunity to be meaningfully involved in defending against" third party claims.[58]  Otherwise, OTMTI suggests, "the notice would be of no value to the indemnitor."[59]  As a threshold matter, the Tribunal is not persuaded by the latter proposition.  Requiring an indemnitor to be promptly notified of a likely exposure, including the likely quantum of its exposure, can serve a range of operational objectives entirely apart from its potential involvement in defense of the underlying claims. For example, notice of a likely claim for a substantial indemnification may trigger reporting requirements regarding such a contingent liability, including disclosures to shareholders or potential regulators. There may be implications for required financial statements. There

---

[56] SSEA Article 10.7(a).

[57] SSEA Article 10.7(a) (emphasis added).

[58] Reply ¶ 147; *see also* Rejoinder ¶ 78 ("notice must go hand-in hand with an opportunity for the indemnitor to participate in the defense against the claim").

[59] Rejoinder ¶ 78.

may be a need to make reserves for potential liability, with impacts on extrinsic covenants or financing obligations.  All of these present commercial reasons to require an indemnitee to provide prompt notice that *a claim for indemnification* already has ripened or is likely to do so, whether or not the indemnitor is contractually entitled to be brought into the investigation or defense of the *underlying third party claims* themselves against the indemnitee.

67.     Be that as it may, the broader point is that the Tribunal does not have the power to rewrite the Parties' contract to provide different rights and obligations than those to which they specifically agreed.  Whatever the validity of OTMTI's proposition for a hypothetical contract requiring notice but entirely silent with respect to the issue of participation, *this is not such a contract*.  The Parties here clearly knew how to grant rights of involvement, including rights of participation, coordination and inclusion.  If they had intended such rights to apply across the board for all potential exposures, they could have done so very simply, by including them in a catch-all provision.  Instead, they apportioned these rights carefully among different types of claims, distinguishing non-tax claims from tax-related claims, and further singling out a particular subset of tax-related claims ("Italian Tax Withholding" claims) for different treatment than all other tax claims. They did so in the context of a heavily negotiated contract between two highly sophisticated Parties, both represented by experienced counsel.  In these circumstances, and in light of the accepted maxim *expressio unius est exclusius alterius*, the Parties' crafting of such distinctions must be given force and effect.  The Tribunal sees no basis, in New York law or in the facts of this case, to rewrite the SSEA to elide distinctions among the three provisions that are apparent on their face.

### (5)     *SSEA Provisions Regarding Consequences of Inadequate Notice*

68.     As noted above, the SSEA specifically addresses the consequences of potentially inadequate notice to the indemnitor.  Article 10.7(a) – the provision requiring provision of information about a potential indemnification claim promptly after the indemnitee "has determined" that a claim "is reasonably likely to result in" a right of indemnification – states that "failure to so notify the Indemnitor shall not relieve the Indemnitor from any

liability which it may have on account of the claim, *except to the extent the Indemnitor shall have been prejudiced by such failure*" (emphasis added).  Similarly, Section 10.7(b) – the provision requiring notice of any non-tax related Third Party Claim promptly after the indemnitee receives notice of such claim – provides that "failure to so notify the Indemnitor shall not relieve the Indemnitor from any liability which it may have on account of the Third Party Claim, except to the extent the Indemnitor shall have been prejudiced by such failure."

69.    Interestingly, there is no parallel provision in Section 10.7(h), addressing the consequences of a failure to provide notice within 10 business days of a "Tax audit or inquiry by any Taxing Authority that may lead to an Italian Withholding Tax Liability."  Conceivably, this may be because the obligation to provide such notice is itself contingent rather than absolute, with an exception regarding confidentiality that does not appear in Sections 10.7(a) or (b). Alternatively, it may be that similar language was impliedly cross-referenced, from the general statement in Section 10.7(h) that its terms are "without prejudice to the provisions of Section 10.7."

70.    Be that as it may, it is worth making a few threshold observations about the "prejudice" provisions.  First, they are framed as a limited "*except[ion]"* to a general presumption that a failure of notice "*shall not* relieve" the indemnitor of its indemnification obligations. "Shall not" is mandatory language.  Second, there is an express causation requirement: the relevant prejudice must be occasioned "*by* such failure," *i.e.*, by the breach of the notice requirement.   As a result, the relevant question is not whether earlier notice than contractually required might be commercially sensible in certain circumstances; it is whether notice later than contractually required itself occasioned harm.   Third, the exception for prejudice is not all or nothing:  the provisions refer to an exception "*to the extent*" of the demonstrated prejudice, leaving open the possibility of a reduction, rather than an outright elimination, of the indemnification obligation.

71.    Finally, the term "prejudice" is not defined, to provide specific direction to a tribunal undertaking such analysis.  Nonetheless, it seems apparent that the term requires an evaluation of *substantive prejudice*, not *procedural prejudice*.  A delay in notice may well

delay the benefits of other procedural rights that attach upon such notice, including for example the right to receive particularized information about the computation of Losses under Section 10.7(a) or the rights of coordination, information and inclusion in Section 10.7(h).[60]   But if this were sufficient to constitute prejudice, then the exception for circumstances of prejudice would swallow the rule from which the exception is intended to derogate.   The violation of the notice obligation *necessarily* would create the very prejudice (late receipt of information, late opportunity to attend meetings, etc.) required to satisfy the exception.

72.   In these circumstances, it is clear that the exception requires a showing of substantive prejudice, meaning material and tangible economic harm.   In other words, the question will be whether later notice to the indemnitor than contractually required made a *material difference* to the indemnitor's exposure, either (a) *directly*, by preventing it from eliminating the indemnitee's primary exposure to the underlying claim, or reducing that exposure so substantially as to render the indemnitee's ultimate settlement objectively unreasonable, or perhaps (b) *indirectly*, by preventing the indemnitor from taking some other business measures to protect or hedge against the detrimental consequences of its eventual indemnification obligations.

73.   In either case, the burden is on the indemnitor to make such a showing.   This is a function of the formulation in the SSEA, in which prejudice is framed as an *exception* (or affirmative defense) to an otherwise binding obligation to indemnify notwithstanding the failure of notice ("*shall not relieve* the Indemnitor from any liability … *except to the extent*").   The language of the SSEA also defeats OTMTI's suggestion that the burden is on VimpelCom to demonstrate the *absence of prejudice* to OTMTI from such delay, in the form of "actual liability" to the Italian authorities notwithstanding any possible counter-arguments OTMTI might now suggest.   Whatever the default rule under New York law about the possible burden to prove "actual liability" where an indemnitee (by denying notice) deprives an

---

[60] The Tribunal is not presented with a scenario in which OTMTI might have had the right, under Section 10.7(b), to assume and control the defense of the underlying claims presented by a third party.   In these circumstances, substantial prejudice from the denial of the procedural right is more apparent.

indemnitor of a meaningful right to control a defense or consent to a settlement, the SSEA here defines the standard differently, and it places the burden on the indemnitor.

74.    Placing the burden of proof on OTMTI in these circumstances is also a matter of commercial reasonableness, because it is in the best position to articulate the manner in which it claims to have been materially prejudiced.  It is neither feasible nor reasonable to expect VimpelCom to prove a negative, namely that there is no step OTMTI conceivably might have taken, had it been given earlier notice, that would have eliminated or materially reduced VimpelCom's risk of exposure from the Italian Tax Audits.  Rather, the burden is on OTMTI to show *concretely* that earlier notice would have enabled it to take *particular, identifiable* steps – steps it was *unable to take later* when notice was provided – which would have either eliminated VimpelCom's exposure, or so materially reduced that exposure as to render VimpelCom's ultimate settlement decision (including the amount of the settlement) unreasonable in the circumstances.  The requirement of concreteness flows from the contract designation of actual prejudice as an *exception* to the ordinary rule.  The exception cannot be invoked based merely on speculation, with the benefit of hindsight, that "something" might have been done with earlier notice that in turn "might" have altered the settlement calculus.

### (6)    *SSEA Provisions Regarding Mitigation of Loss*

75.    The final element in the legal analysis concerns the issue of mitigation.  As noted above, Article 10.7(f)(C) provides that "[t]he Indemnitor shall not be held liable for indemnification with respect to a Loss or the increased portion of a Loss, as the case may be, … to the extent the Indemnitee Group had not, upon learning of the situation giving rise or likely to give rise to a Loss, used or caused entities of its Group to use, all reasonable efforts to mitigate the corresponding Loss."

76.    Several observations are warranted.  The first is about timing.  Contrary to the normal notion that mitigation is a duty that a wronged party assumes only after it has been harmed by another party, here the contractual duty of the indemnitor to mitigate its Losses accrues not only *after* it has incurred a liability (*i.e.,* "upon learning of the situation *giving rise* … to a Loss"), but also *before*, when the loss becomes reasonably foreseeable (*i.e.,* "upon

27

learning of the situation … *likely to give rise* to a Loss"). The former means that once on notice of a situation giving rise to loss, the indemnitor has a duty to take reasonable steps to keep that *existing* loss from recurring or expanding, for example by ceasing to engage in the same risky conduct or seeking to forestall additional negative consequences of its existing liability. The latter requires a degree of due diligence in preventing foreseeable *future* loss, but only to the extent that loss is otherwise "*likely*" and not merely theoretical or potential. Again, the use of the word "likely" – rather than the word "may" – implies some internal evaluative process by the indemnitee regarding the probability of loss, prior to the triggering of its duty of mitigation.

77. The second observation is about content. The general mitigation requirement in the SSEA – or the general requirements of New York law with regard to mitigation of loss from another party's wrongful conduct – cannot alter the contours of the *Parties' specific agreements* in other provisions of the SSEA, including with respect to the required level of notice and participation in regard to third party claims. Consistent with the general rule of contract construction that "specific terms and exact terms are given greater weight than general language,"[61] the notice and participation rights relevant to this case are governed by Articles 10.7(a) and (h), and not by Article 10.7(f)(C), which makes no reference to notice or participation. In these circumstances, the indemnitor cannot invoke the general mitigation provision to posit a legal requirement that the indemnitee engage it either earlier or more extensively in the defense of potential third party claims than the SSEA *otherwise* gave the indemnitor a right to expect.

78. Moreover, in the context of exposure to third party claims, a general mitigation requirement cannot impose an absolute *duty to litigate*, or to adopt a *more aggressive posture* in settlement negotiations within a range of reasonable approaches to potential liability.[62] Different parties naturally will have different degrees of risk aversion, and indemnification

---

[61] *See, e.g.,* RLA-11, Restatement (Second) of Contracts, 203(c) (1981).

[62] OTMTI was asked at the hearing if it was aware of any cases in which a New York court had concluded that a party seeking indemnification for a settlement had failed to mitigate its losses by litigating instead, and as a consequence had forfeited a right to indemnification. No such cases were identified, although OTMTI maintained the principle that "it depends on the facts and circumstances," and that such a failure of mitigation could be found where litigating was "definitely a viable option" and "there was no downside to litigating." *See* Hearing Transcript, (1) 225-227.

agreements do not require – as a condition of indemnification – that the indemnitee adopt the same posture towards litigation and assumption of risk that the indemnitor might have been prepared to adopt. Where this is important to an indemnitor, it can negotiate a right to assume and control the defense of a case. Absent such a right, it must expect that the indemnitee may have different views about both strategy and risk tolerance. The inclusion of a general clause about mitigation of loss does not entitle the indemnitor later to deny indemnification, simply because the indemnitee's approach was more cautious than the indemnitor might have been with respect to its evaluation and assessment of risk.

79.     The reality that indemnification disputes are generally litigated in hindsight, after the underlying losses have crystallized, underscores this interpretation. If general mitigation clauses allowed indemnitors to broadly second-guess decisions to settle rather than litigate third party claims to conclusion, then the reverse could also be true: indemnitors who are *more* risk-averse than their indemnitees could assail in hindsight any decision to *reject* a settlement offer and proceed to trial, whenever the trial outcome results in greater loss than the earlier settlement offer. Mitigation clauses then would become the vehicle always for arguing that the indemnitee made the wrong decision, with the benefit of later knowledge of events.

80.     For this reason, the Tribunal does not read Article 10.7(f)(C)'s reference to using "all reasonable efforts to mitigate the corresponding Loss" as requiring VimpelCom necessarily to litigate all possible defenses against third party claims, rather than to accept settlements that entail loss below the amounts of total potential exposure.

81.     The question then becomes what obligations Article 10.7(f)(C) add to the analysis that is otherwise dictated by other provisions of the SSEA and New York law, in the context of a party's settlement of third party claims. OTMTI initially argued that the "all reasonable efforts" formulation elevated VimpelCom's mitigation obligations beyond what New York law otherwise would require, with the use of the word "*all*" suggesting a requirement to make "*every* effort," and not just reasonable efforts.[63] However, as VimpelCom noted, the

---

[63] *See, e.g.*, SoDC ¶¶ 135-136 (citing RLA-26, *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*, 230 F.3d 569, 574, 577-578).

case upon which OTMTI relied actually interpreted an express "every effort" clause to mean "every *reasonable* effort,"[64] suggesting certain limitations on the duties imposed. The Parties also debated the contours of an analogous "best efforts" formulation, with VimpelCom contending that it requires only "such efforts as are reasonable" in the circumstances,[65] and OTMTI contending it requires "all reasonable means," which it said implied duties beyond simply acting in good faith.[66] Perhaps recognizing the inevitable fluidity of these terms, and in response to questions from the Tribunal, OTMTI ended up characterizing the mitigation requirement of the SSEA primarily as a "point of emphasis," that "underscored" obligations of reasonableness already existing under New York law.[67]

82.     Be that as it may, in the Tribunal's view, a duty of mitigation does suggest certain requirements.  First, an indemnitee should approach a decision whether to settle a claim based upon a *bona fide evaluation* of its potential liability, and not entirely or primarily on extrinsic factors unconnected to such evaluation.  This is connected to its duty of subjective good faith.  Second, an indemnitee should conduct a *reasonable inquiry* into the legal and factual bases for the claim, and evaluate the relative strengths and weaknesses of the opposing positions with reasonable care, for example with the assistance of appropriately knowledgeable legal counsel.  This does not mean it is required to chase down every possible piece of information, interview every possible witness, or consider every possible legal argument; nor is it required to assert every possible defense, even ones that in hindsight might appear potentially promising.  The cases confirm instead that the duty is one of "*reasonable* efforts," and reasonableness must be evaluated in the circumstances, including the time and resources available.[68]  Finally, in addition to these requirements

---

[64] Reply ¶ 48 (citing RLA-26, *Aeronautical Indus. Dist. Lodge 91*, 230 F.3d at 578).

[65] Reply ¶ 49.

[66] Rejoinder ¶ 66-68.

[67] Hearing Transcript (1) 228.

[68] *See, e.g.,* CLA-46, *Eskenazi v. Mackoul*, 72 A.D.3d 1012, 1014 (N.Y. App. Div. 2d Dep't 2010) (duty is to make "diligent efforts" and "reasonable exertions"); CLA-36, *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 718 F. Supp. 2d 280, 306-08 (S.D.N.Y. 2009) ("the breaching party must show that the plaintiff *unreasonably* failed to minimize damages.... [T]he issue is not whether plaintiff chose the path most likely to prevent further damage, but whether plaintiff's decision was reasonable under the circumstances.") (emphasis in original; citations omitted); CLA-62, *Matsushita Elec. Corp. of Am. V. Gottlieb*, 1991 WL 152615 at *9 (S.D.N.Y. 1991) ("proof of mitigation of damages requires only a showing that plaintiff took reasonable steps to cut its losses, not that plaintiff did what the ... defendants would have had it do, or what in hindsight seems most effective to reduce the ... damages"); RLA-10, *Fed.*

about *motive* and *process*, a mitigation obligation imposes a duty of *proportionality*, which is closely connected to the reasonableness of the ultimate settlement. The indemnitee does not mitigate its potential loss from litigation if it settles claims for amounts that are patently excessive in relation to any realistic evaluation of the scale of potential liability.

83.   With respect to each of these inquiries, the burden of proof is on the indemnitor to identify a particular "reasonable effort" that the indemnitee should have taken, *not* on the indemnitee to demonstrate that it took every possible theoretical care. This burden is reflected in the structure of the SSEA provision, which suggests that it provides an indemnitor with an affirmative defense to its otherwise applicable obligations ("[t]he Indemnitor shall not be held liable for indemnification … to the extent …."). In accordance with this provision, the indemnitor must demonstrate that the indemnitee *unreasonably* failed to take *particular, concrete steps* that it should have done. Finally, the indemnitor bears the burden of demonstrating that the additional steps it contends were required would have been "mitigated" the Losses, in the sense of eliminating or materially reducing such losses, without at the same time creating significant additional risks.[69] It is not sufficient simply to speculate, after the fact, that additional steps "might" have had that salutary effect. The mitigation defense in this sense is similar to the "substantive prejudice" exception discussed above.

### (7)   Conclusion

84.   Based on this framework, the Tribunal concludes that the appropriate sequence of inquiry for each of VimpelCom's three separate indemnification claims is as follows. First, the Tribunal determines whether the claims fall within the *scope* of the indemnification obligation in the first place. If so, the Tribunal next examines whether in reaching the decision to settle each of the Italian tax claims, VimpelCom *in good faith believed* that it

---

*Ins. Co. v. Walker*, 53 N.Y.2d 24, 34 n.3 (1981) (noting that the indemnitee may not "unilaterally increase the indemnitor's liability by simply sitting back and refusing to take *reasonable* steps to cover its loss") (emphasis added).

[69] *See e.g., CLA-46, Eskenazi*, 72 A.D.3d at 1014 (affirmative defense requires showing both a failure "to make diligent efforts to mitigate its damages, and the extent to which such efforts would have diminished those damages"); CLA-61, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 72 A.D.3d 409, 411 (N.Y. App. Div. 1st Dep't 2010) (same); CLA-38, *Assouline Ritz LLC v. Edward I. Mills & Assocs. Architects, PC*, 91 A.D.3d 473, 474 (N.Y. App. Div. 1st Dep't 2012) (same).

otherwise faced a cognizable risk of exposure with respect to such claims. This is a threshold requirement under New York law, and is not varied by any contractual provisions under the SSEA. Assuming subjective good faith, the Tribunal next examines whether VimpelCom complied with the applicable *notice and participation* provisions of the SSEA, and to the extent there is any doubt, whether any shortfalls in this regard demonstrably *prejudiced* OTMTI, in the sense that it exposed OTMTI to loss that otherwise it would not have faced. In the absence of any such demonstrable prejudice, the inquiry remains as it would be under New York law where there is no dispute about notice, namely whether the decision to settle at all, or the terms of the resulting settlement, were *objectively unreasonable*. If not, then OTMTI's obligation to indemnify attaches, except to the extent that the "Losses" could reasonably have been obviated or significantly reduced by concrete steps that VimpelCom failed to take in *mitigation*. The obligation otherwise extends to all Losses *effectively sustained* by VimpelCom, and includes OTMTI's 72.65% share of such Losses, plus applicable *interest*. The Tribunal examines each of these issues in turn below.

### D.    The Wind Telecom Indemnification Claim

#### (1)    *Background on the Transactions and the Audit*

85.    As previously noted, VimpelCom did not acquire the Greek businesses that Wind Telecom previously had held and operated through Wind Hellas; these were spun off to other buyers before closing. Well prior to the Spin-Off, Wind Telecom had consolidated its own direct and indirect interests in a Greek fixed-line provider (Tellas Communications S.A., or "**Tellas**") and a Greek mobile carrier, TIM Hellas, to bring them under the single umbrella of Wind Hellas. The transactions by which this was accomplished were complex, and the Tribunal does not purport to summarize them here. The numerous steps included, however, a series of intra-group derivative transactions among Wind Hellas, Wind Telecomunicazione and Wind Telecom, which were backed by put and call options issued without premiums on the underlying stock of an affiliated Greek company (Hellas I Telecommunication S.à r.l., or "**Hellas I**"). As initially created in October 2007 by a Shareholders' Agreement among the three companies involved in the derivative transactions (the "**2007 Shareholders Agreement**"), the put option was granted by Wind Telecom to Wind Telecomunicazione, and the call option was granted by Wind

Telecomunicazione to a different company, Wind Hellas.  In September 2008, the call option was terminated, but a few months later in February 2009 a new call option was agreed and implemented through an amendment of the Shareholders' Agreement.  The 2009 call option was held by the ultimate parent, Wind Telecom, rather than by Wind Hellas, the original holder of the call option.  Wind Telecom continued to hold a put option in favor of Wind Telecomunicazione, with the result that the previously "non-matching" put and calls were now matching, reciprocally between Wind Telecom and Wind Telecomunicazione.[70]

86.     Within months of the February 2009 transaction, the Greek businesses collapsed, resulting in insolvency by the end of the year.  Wind Telecom devalued the put option on its year-end 2009 balance sheet, and thereafter Wind Telecomunicazione exercised the put option, resulting in a loss to Wind Telecom some €207 million.  Wind Telecom carried the loss forward to deduct it from subsequent years' taxable profits, ultimately yielding roughly €57 million in tax savings in Italy.[71]

87.     The Wind Telecom Audit is discussed further below.  For purposes of this background section, it is essentially undisputed that on 14 February 2013, after VimpelCom had acquired Wind Telecom, the Italian Tax Authorities served notice of the opening of the audit and requested certain financial and accounting documents from 2009, as well as documents related to Wind Telecom's restructuring of Wind Hellas from 2007 through 2009.[72]  As the new owner of Wind Telecom, VimpelCom oversaw responses to the audit inquiries.  Following certain additional inquiries, document requests and discussions, the Italian Tax Authorities provided Wind Telecom in late May 2013 with a summary of a draft audit report, expressing a preliminary view that the derivative transactions under which Wind Telecom had claimed the €207 million loss violated Italian tax avoidance laws, since absent the derivative structure a more straightforward loss on shareholding in the Greek business would not have been tax deductible.[73]  The draft audit report was

---

[70] SoC ¶ 41; SoDC ¶ 34; *see also* CE-56, CE-62.
[71] SoC ¶ 41; SoDC ¶ 34.
[72] SoC ¶ 42; SoDC ¶ 35.
[73] SoC ¶ 44; SoDC ¶ 37.

accompanied by a questionnaire, to which Wind Telecom submitted answers in mid-June 2013.[74]   On 17 July 2013, the Italian Tax Authorities indicated that they were close to issuing a final audit report finding liability, but proposed a settlement under which Wind Telecom would pay €24 million in back taxes plus penalties and interest, understood by Wind Telecom (and VimpelCom) to total approximately €29 million.  The Italian Tax Authorities proposed that this settlement could be achieved by a report focusing on one of the constituent parts of the derivative transactions, namely the granting of the put option without any premium, which would be said to violate Italian transfer pricing rules requiring affiliates to deal with one another on an arm's length basis.  The settlement offer would not require Wind Telecom to admit wrongdoing under this or any other theory, but would require it to "adhere" to the terms of the Authorities' final audit report in the sense of agreeing not to challenge it before the Italian tax courts.  The Italian Tax Authorities indicated that this offer would expire at the end of July 2013.[75]

88.   Following certain deliberations discussed further below, on 31 July 2013, VimpelCom agreed to settle the audit for a total €31.3 million, which was based on the Italian Tax Authorities' intervening (higher) calculation of the interest component.  This sum was to be paid in quarterly installments over several years.[76]   VimpelCom demanded that OTMTI indemnify it for 72.65% of the settlement amount under the SSEA, which OTMTI refused.

### (2)   *Whether the Audit Falls Within the Scope of Indemnification Obligations*

89.   The first disputed issue is whether the SSEA's indemnification obligation applies to the Wind Telecom Audit at all.  The New York courts require an agreement to indemnify to be "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances."[77]   The question therefore is whether the SSEA's

---

[74] SoC ¶ 45; SoDC ¶ 38.

[75] SOC ¶¶ 52-53 and CE-89; SoDC ¶¶ 54-55.

[76] RFA ¶¶ 28, 31.

[77] RLA-18, *Hooper Assoc. v. AGS Computer*, 74 N.Y.2d at 491-492 (1989) (also stating that the intention to indemnify should be "unmistakably clear"); *see also* RLA-84, *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs.*, Inc., 458 F. Supp. 2d 178, 188 (S.D.N.Y. 2006) (citing *Hooper*); CLA-45, *E\*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp.2d 313, 391 (S.D.N.Y. 2009) (same); RLA-122, *PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*, 2006 WL3370698, at \*1 (2d Cir. 2006) (same).

indemnification obligations clearly extend to the type of claims the Italian Tax Authorities presented in the Wind Telecom audit.

90.   The Tribunal finds that it does. The relevant provision is Article 10.2(b), which provides for indemnification of VimpelCom's Losses "arising out of or resulting from (i) claims or residual liabilities related to [Wind Telecom's] ownership of Wind Hellas prior to the completion of the Wind Hellas Spin-Off, (ii) the Wind Hellas Spin-Off or (iii) claims related to Wind Hellas after the Wind Hellas Spin-Off."

91.   OTMTI argues that VimpelCom's settlement of the Wind Telecom Audit does not fall within Article 10.2(b)(i), as the settlement was based on alleged tax law violations in connection with intercompany transactions (the put and call options) between Wind Telecom and Wind Telecomunicazione, and not on Wind Telecom's *ownership* of Wind Hellas.[78] Further, the shares underlying the put option were not shares in Wind Hellas, but rather in Hellas I, a subsidiary of Wind Telecom.[79] As to Article 10.2(b)(iii), OTMTI argues that "these transactions and their tax treatment were finalized before the Wind Hellas Spin-Off," so the Wind Telecom Audit cannot constitute a "claim[] related to Wind Hellas after" the Spin-Off.[80]

92.   In the Tribunal's view, however, these arguments do not take into account the fair reading of the term "*related to*," as used in both of the arguably relevant clauses. "Related to" is a fairly broad term that encompasses a variety of direct and indirect relationships. Both contemporaneously and in this arbitration, OTMTI has sought to explain the put transaction not as an isolated, stand-alone arrangement, but rather as a critical part of a broader series of transactions with the legitimate business objective of restructuring Wind Telecom's Greek mobile and fixed telephone businesses under the common umbrella of Wind Hellas.[81] Other steps in this series of transactions included Wind Hellas' purchase from a third party of a 49% stake in the joint venture that owned Tellas, to bring Tellas fully under

---

[78] SoDC ¶¶ 118, 121; Rejoinder ¶¶ 31-32; O-PHB ¶¶ 27-29.

[79] SoDC ¶ 122; Rejoinder ¶¶ 31-32.

[80] SoDC ¶ 123; *see also* Rejoinder ¶ 41; O-PHB ¶ 31.

[81] *See, e.g.,* CE-27 at 1, 6-8, 10-13 (draft OTMTI structure paper suggesting analysis of tax claim by reference to the "[v]arious [s]teps and [r]elated [b]usiness [r]ationale" for the "Wind Hellas Transaction"); Nasr ¶ 34.

Wind Telecom's ownership (the other 51% already being owned by Wind Telecom's subsidiary, Wind Telecomunicazione); the call option, which as created in 2007 gave Wind Hellas the right to buy the remaining joint venture stock from Wind Telecomunicazione; and the put option, which entitled Wind Telecomunicazione to put the same stock to the parent, Wind Telecom.  All of these steps were connected to Wind Telecom's broader business purpose of enable the folding of Tellas into the combined entity.  And all of this was structured, as OTMTI's witness Karim-Michel Nasr explained at the hearing, in order to serve the overall interest of the *Wind Telecom* Group;[82] Wind Telecom was able to achieve all of this because of its "ownership of Wind Hellas" at all relevant times.  The tax claim that the Italian Tax Authorities asserted arose out of that restructuring, and thus "related to" Wind Telecom's "ownership" of Wind Hellas within the meaning of Article 10.2(b)(i).  To conclude otherwise would require viewing the constituent parts of the restructuring transaction as entirely separate from one another, which is precisely the *opposite* of the holistic approach that OTMTI contends is warranted to understand the broader business purpose served by the originally asymmetrical put and call components.

93.     The Wind Telecom Audit likewise falls within the scope of Article 10.2(b)(iii).  The Italian Tax Authorities' 2013 challenge to the deductions taken on the put was a claim "related to" Wind Hellas, and it was asserted "after" the Spin-off.  It is not logical to read the temporal provision ("claims related to Wind Hellas after the Wind Hellas Spin-Off") as OTMTI does, namely as referring only to post-Spin-Off *conduct* giving rise to potential liability, as opposed to post-Spin-Off *claim*s.  After the Spin-Off, any new business conduct related to Wind Hellas presumably would be the responsibility of Wind Hellas' new (post-Spin-Off) owner, not of Wind Telecom as its pre-Spin-Off owner.  Yet the whole purpose of this SSEA indemnification provision was to allocate burdens falling on Wind Telecom, as between OTMTI (Wind Telecom's prior owner, at the time Wind Telecom owned Wind Hellas), and VimpelCom (Wind Telecom's new owner, after Wind Telecom ceased to own Wind Hellas).  The more logical reading of the provision, in the context not only of its language but also "the purpose of the entire agreement and the surrounding facts and

---

[82] Hearing Transcript (3) 918 (Nasr testifying that "the granting of a put option at no premium … made sense because it was for the benefit of Wind Hellas in this transaction, which was a controlled subsidiary of Wind Telecom").

circumstances,"[83] is thus to address *claims* that might be brought against Wind Telecom even after the Spin-off, for events related to Wind Hellas that occurred during the earlier time when Wind Telecom remained Wind Hellas' owner.  The Wind Telecom Audit presented just such a claim.

### (3)    *Good Faith*

94.   The next question is whether in reaching the decision to settle the Wind Telecom Audit, VimpelCom *in good faith believed* that it otherwise faced a cognizable risk of exposure. In accordance with the legal principles discussed in Section IV.C.2, a presumption of good faith applies given that VimpelCom at all times retained significant exposure (a minimum of 27.35%) from any settlement.  The presumption is all the more warranted here because VimpelCom was aware that OTMTI was unlikely to indemnify VimpelCom for the other 72.65% voluntarily.  In these circumstances, VimpelCom understood that it faced a risk of bearing the full consequences of its settlement decision.  It is therefore presumed to have subjectively believed the settlement was reasonable in the circumstances.

95.   That presumption of subjective good faith is further supported by the fact that VimpelCom *engaged in a process* intended to enable it to evaluate Wind Telecom's exposure from the Wind Telecom Audit.  This included an effort to determine the reasons for the relevant steps in the complex Wind Hellas transactions, and to consult with Italian tax counsel regarding the applicable legal principles, the nature of the judicial proceedings Wind Telecom would face if it chose to litigate the claim, and the potential outcomes and risks of that course of action.  In particular, even apart from VimpelCom's eventual outreach to OTMTI, it is undisputed that VimpelCom conferred with Wind Telecom personnel whom it believed to have relevant knowledge (including Mr. Shalaby, the Wind Group's General Counsel at the time of the transactions); gathered and reviewed documents available to the Wind Group; and reviewed the information thus gathered with its own Group Tax Advisor (Mr. Kuper) and with external tax counsel experienced in contentious tax matters in Italy, including the same outside counsel (Mr. Cisternino) who had advised OTMTI when it still

---

[83] RLA-18, *Hooper Assoc. v. AGS Computer*, 74 N.Y.2d at 491-492 (1989).

owned Wind Telecom.[84]  These discussions were aimed at understanding both the legal theories pursued by the Italian Tax Authorities and the potential defenses to liability on those theories.   However thorough (or not thorough) this exercise may have been, and however it might have been improved, and however risk-averse VimpelCom ultimately may have been in evaluating the information it gathered, these are not the steps of a company acting in subjective bad faith.

96.  The presumption of good faith is also supported by evidence demonstrating that VimpelCom's decision to settle was based on its *perception* (rightly or wrongly) that the company otherwise faced greater exposure – both financial and possibly criminal – from not doing so.  VimpelCom's analysis was set forth in a 25 July 2013 memorandum from the company's management to its Supervisory Board,[85] which attached a memo from the Group Tax Department that itself summarized a detailed 23 July 2013 memorandum from external tax counsel.[86]  These documents focused on the Italian Tax Authorities' stated intent to issue imminently a final audit report on tax avoidance grounds, based on the theory that the inter-company put arrangement had little rationale from the Wind Telecom perspective other than to enable it to convert any non-deductible losses related to its equity investment into a deductible loss on a derivative contract.   Management's contemporaneous understanding was that this claim "could subject Wind Telecom to substantial tax claims" of *at least* €114 million (composed of €57 million in back taxes, plus interest and penalties ranging from 100%-200%).  Management also noted that "[c]riminal charges conceivably could be brought against officers and directors of Wind Telecom (including individuals who are presently officers of VimpelCom) during the relevant period."[87]

97.  With respect to the likelihood of such exposure, VimpelCom's contemporaneous understanding – again based on the advice of its external tax counsel – was that there were "current uncertainties" in the way the Italian tax courts would apply the relevant legal

---

[84] *See, e.g.,* CE-88.

[85] CE-89 (Revised).

[86] CE-88.

[87] CE-89 (Revised) at 1-2; *id.,* Annex at 2; *see also* CE-88 at 1 (outside counsel advising that "in our experience, tax reports related to all violations of this kind … are generally sent also to the criminal prosecutor's office").

principles, "due to the fact that these anti-abuse principles are not reflected in a written provision in the Italian (tax) laws" but "only originate from ... case law [that] is still too recent and not uniform," which "does not allow for any reliable prediction on the possible ramifications."[88]  The authors acknowledged that "from a pure legal standpoint – there are defensive arguments to challenge" the Italian Tax Authorities' position in the tax courts. On the other hand:

> from a substantial standpoint – in our experience the current approach of Italian tax courts (and the Supreme Court of Justice) is generally very tough against taxpayers in relation to complex intra-group cross-border transactions generating an overall tax erosion in Italy, in particular in cases in which the transaction gives rise to costs not reflected in (i) real cash payments between related parties and (ii) income taxed at the level of another resident group company.[89]

98.   On balance, management "concluded that it is unlikely that Wind Telecom would win in court if it were to challenge the audit report."[90]  Moreover, VimpelCom had received legal advice that, in order even to challenge a tax assessment in Italy, Wind Telecom first would have to first pay 1/3 of the assessed amount (here €19 million) plus interest – and in order to appeal from any adverse ruling by the court of first instance, 2/3 of the assessed amount (€38 million), plus interest and penalties.[91]  In addition to these financial considerations, management also considered the risk of possible criminal prosecution of Wind Telecom officers and directors, a possibility that the Italian Tax Authorities had raised expressly and that outside legal counsel had confirmed to be a risk.[92]

99.   Against these risks, VimpelCom evaluated the alternative to litigation, in the form of the settlement proposal under a theory that the put component of the transaction lacked arms' length consideration.  The cost of this avenue was understood to be approximately €29

---

[88] CE-89 (Revised), Annex at 2; CE-88 at 2 (legal advice to this effect).

[89] CE-89 (Revised), Annex at 2; CE-88 at 2 (legal advice to this effect).

[90] CE-89 (Revised) at 3; CE-88 at 2 (legal advice that "considering the current case-law and the information we have been provided in relation to the case at stake, it seems unlikely that the company would succeed in litigation").

[91] CE-89 (Revised), Annex at 3; CE-88 at 2 (legal advice to this effect).

[92] CE-89 (Revised) at 2 ("The ITA has also stated that it will forward its audit to the Italian criminal prosecutor for potential criminal charges against Wind Telecom and its officers and directors.") and Annex at 2 ("Furthermore, in our experience, tax reports relating to alleged violations of this kind (that in principle may give rise to a criminal offense) are generally sent also to the criminal prosecutor office."); CE-88 at 1.

million, and *"[m]ost importantly* … the [authorities] will NOT file a tax report with the criminal prosecutor."[93]   However, management understood that the settlement offer was contingent on "the Company agree[ing] to 'adhere' to the tax report without contesting it in front of the tax courts," and that the offer "will not be open for acceptance after 31 July 2013."[94]   VimpelCom understood this to be "A HARD DEADLINE."[95]   The evidence was that VimpelCom believed the Italian Tax Authorities had floated the alternative "transfer pricing" theory only as a compromise to induce settlement, but if Wind Telecom declined, then the Authorities would pursue the original anti-abuse theory of liability, not the transfer pricing theory.[96]   The Authorities "ha[ve] also stated" that, if the settlement offer was not accepted by the deadline, they "will forward [the] audit to the criminal prosecutor for possible criminal charges against Wind Telecom and its officers and directors."[97]

100.   With this understanding of the options, on 25 July 2013 VimpelCom's management recommended that Wind Telecom accept the proposal "because there is a significant risk of higher liability if we challenge the audit report."[98]   They acknowledged that "the indemnity from [OTMTI] is helpful and we believe will mitigate our losses," but stated that "[h]owever, we would recommend settlement even if there was no indemnity available in view of the significant risk of higher liability if we do not settle."[99]

101.   On the same day as this recommendation (by letter dated 25 July 2013), OTMTI informed VimpelCom that that "it does not accept" any obligation to indemnify VimpelCom regarding the Wind Telecom Audit, that it could "neither object to nor support any settlement," and that "VimpelCom will need to proceed as it deems appropriate under its own responsibility and on its own account."[100]

---

[93] CE-89 (Revised), Annex at 3-4 (emphasis added; capitalization in original).

[94] CE-89 (Revised), Annex at 2-3; CE-88 at 3.

[95] CE-89 (Revised), Annex at 4 (capitalization in original).

[96] CE-89 (Revised) at 2, 3, 6.

[97] CE-89 (Revised) at 2.

[98] CE-89 (Revised) at 3.

[99] CE-89 (Revised) at 3.

[100] CE-6 at 1-2.

102.    The next day (26 July 2013), VimpelCom's Supervisory Board unanimously approved the recommended settlement.[101]  It is not clear if this decision was made with knowledge of OTMTI's letter dated 25 July 2013; VimpelCom's Statement of Claim suggests that the letter may have been received on 26 July 2013.[102]  However, VimpelCom already understood (including from an OTMTI email of 9 July) that "OTMTI, as a matter of princip[le], opposes a settlement, or indeed settlement discussions,"[103] yet as noted above it determined to proceed even if an indemnity would not be forthcoming.[104]  In accordance with New York law, VimpelCom's awareness of risk that it might not be indemnified – together with its retention in any event of 27.35% of the potential financial liability, and Wind Telecom's retention of the full risk of any criminal prosecution of its officers and directors – supports the presumption that VimpelCom acted in good faith in deciding to settle the Italian Tax Authorities' claims.

103.    The Wind Telecom Board of Directors in turn approved the settlement on 30 July 2013.[105]  On 31 July 2013, the Italian Tax Authorities issued their final report regarding the Wind Telecom Audit, to which Wind Telecom formally "adhered" the same day, accepting the settlement offer which used a "transfer pricing" rationale as the basis for calculating the amounts to be paid.  Wind Telecom submitted a letter for the record stating that although it "adhered" to (i.e., would not challenge) the final tax audit report, it did not admit liability and objected to the audit conclusions.[106]

104.    With regard to the issue of good faith, OTMTI contends that VimpelCom's "conduct was not consistent with how one would expect a good faith indemnitee to behave," in several respects.[107]  At the most basic level, it contends that VimpelCom "settled hastily, without sufficient investigation."[108]  It suggests that, if VimpelCom had been acting in good faith,

---

[101] CE-90.
[102] SoC ¶ 60.
[103] CE-28 at 1 (referring to CE-26 at 1).
[104] CE-89 (Revised) at 3.
[105] CE-91.
[106] CE-2.
[107] Rejoinder ¶ 331.
[108] SoDC ¶ 176.

it would have notified OTMTI about the Audit earlier, since VimpelCom knew that OTMTI personnel had superior information about the underlying transactions and their business rationale.[109]   Doing so would have enabled Mr. Nasr, the self-described "architect" of the Wind Hellas transactions,[110] to "reconstruct[] the precise steps of, and the reasons for such a complex series of transactions that had taken years earlier," which OTMTI describes as "a difficult and time-intensive task."[111]   OTMTI contends that, in general, VimpelCom showed little interest in (or even actively "thwarted") its eventual efforts to assist, entering into the settlement less than two months after informing OTMTI of the Audit.[112]   As a result VimpelCom remained "confused, perhaps willfully so, about the business rationale for the transactions at issue in the Wind Telecom Audit."[113]

105.   OTMTI also argues that VimpelCom provided the Italian Tax Authorities with mistaken information – specifically, not clearly explaining that by the time the put option was exercised, the call option no longer involved Wind Hellas but rather Wind Telecom. According to OTMTI, VimpelCom's failure to explain that the February 2009 call option was held by Wind Telecom rather than Wind Hellas enabled the Authorities to promote the alternative transfer pricing theory, which otherwise could not properly have applied to a transaction now between two Italian companies.   VimpelCom then failed to timely inform OTMTI that the Italian Tax Authorities had presented the transfer pricing theory. These are both said to be evidence that VimpelCom was not acting in good faith when it accepted the settlement on that basis.[114]

106.   Finally, OTMTI also faults VimpelCom for insufficiently crediting the strength of potential defenses.   It suggests that VimpelCom should have placed more emphasis on internal doubts by members of its own team about the merits of the anti-abuse claim,[115] and should

---

[109] Rejoinder ¶ 331(a).

[110] Nasr ¶ 34.

[111] O-PHB ¶ 69.

[112] Rejoinder ¶ 331(c) (citing this as evidence that VimpelCom was not acting in good faith).

[113] Rejoinder ¶ 204.

[114] Rejoinder ¶¶ 331(b), (d), (e); see also id., ¶¶ 179-181.

[115] See, e.g., Rejoinder ¶ 203 and O-PHB ¶ 57 (citing inter alia RE-160 and RE-162 at 5, as well as Wind Telecom's formal statement of disagreement with the final audit report, in RE-8 at 43).   VimpelCom responds that the internal

have actively pursued defenses as well to the transfer pricing claim, rather than simply accepting this alternative without analysis.[116]   According to OTMTI, a more aggressive posture towards the Italian Tax Authorities "could have defeated" any claims or "at least attempted to defeat [them] with no downside risk if VimpelCom did not prevail."[117]

107.   The Tribunal returns to these issues later in its discussion of issues of notice, prejudice and mitigation.  For purposes of the present inquiry, however, none of these alleged failings demonstrates that VimpelCom approached its assessment of its exposure in *subjective bad faith*.  In retrospect, it is always possible to identify steps that might have been taken earlier or in addition to those already taken.  But this does not suggest that VimpelCom was making *no good faith effort* to examine the issues involved in the anti-abuse claim, or was "willfully" choosing to remain ignorant about those issues as OTMTI suggests.[118]  As for the transfer pricing claim, the evidence is clear that VimpelCom believed this was simply a mechanism to support a settlement at a lower level, such that asserting defenses to that claim would simply drive the Italian Tax Authorities back to the higher-exposure anti-abuse claim.  Moreover, there was credible evidence that the Italian Tax Authorities were following a pattern of imposing tight deadlines, and that the pace of investigation – and therefore the timing of VimpelCom's decision-making – was not entirely within its control.  Whether it made the *best use* of the limited time it had is not the relevant inquiry, particularly for the threshold issue of good faith.  As noted above, the law requires more to overcome the presumption of good faith than arguments about either an allegedly negligent failure to fully investigate potential defenses,[119] or the exercise of allegedly questionable judgment in evaluating the strengths and weaknesses of a case.  OTMTI has not presented

---

VimpelCom documents reflected persistent concerns about liability risk *notwithstanding* the existence of potential defenses, and contends that further investigation only strengthened these concerns.  *See, e.g.*, V-PHB ¶¶ 120-122.

[116] SoDC ¶¶ 63, 184; Rejoinder ¶¶ 186-190.  OTMTI also complains that VimpelCom failed to challenge the erroneous computation of interest accrued on the amount assessed.  Rejoinder ¶ 331(f).

[117] Rejoinder ¶ 325.

[118] Rejoinder ¶ 204 (emphasis added).

[119] That OTMTI's case is effectively about negligence rather than bad faith is evident in its own general choice of language throughout its submissions.  For illustration, see the verbs used in Rejoinder ¶ 185 (accusing VimpelCom of "failing to learn," "failing to effectively explain," "misinforming" the Authorities, and "bumbl[ing] its way") and O-PHB ¶ 49 (accusing VimpelCom of not engaging in "reasonable and diligent analysis," "fail[ing] to educate itself," and "rush[ing] into an ill-advised settlement").

any basis for suspecting active bad faith with respect to the Wind Telecom Audit, such as fraud or collusion with the Italian Tax Authorities.

108.   Indeed, OTMTI's only suggestion that VimpelCom may have had less than pure motives with respect to settlement of the Wind Telecom Audit is a general speculation (running through its submissions regarding all the audits) that VimpelCom placed undue weight on conciliation with the Italian Tax Authorities in light of the company's ongoing business in Italy.  Even if true, this particular fact – that following the acquisition VimpelCom would place more value than OTMTI would have on preserving official relationships in Italy – was entirely foreseeable, as the natural result of a result of a transaction that enabled OTMTI to leave the country while VimpelCom remained heavily invested there.  The Parties nonetheless decided to *expressly exclude* tax claims from the category of Third Party Claims for which OTMTI had the right, under SSEA Article 10.7(b), to participate directly in the defense, and even to assume the defense outright if it conceded its indemnification liability.  Indeed, there was testimony that the very reason VimpelCom insisted on stripping out tax claims from Article 10.7(b) was to assure that it could make prudent judgments in light of its overall status as an Italian taxpayer under continuing review by the Italian Tax Authorities.[120]  The resulting agreement left the defense of tax claims in the hands of VimpelCom, but still subject to its retention of 27.35% of the burden of any settlement, which was a considerable check on any temptation otherwise to prioritize continuing relationships over concrete financial interests.

109.   In any event, the duty of good faith does not require a complete absence from a settlement calculus of any possible extrinsic considerations, such as the value of preserving reputation and good will.  OTMTI has not shown that either this alleged factor or any other allegedly improper consideration motivated VimpelCom to accept a settlement that it did not otherwise believe to be reasonable in the circumstances.  The Tribunal concludes to the contrary: that VimpelCom in good faith believed, at the time it decided to settle the Wind Telecom Audit, that there was a credible, non-negligible risk that it would be unable to persuade the Italian Tax Authorities, and thereafter the Italian courts, that the put and call

---

[120] Reply ¶ 75 (citing Lemke II ¶ 14).

structure served valid business objectives other than tax avoidance, particularly from the perspective of the *Italian entity* that was subject to the Italian tax laws. VimpelCom also apparently had a genuine concern that Wind Telecom directors and officers could be exposed to personal risk of criminal prosecution, a factor that it described as "*most important*[]" in its consideration.[121] While it may be easy for OTMTI in hindsight to discount this risk as unlikely, it was not OTMTI's personnel facing the prospect of potential prosecution, and VimpelCom cannot be faulted for placing a premium on the security of personnel now under its corporate chain of responsibility. Finally, the evidence demonstrates that VimpelCom genuinely believed that the settlement terms offered presented a reasonable means of avoiding the uncertainties and risks of litigation, including the possibility of greater liability. This is sufficient to find that it acted subjectively in good faith. The objective reasonableness of its settlement is a separate issue to which the Tribunal turns in due course, after first addressing the issues of contractual notice, participation and prejudice.

### (4)  The Adequacy of Notice and Opportunity to Participate

110.  The relevant question for this portion of the analysis is not whether it might have been *wiser* for VimpelCom to provide earlier notice to OTMTI regarding the Italian Tax Authorities' inquiries, or to seek greater involvement by OTMTI in developing responses to those inquiries. The question is whether different conduct was *contractually required*.

111.  The SSEA provision relevant to the corporate income tax issue in the Wind Telecom Audit is Article 10.7(a). As discussed in Sections IV.C.3 and IV.C.4 above, this is crafted quite differently both from Article 10.7(b) governing claims not related to taxes, and from Article 10.7(h)(i) governing claims related to Italian withholding taxes. For those provisions, VimpelCom's duty to notify OTMTI would be triggered by its own receipt of a notice of a "claim or proceeding" (in the case of Article 10.7(b)) or "the beginning of" of a "Tax audit or inquiry" (in the case of Article 10.7(h)(i)), *regardless* of VimpelCom's view of the strength or weakness of such claim or inquiry. Following such notice, OTMTI would be provided a right to "participate in the defense" or "assume and control the defense" (in the

---

[121] CE-89 (Revised), Annex at 3-4 (emphasis added).

case of Article 10.7(b)), or a right to have VimpelCom "coordinate … in the taking of any action relating to the conduct" of a withholding tax inquiry, "use its reasonable efforts" to include OTMTI in meetings and calls with the Italian Tax Authorities, and provide OTMTI "such information and access" as OTMTI may reasonably request (in the case of Article 10.7(h)(i)).

112.   By contrast, under the only provision applicable to the Wind Telecom Audit, notice was due to OTMTI only after Vimpelcom "*has determined*" that a claim is "*reasonably likely to result in*" a tangible loss as to which VimpelCom has a right to indemnification (Article 10.7(a), emphasis added).  As noted previously, VimpelCom could not unreasonably delay reaching an internal determination on the likelihood of a loss, but nor was it obliged to alert OTMTI immediately upon learning of a potential claim, before even conducting its own analysis.   The provision implicitly accepts that some reasonable period of time is appropriate for VimpelCom first to evaluate a potential claim for the "likel[ihood]" of a loss.   Only after doing so is VimpelCom is required to notify OTMTI promptly of its determination that a loss is reasonably likely, along with "the amount of the Losses, if known, and method of computation thereof, all with reasonable particularity and including documentary proof, if available" (*id.*).   These are the only obligations that Article 10.7(a) places on VimpelCom.   Unlike Article 10.7(b), Article 10.7(a) grants no rights to OTMTI to "participate in the defense" of the third party claim, nor does it impose (as does Article 10.7(h)(i)) any duties to "coordinate" with OTMTI with regard to the conduct of a tax audit, or to "use its reasonable efforts to include" OTMTI in meetings or telephone calls with the Italian Tax Authorities.   Any fair reading of the SSEA must treat the distinctions among these three provisions, in a contract between two sophisticated parties, as having substantive significance.

113.   Two questions therefore arise under Article 10.7(a).   First, when did VimpelCom *itself determine* that Wind Telecom would face a claim from the Italian Tax Authorities that was "reasonably likely" to give rise to a tangible loss – and has OTMTI demonstrated that VimpelCom was *unreasonably tardy* in making this internal determination?   Second, after making this internal determination, did VimpelCom provide "prompt" *notice* of this fact to

OTMTI, including such information about the amount of the likely Losses and the method of their computation, with "reasonable particularity" as it was then able?

114.   The evidence is that the Italian Tax Authorities first contacted Wind Telecom regarding this matter on 14 February 2013.  OTMTI contends that this initial contact triggered VimpelCom's obligation to notify OTMTI under Section 10.7(a), because as of this date VimpelCom "knew or should have known" that the audit would be "reasonably likely to result in a right of indemnification" against OTMTI.[122]  VimpelCom responds that this is not so, because "many inquiries from the Italian Tax Authorities never mature into potentially indemnifiable claims," and the SSEA obligation is triggered not by notice simply of the authorities' interest in a transaction, but rather by a VimpelCom determination that it is facing a "reasonably likely" loss.[123]

115.   The Authorities' 14 February 2013 communication to Wind Telecom was solely a request for documents:  the 2007 Shareholders Agreement, the put and call option contracts and their amendments, and various 2009 financial and accounting documents.[124]  The inquiry contained no allegations of any breach by Wind Telecom of any tax obligations, nor any indication that the Authorities already were leaning towards a finding of such a breach.  It made no reference to any Italian tax law provisions or to any particular theories of potential liability.  In these circumstances, the Tribunal cannot find that the mere receipt of such a document request required VimpelCom already to conclude that an indemnifiable loss had become "reasonably likely," which would trigger its duty under Article 10.7(a) to notify OTMTI of that determination and of the projected "amount of the Losses … and the method of computation thereof … with reasonable particularity."  This is far too much to read into an initial document request.

116.   The evidence demonstrates that by mid-to-late March 2013, however, Wind Telecom understood that the Italian Tax Authorities were "focusing their attention" on the put and

---

[122] SoDC ¶ 190.
[123] Reply ¶¶ 77- 78.
[124] CE-24 at 4; RE-131T.

call transactions, in connection Wind Telecom's deduction of the €207 million loss.[125] Even so, in the Tribunal's view, there remains a difference between understanding that authorities are *looking into* a particular transaction, and being required to make a company *determination* that such an inquiry has matured to a point that a tangible loss can be said to be "reasonably likely." As of early April 2013, the Italian Tax Authorities were still in information-seeking mode. On 3 April 2013, Wind Telecom had provided them with a short summary of the corporate events between 2007 and 2010,[126] and on 4 April 2013, the Italian Tax Authorities responded with a request for "clarifications" regarding the "financial charges cost item" of €207 million, stating that they sought to "understand the nature, origin, accounting methods" and other information in relation to this entry.[127] On 10 April 2013, Wind Telecom responded with a brief explanation that this was the "charge … derived from the valuation of the derivative agreed upon between" Wind Telecomunicazione and Wind Telecom, specifically the put option referenced in its summary memo of 3 April 2013, and the loss was booked on the 2009 financial statements "as a result of the default of the Wind Hellas sub-group and the consequent initiation of bankruptcy proceedings."[128] On 24 April 2013, the Italian Tax Authorities requested additional information, including information about increases or decreases in Telecomunicazione's own income for 2009, and copies of certain correspondence.[129] Wind Telecom provided the requested information on 6 May 2013.[130]

117.   The evidence does not show that during these exchanges through mid-May 2013, the Italian Tax Authorities ever conveyed to Wind Telecom even preliminary conclusions regarding alleged wrongdoing. While subsequent developments may encourage hindsight judgments about when the Authorities may have formed such views, the relevant question under

---

[125] RE-170. This may have been as a result of the Authorities' second document request of 13 March 2013, which "invit[ed] [Wind Telecom] to submit" additional documents, including account ledgers showing costs for legal consultation, a table summarizing certain regional income tax adjustments, Wind Telecomunicazione's notice of exercise of the put option, and an "Explanatory report" for the 2007 Shareholders Agreement, "especially in regard to the Put and Call options." CE-80.

[126] This 2 1/2-page summary essentially was a chronology of corporate steps; it did not purport to explain the business rationales any of steps, which the Italian Tax Authorities had not requested at this point in time. CE-81 at 2.

[127] CE-82 at 1.

[128] CE-82 at 1.

[129] RE-173 at 1.

[130] RE-173 at 1.

Article 10.7(a) is whether their communications to Wind Telecom *at the time* were sufficiently clear and ominous as to require VimpelCom already to have "determined" that a quantifiable loss was "reasonably likely." There is no evidence that VimpelCom in fact formed any such conclusions during this time period, nor is the Tribunal prepared to condemn it for not having done so, simply on the basis of the Authorities' requests for information. Indeed, to posit otherwise – that VimpelCom was remiss in not concluding from these inquiries that a loss was "reasonably likely" – would assume the contrary of what OTMTI itself insists, namely that it should have been obvious to VimpelCom by this time either that there was no legitimate business rationale for the put arrangement, or that it was reasonably likely the Italian Tax Authorities would reject any contentions regarding such a legitimate rationale. The Tribunal sees no basis in the evidence for requiring VimpelCom to have made such determinations of a likely loss based on the Authorities' initial inquiries.

118.   This situation changed in late May 2013, however, when the Italian Tax Authorities presented Wind Telecom with a summary of a draft audit report, reflecting the Authorities' preliminary conclusions from the materials they had examined, together with a list of additional questions. The summary report, which was provided in draft on 22 May 2013 and in final on 31 May 2013,[131] cited Article 37-*bis* of Decree 600 (the Italian tax law provision applicable to anti-avoidance), and stated that the Authorities viewed the Wind Hellas derivative transactions as a "maneuver to avoid taxes … which … allowed [Wind Telecom] to achieve undue tax reductions."[132] This notice was sufficiently clear about the Authorities' intent as to trigger VimpelCom's duty to make a determination of the likelihood of loss and promptly notify OTMTI if it believed such loss to be reasonably likely.

119.   However, there is no reason to conclude that VimpelCom was tardy in making its internal determination, following its receipt of the Authorities' summary draft report in late May 2013. The record demonstrates that VimpelCom personnel informed the company's

---

[131] CE-25; CE-83; RE-175.
[132] CE-25.

Finance & Strategy Committee of the situation during June 2013.[133] This internal reporting step, generally required when company management become aware of a concrete or likely risk of exposure, is indicative of when VimpelCom made its own determination that a loss was reasonably likely in connection with the Wind Telecom Audit.

120. Importantly, VimpelCom's notification to OTMTI was *virtually contemporaneous* with the report to its own Finance & Strategy Committee. On 13 June 2013, VimpelCom notified OTMTI of the audit, both by phone and by email.[134] On 19 June 2013, VimpelCom formally asserted its right to indemnification pursuant to the SSEA.[135]

121. OTMTI objects, first, that it was not informed of the Italian Tax Authorities' inquiries during the roughly four months between 14 February 2013 (when the Authorities sent their initial document requests to Wind Telecom) and 13 June 2013.[136] But as discussed above, SSEA Article 10.7(a) in no way obligated VimpelCom to notify OTMTI of the *receipt* of government inquiries, nor of the *beginning* of an audit process, nor of the ongoing *progress* of any inquiry or audit. Had the contract required such notice, the Tribunal would have little difficulty accepting OTMTI's objection that it was not provided. But that is not what the provision says. Given the precise wording of Article 10.7(a), the Tribunal concludes that VimpelCom's notification of 13 June 2013 satisfied the rather minimal requirements of the provision, namely for prompt notice to OTMTI after VimpelCom "has determined" that a tax claim (other than one involving Italian Withholding Taxes) was "reasonably likely" to give rise to a right of indemnification under the SSEA.

122. OTMTI also complains about the limited degree to which VimpelCom *solicited and meaningfully considered its input* regarding a possible anti-abuse or anti-avoidance claim, between the 13 June 2013 notification and the Authorities' 17 July 2013 settlement offer on a different (transfer pricing) theory.[137] The record suggests that the Parties had a number of written exchanges and held a number of conference calls and meetings during June and

---

[133] CE-89 at 2.

[134] CE-84.

[135] CE-5.

[136] *See, e.g.*, SoDC ¶¶ 35-38, 190-191; Rejoinder ¶¶ 119-132.

[137] *See, e.g.*, SoDC ¶¶ 39-53; Rejoinder ¶¶ 133-140.

July 2013, including a significant meeting in Rome on 16 July 2013.  OTMTI contends, however, that VimpelCom did not alert it to any particular urgency during this period to reconstruct the business rationale for the put and call transactions, and in any event did not seem particularly interested in the explanations OTMTI attempted to provide, much less in including it directly in any discussions with the Italian Tax Authorities.[138]  As to these complaints, however, the Tribunal again emphasizes that the SSEA did not obligate VimpelCom to coordinate at all with OTMTI with respect to its dealings with the Italian Tax Authorities, other than for one specific type of audit – a withholding tax audit – addressed in Article 10.7(h)(i).  No similar coordination or consultation duties appear within Article 10.7(a).  In these circumstances, OTMTI's complaints about the wisdom of VimpelCom's not involving it earlier or more extensively in its consideration of the anti-abuse exposure cannot give rise to a valid claim for violation of contractual participation rights that did not exist.

123.  A final question regarding compliance with Article 10.7(a) arises with respect to a "reasonably likely" loss in connection with a settlement on *transfer pricing grounds*.  OTMTI complains that VimpelCom withheld from it for some time the fact that settlement was under discussion with the Italian Tax Authorities, and particularly that a settlement might be framed as involving transfer pricing charges.  The evidence regarding those settlement discussions is as follows.

124.  First, contemporary documents confirm that as of 8 July 2013, VimpelCom understood that "the Italian authorities are ready to issue an audit report" asserting liability for "€57 million in back taxes plus between 100%-200% in penalties plus interest," but "[t]he tax authorities have held off issuing their report to give Wind Telecom time to consider whether it will enter into non-binding settlement discussions."[139]  Outside counsel had advised VimpelCom that the audit report would be on anti-abuse grounds, and that Wind Telecom's "main strengths" in facing such a case were the absence of any direct evidence of tax motivations for the transactions, the fact that alternative structures were not available because of financial covenants, and that from the perspective of the Wind Group as a

---

[138] SoDC ¶¶ 39-53; Rejoinder ¶¶ 133-140.
[139] RE-160.

whole, there were valid business reasons to consolidate the Greek fixed and mobile operations. The corresponding "main weaknesses" were that "a tax court will consist of non-tax-experts, who may be more inclined to a substance over form argumentation," that as of this point the "business arguments" for some of the complex structures were "mere anecdotal" rather than supported by contemporaneous documentation, and that "[t]he reasons for certain decisions during the period 2007-2010 cannot (yet) be explained persuasively."[140] On balance, VimpelCom's Group Tax Department considered that the company "should be prepared to continue to appeal and litigate this issue, *unless* [the Italian Tax Authorities] would come up with a very generous proposal for settlement."[141] At the same time, outside counsel advised that "it is highly recommended to pursue this [*i..e.*, the possibility of a settlement] before the tax audit report has been issued (which is expected very soon)."[142] In terms of what might be considered acceptable parameters for settlement, VimpelCom's "tax team feels that a settlement in the range of 50%-75% of the back taxes without any penalties (and without accepting any criminal liability) would be a good deal."[143]

125.     Based on this assessment, Wind Telecom's outside counsel that day broached the possibility of settlement with the Authorities.[144] VimpelCom understood that the outreach proposal would track the recommendations from its tax team, namely that it "would potentially include" payment of "[b]ack taxes reduced to 50-75% of EUR 57m, [p]enalties reduced to zero; [l]ate payment interest on the reduced amount of back taxes; [and] [n]o notification to the public prosecutor."[145] It approved the outreach on the basis that its advisers "all seem to agree that it makes sense to speak with the tax authorities now before the report is issued" on a tax-avoidance basis.[146]

---

[140] RE-162, Annex at 4.

[141] RE-162, Annex at 4 (emphasis added).

[142] RE-162, Annex at 2.

[143] RE-160.

[144] RE-162.

[145] RE-162, Annex at 3.

[146] RE-160 at 1.

126.    However, at least as of 10 July 2013, VimpelCom had not yet received even "an initial feedback from [the Italian Tax Authorities] on their view of an out of court settlement."[147] VimpelCom thus considered it "far from clear that the tax authorities are anywhere near accepting this."[148]  In particular, VimpelCom considered it quite possible that the Italian Tax Authorities would decline to do so, as "it would mean that they are letting Wind Telecom realize part of the tax benefit from what they claim is an artificial scheme to generate such benefit."[149]  VimpelCom's concerns in this regard make clear that it believed the Authorities were still committed to an anti-avoidance theory of liability.  There is no evidence that VimpelCom at this time believed the Authorities had embraced any alternative theory such as transfer pricing.

127.    On 17 July 2013, the Italian Tax Authorities responded with a concrete settlement proposal, which indicated their willingness to resolve the issue at roughly the levels proposed – and apparently explained that they could do so by invoking an alternative transfer-pricing theory of liability.  Two days later, on 19 July 2013, VimpelCom notified OTMTI of the fact of the Authorities' proposal, the quantum of the proposed settlement (understood to total roughly €29 million, with no criminal prosecution), and the Authorities' statement that "this offer will not be available after 31 July 2013."[150]  On 25 July 2013, OTMTI responded that it understood the Italian Tax Authorities were "a few days away from completing [their] audit and issuing [their] report if this matter is not settled this week," but that "we are not in a position to comment" on the terms of the proposed settlement," and VimpelCom therefore would have to proceed at its own risk.[151]

128.    There are two separate components of a "notice" inquiry regarding these settlement developments.   The first is whether VimpelCom violated Article 10.7(a)'s notice requirement by not alerting OTMTI to Wind Telecom's overture to the Italian Tax Authorities, around 8 July 2013, about a possible settlement.  The evidence suggests that

---

[147] RE-162, Annex at 3.
[148] RE-160 at 1.
[149] RE-160 at 1.
[150] CE-28 at 1.
[151] CE-6 at 1-2.

by this time VimpelCom already had made certain general remarks to OTMTI about the possibility of engaging the Authorities in settlement talks, including during a 27 June 2013 conference call.[152]   It did not, however, subsequently disclose that in early July Wind Telecom raised the issue directly with the Authorities and floated proposed figures for their consideration.   In the Tribunal's view, VimpelCom's 8 July 2013 outreach necessarily reflects that by this time it had determined that a loss of at least this magnitude was "reasonably likely."   On the other hand, by this time OTMTI already was on notice of the potentially *higher* exposure threatened by the Authorities' anti-abuse theory, and it was not until the Authorities responded concretely on 17 July 2017 that VimpelCom could determine that the "reasonably likely" loss was now crystallizing around this lower amount. VimpelCom's notice to OTMTI two days later of the proposed settlement amount did not violate its obligation under Article 10.7(a) of prompt notice regarding the "amount" of a "reasonably likely" loss.

129.   The second component of the inquiry concerns the sufficiency of the *explanation* provided on 19 July 2013, regarding the Authorities' settlement proposal.   That notice did not specifically alert OTMTI that the proposed settlement was on a *transfer pricing theory*. The 19 July 2013 notice alluded only vaguely to certain "technical adjustments ... to the [Authorities'] report which get to the resulting settlement figures."[153]   OTMTI describes this as "a deliberately opaque mischaracterization."[154]   VimpelCom responds that it "had no contractual obligation to provide OTMTI with updates on the Italian tax authorities' evolving legal theories."[155]   However, the cases upon which VimpelCom relies for this proposition did not involve contracts that specified the required content of the relevant notice.[156]   By contrast, Article 10.7(a) expressly obligated VimpelCom to notify OTMTI

---

[152] V-PHB ¶ 69.

[153] CE-28 at 1.

[154] SoDC ¶ 141.

[155] Reply ¶ 83.

[156] *See* CLA-45, *E*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 378 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 119 (2d Cir. 2010) (indemnitee met contractual notice obligation, even without detailed description of nature of liability or specific breach asserted, because contract did not require more); CLA-72, *Thule AB v. Advanced Accessory Holdings Corp.*, 2010 WL 1838894, at *8 (S.D.N.Y. 2010) ("If the parties had wished to require greater specificity or formality" in providing notice, " they could have included such requirements in the agreement," and "[i]t is well established that unless otherwise specified by contract, no particular form of notice is required under New York law for an indemnitee's notice of claim to his indemnitor").

promptly not only that VimpelCom had made a "determination" of the *fact* of a "reasonably likely" loss and the projected "*amount*" of such loss, but also (to the extent possible) about the "*method of computation* thereof ... with reasonable particularity." This provision arguably did require VimpelCom to notify OTMTI promptly of a significant change in the legal theory underlying any "reasonably likely" loss.

130. In these circumstances, if VimpelCom had provided no prompt amplification of its reference in the 19 July 2013 communication to unspecified "technical adjustments," an argument could be made that it would have breached Article 10.7(a) by not alerting OTMTI to the "method of computation" of a loss that had become "reasonably likely" by virtue of the Authorities' 17 July 2017 settlement offer. However, the 19 July 2013 email specifically offered "a call to explain the technical adjustments," and proposed the next business day, 22 July 2013, "[i]n light of the ITA's settlement proposal and the limited timeframe we have in which to consider it." OTMTI asked for the call to be a day later, on 23 July 2013.[157] The call was held that day, and OTMTI's own witnesses confirm that at that time VimpelCom did explain that the proposed settlement would be on a transfer pricing theory.[158] In these circumstances, no breach of Article 10.7(a) can rest on the short delay between Wind Telecom's receipt of the Authorities' settlement proposal on 17 July 2013, VimpelCom's 19 July 2013 suggestion of a call with OTMTI to discuss that proposal, and the ensuing 23 July 2013 call in which the underlying theory was identified to OTMTI.

### (5)    *The Issue of Prejudice*

131. As discussed above, the Tribunal finds that there was no breach by VimpelCom in not notifying OTMTI before 13 June 2013 of a determination that a loss was reasonably likely with respect to the Wind Telecom Audit. As a result, it is not strictly necessary to explore OTMTI's argument regarding alleged prejudice from such an SSEA breach. Article 10.7(a) does not compel an inquiry into whether notice earlier than contractually required might have been *more prudent*, to facilitate VimpelCom's gathering of information for its

---

[157] CE-28 at 1.
[158] *See, e.g.*, Hupert II ¶ 19; V. Petrella I ¶ 27.

dealings with the Italian Tax Authorities.  It only asks whether OTMTI has been prejudiced by a *breach* of VimpelCom's legal obligations.  Absent such a breach, the issue of prejudice does not arise.

132.    For the avoidance of doubt, however, the Tribunal notes that, even if earlier notice to OTMTI of the Wind Telecom Audit had been contractually required, OTMTI has not met its burden of showing substantive prejudice caused by the intervening delay.  As explored in Section IV.C.5 above, OTMTI must show not simply that earlier notice would have enabled it to be more engaged in the process – as to which it had no procedural right under Article 10.7(a) – but rather that by doing so, it would have been able to offer concrete contributions that it was unable to offer later, which would have either eliminated Wind Telecom's exposure from the audit, or so substantially reduced that exposure as to render the decision to settle objectively unreasonable.

133.    OTMTI presents two principal arguments regarding such prejudice, one relating to the anti-avoidance/anti-abuse theory of liability and the other relating to the Italian Tax Authorities's eventual findings regarding transfer pricing liability.  With respect to the former, OTMTI's argument is that earlier notice to it of the Authorities' inquiries would have enabled Mr. Nasr and his colleagues to "reconstruct[] the precise steps of, and the reasons for such a complex series of transactions that had taken years earlier," which OTMTI describes as "a difficult and time-intensive task"[159] that could not be accomplished within the roughly four weeks it had between mid-June and mid-July 2013.  Had OTMTI been provided more time for this process, it contends, "VimpelCom would have learned, and then could have effectively explained to the [Italian Tax Authorities], that there were no legitimate grounds for an abuse-based assessment."[160]

134.    The Tribunal accepts on the present record that Mr. Nasr and his colleagues had *bona fide* business objectives, from the perspective of the *Wind Group as a whole*, in connection with the put and call structure it adopted in 2007.  There is no evidence in the record to suggest that in 2007 the Wind Group either already foresaw a significant risk that the Greek

---

[159] O-PHB ¶ 69.
[160] Rejoinder ¶ 148.

businesses could collapse, or planned the derivative transactions for the primary purpose of hedging against such a possibility, by enabling Wind Telecom to claim tax deductions at the parent company level in Italy to partially offset any future downturn in the Greek business at the level of its subsidiaries.

135.    The Tribunal also accepts that, given more time, OTMTI could have developed a *more thorough presentation* regarding the Wind Group's underlying business rationale for the derivative transactions, than the ones it presented to VimpelCom on 9 July 2013 and 14 July 2013 (in draft "structure papers" prepared by its outside counsel) and that the Parties thereafter discussed in Rome on 16 July 2013.  OTMTI's 9 July 2013 draft recognized that "[i]t is *crucial* to explain the business reasons underlying the put option agreement, which is a *key step* to avoid a potential challenge of the tax loss of Euro 207ML."[161]  OTMTI's 14 July 2013 draft updated this slide to criticize Wind Telecom/VimpelCom for not yet "effectively explain[ing]" those business reasons to the Italian Tax Authorities,[162] but at the same time it left placeholders for what explanation should be provided, including placeholders to (a) "*document* business rationale underlying the put and call, emphasizing reasons for timing and parties' mismatch," (b) to "*try to explain* rationale underlying call on matching terms as put," particularly from the perspective of Wind Telecom rather than the Wind Group as a whole; and (c) to "*[s]ee whether and to what extent* we can successfully articulate an argument that a deductible loss would have been realized anyhow in 2010 upon the ultimate disposal" of the underlying shares.[163]  VimpelCom emphasizes these placeholders, arguing that by the time of the Rome meeting, OTMTI had "identified no material arguments that had not already been raised – and rejected – by the Italian tax authorities."[164]  VimpelCom also argues that no further time was available beyond this point, given the strict 31 July 2013 settlement deadline imposed by the Italian Tax Authorities.  OTMTI responds that it had not been told of the urgency to complete its work by the time of the Rome meeting.[165]  In any event, OTMTI argues that if VimpelCom had

---

[161] RE-144, Annex at 2 (emphasis added).

[162] CE-27 at 2.

[163] CE-27 at 9, 17, 20 (emphasis added).

[164] SoC ¶ 162; Reply ¶¶ 88-92; V-PHB 6(c), 74-75, 103.

[165] Rejoinder ¶ 137; O-PHB ¶¶ 68-69.

informed it of the audit *earlier* than June 2013 – for example, in February when the Authorities first presented their document requests – it would have had far more time to review underlying records and supply the missing explanations.[166] The Tribunal assumes *arguendo* that this is the case.

136.    The real question, however, is whether such a fuller reconstruction (a) would have revealed something so materially different than VimpelCom already understood, (b) as to have enabled it to present a defense for Wind Telecom that would be so understandable and compelling, from the perspective of the Italian Tax Authorities and Italian tax courts (not from OTMTI's own perspective), (c) that either the Authorities would forgo any potential assessment on anti-avoidance grounds, or Wind Telecom would be assured success in a subsequent court challenge, without any risk of a worse outcome than the settlement terms. It is important to recall that Wind Telecom's ultimate exposure did not depend upon the Authorities finding a "smoking gun" document that would definitively prove an actual tax avoidance motive.   Rather, the expert evidence was that the Italian Tax Authorities could raise doubts about apparent motives, by identifying seeming "anomalies" of a transaction that resulted in tax benefits to which a taxpayer otherwise would not be entitled, and thereby shift the burden to the taxpayer to *disprove* an inference about tax avoidance motivations.[167]  In this context, the question of prejudice boils down to whether OTMTI has shown that its earlier involvement in the Wind Telecom Audit would have enabled VimpelCom and Wind Telecom to *disprove* any such inference, so clearly and certainly as to remove any reasonable exposure and therefore render the settlement decision objectively unreasonable.  As to this question, OTMTI has not sustained its burden.

137.    First, the arguments that OTMTI states it would have presented more fully, had it been given earlier notice, are essentially amplifications on those that Wind Telecom presented in shorter form to the Italian Tax Authorities.  OTMTI's explanations of the business rationale for the derivative transactions were focused heavily on the objectives of the Wind Group as a whole, in particular the importance to it of consolidating the Greek fixed and mobile telecommunications businesses, while providing additional protection to lenders

---

[166] Reply ¶¶ 136, 148; O-PHB ¶¶ 67-71.

[167] *See generally* Hearing Tr. (3) 1008-1009 and (4) 1086, 1214-1215 (Maisto).

who otherwise could have blocked the consolidation through financial covenant restrictions on Wind Hellas.[168]  While the Tribunal has no doubt that OTMTI could have forcefully defended these objectives, they are not materially different points than Wind Telecom itself provided to the Italian Tax Authorities.[169]

138.  Second, these arguments were heavily focused on the business objectives of the Wind Group *as a whole*, and not the specific advantages to *Wind Telecom* – the Italian entity of most interest to the Italian Tax Authorities and Italian tax courts – of granting the put option to its subsidiary at no premium.  As of 2007 when the derivative structure was created, it was capable of generating only tax losses (and never taxable gains) in Italy, since any share value increases would benefit Wind Hellas in Greece, not Wind Telecom in Italy.[170]  The new call option in February 2009 did not change this by creating any realistic upside for Wind Telecom, particularly in light of the already impending collapse of the Greek market.  There were other seeming anomalies in 2009, including (a) a February 2009 increase in the strike price of the put option, at a time when the underlying share value already was falling, and (b) Wind Telecomunicazione's decision not to exercise its put option at the end of 2009, despite Wind Hellas already being in default (which would not have afforded any tax benefits for its parent Wind Telecom), but instead to wait until 2010, after Wind Telecom first devalued the derivative on its year-end 2009 balance sheet (which created the tax-deductible "financial" loss).  These factors were likely to increase suspicion by the Italian Tax Authorities, and eventually the Italian courts, even if OTMTI might have been

---

[168] Rejoinder ¶ 136 (identifying these as "the business considerations that drove the structure and execution of the Challenged Transactions, and explain the business rationale for the Challenged Transactions that VimpelCom and Wind Telecom could have and should have relied upon to prevent or defeat any abuse-based assessment, if only they had timely obtained the pertinent facts from OTMTI"); *see also* Rejoinder ¶¶ 152-158 (explaining that the put/call transactions were designed to achieve the Wind Group's goal of consolidating the fixed and mobile Greek telecommunications businesses while providing additional protection to the Wind Group's lenders).

[169] *See, e.g.*, CE-81 at 1 (explaining on 3 April 2013 that the 2007 transactions were "designed to concentrate fixed and mobile telephony under a single operator"); CE-85 at 4, 7 (explaining on 14 June 2013 that Wind Hellas did not have the financial capability to acquire Wind Telecommunicazione's stake in the Greek businesses directly, and that the put option was designed to solve this dilemma and "avoid[] … the transfer of resources outside of the [Wind Hellas Group]").

[170] *See, e.g.*, G. Petrella ¶ 36 (OTMTI's expert confirming that "if the Underlying Asset would appreciate, the call option would expire in-the-money and Wind Hellas *only* would make a profit; if the Underlying Asset would appreciate, the Put Option would expire-in-the-money and Wind Telecom *only* would make a loss").

able to articulate further explanations as it now claims.[171]   At the most basic level, the Italian Tax Authorities likely still would have been skeptical of a series of inter-company transactions resulting in a €57 million tax benefit that Wind Telecom "*would not have gotten but for a put [and] call arrangement with its subsidiaries.*"[172] That inescapable reality underpinned the concerns about a "serious risk of liability" which were being conveyed to VimpelCom at the time by both its internal tax department and its external counsel.[173]

139.   Third, earlier OTMTI involvement would not have removed the *practical* challenges Wind Telecom would have faced had an anti-avoidance claim proceeded to court.   These included the fact that its explanations regarding legitimate business rationales would have been heavily reliant on after-the-event witness statements, rather than contemporaneous documents from 2007 and 2009 that directly memorialized Wind Telecom's thought processes.   Even with the additional years available to develop this case for arbitration, OTMTI was not able to locate any such contemporaneous written explanations.   The expert evidence was that Italian courts are skeptical at best of written witness statements by a taxpayers' personnel, seeking to supply explanations for which there is limited contemporaneous corroboration.[174]   The complexity of the derivative transactions also would remain a challenge, in a system in which (a) tax court judges are not specialists in sophisticated financial instruments;[175] (b) they are known to be suspicious of complicated transactions between related companies which yield substantial tax benefits;[176] and (c) hearings for parties to try to persuade judges who remain skeptical based on written

---

[171] *See, e.g.,* Rejoinder ¶ 172 (addressing the 2009 strike price recalculation) and ¶ 173 (contending that "[i]t was not until early 2010 … that the Weather group saw the first evidence that the business's value could be reduced to zero").

[172] RE-160 at 1 (emphasis added).

[173] RE-160 at 1.

[174] *See generally* Hearing Tr. (3) 993-997 and (4) 1090-1091 (Maisto).

[175] *See generally* Maisto ¶¶ 88, 158; Hearing Tr. (3) 977-78 and (4) 1229 (Maisto); Hearing Tr. (4) 1400-1401 (Manzitti).

[176] *See generally* CE-88 at 2 (contemporaneous legal advice to this effect); Cisternino II ¶ 32; Maisto ¶ 188; Hearing Tr. (4) 1227-1228 (Maisto).

submissions are generally limited to 30 minutes or less of counsel argument, without any opportunity for fact witnesses to provide live explanations.[177]

140.     Given these practical constraints, the Tribunal is unable to conclude that earlier notice to OTMTI of the Authorities' interest in the transactions *necessarily* would have allowed it to dissuade the Authorities even from pursuing an anti-avoidance claim, or *necessarily* would have enabled Wind Telecom to prevail in defending such a claim before the Italian tax courts.   Put most plainly, OTMTI did not have a "secret weapon" that could have rendered Wind Telecom absolutely confident of a "knockout blow."   In these circumstances, OTMTI has not met its burden of demonstrating prejudice from any arguable late notice.   It has not shown that earlier notice would have enabled it to guide Wind Telecom to an outcome in which it assuredly "would have prevailed if it had challenged the assessment in litigation," which is what OTMTI in this case contends.[178]

141.     Nor has OTMTI demonstrated that its earlier involvement would have ensured that Wind Telecom could litigate its defenses with "no downside risk" of a worse outcome than it achieved through its decision to settle with the Authorities.[179]   The Italian law experts differed in their views of the likelihood of penalties attaching to an anti-abuse finding,[180] and the Tribunal concludes that Wind Telecom's potential exposure to such penalties was not a settled question.   It is unclear how OTMTI's earlier involvement would have resolved this uncertainty.   More fundamentally, even in the theoretical absence of *any* risk of court-imposed penalties, litigation of an anti-abuse claim still would have been a fight over €57 million in back taxes plus interest on that amount, continuing to accumulate during the significant length of the court proceedings.   This is self-evidently a greater exposure than the €31.3 million (inclusive of all interest and penalties) that Wind Telecom agreed to pay through its settlement tied to an alternative theory of a transfer pricing violation.

---

[177] *See generally* Hearing Tr. (3) 975-976 and (4) 1093, 1228-1229 (Maisto); Hearing Tr. (4) 1250-51, 1307 (Manzitti).
[178] O-PHB ¶ 90.
[179] O-PHB ¶ 49.
[180] *Compare* Manzitti I ¶¶ 31-33, 90 and Manzitti II ¶¶ 101 (contending that under Italian law penalties will not be imposed if a violation was committed in the context of "objective conditions of uncertainty" about the extent and scope of the relevant tax code provisions) *with* Maisto ¶ 89 and Hearing Tr. (3) 1022 (contending that Italian courts generally do not lift penalties in anti-abuse cases).

142.    This brings the Tribunal to OTMTI's second main argument regarding prejudice, which involves the alternative transfer pricing theory.  OTMTI contends that earlier notice to it of the audit would have enabled it to prevent Wind Telecom from making a "mistake" in the description of the call option, which allegedly prompted the Italian Tax Authorities to claim a transfer pricing violation.  As to this argument, OTMTI's burden is to show not just that (a) Wind Telecom made such a mistake, and (b) that a more accurate description would have eliminated all risk of liability under a transfer pricing assessment, but also that (c) this would have eliminated the risk of the Italian Tax Authorities proceeding against Wind Telecom on the *original* anti-abuse theory.  OTMTI's arguments focus on the first and second issues, while doing little to address the third.

143.    Specifically, OTMTI argues that, if Wind Telecom had emphasized that Wind Telecom and not Wind Hellas held the call option from February 2009, the Italian Tax Authorities could not have pursued a transfer pricing theory, because this replacement eliminated the cross-border component of the 2007 structure, which was an absolute prerequisite for any transfer pricing claim.[181]  VimpelCom responds, first, that Wind Telecom *did* provide the Authorities with the correct information about the holder of the call option in 2009.[182]  The evidence partially supports this contention.  On 3 April 2013, Wind Telecom told the Authorities that the 2007 call option had been "modified …, providing for [Wind Telecom] to be able to exercise it" on the shares owned by Wind Telecomunicazione.[183]  The Agenzia's 31 May 2013 questionnaire acknowledged this notification, stating that in 2009 "[Wind] Telecom and Wind Telecomunicazione modified the Put/Call option."[184]  OTMTI criticizes Wind Telecom for using the word "modified," when the precise sequence was that the 2007 call option was terminated in September 2008 and a new call option agreed in February 2009.[185]  It is not clear, however, why the distinction between a direct modification (on the one hand) and a termination followed by replacement after a few months' gap (on the other) would have been so crucial as to change the Authorities' views.

---

[181] SoDC ¶¶ 7, 39, 61, 183; Rejoinder ¶¶ 3, 141, 179-181; O-PHB ¶¶ 76-77.
[182] Reply ¶ 10, 92.
[183] CE-81 at 2.
[184] CE-85 at 6.
[185] *See, e.g.,* O-PHB ¶ 76.

Wind Telecom *did* explain the main point on 3 April 2013, namely that the *party* holding the call option in 2009 was Wind Telecom and not Wind Hellas as originally structured in 2007.  On the other hand, Wind Telecom missed an opportunity to expand on this issue in its later 14 June 2013 response to the questionnaire, which asked (*inter alia*) for an explanation of "the economic reason that drove Weather Investment S.p.A. [Wind Telecom] to accept this modification."  Wind Telecom's response focused on the reasons the put option had been modified, not why the call option was reissued to Wind Telecom rather than Wind Hellas.[186]

144.   It is also true that Wind Telecom and VimpelCom did not invoke the absence of a cross-border element in the 2009 call option as part of a reasoned and vigorous defense to transfer pricing liability.[187]  VimpelCom contends that this would not necessarily have eliminated exposure, as the Italian Supreme Court at the time (prior to a 2015 regulatory change) had ruled that transfer pricing principles could apply even in domestic abuse cases.[188]  More fundamentally, VimpelCom argues that the question of exposure from a transfer pricing claim was purely academic, because the transfer pricing theory was merely a convenient means to an end – a tool that provided the Italian Tax Authorities with flexibility to conclude a settlement at a lower figure than they could have offered under the anti-abuse theory that the Authorities otherwise were determined to pursue.[189]

145.   The Tribunal accepts, first, that this was VimpelCom's contemporaneous understanding of the Italian Tax Authorities' position:  it is reflected in management's 25 July 2013 memorandum to the Supervisory Board, which recounted that "[i]f the offer is not accepted, the ITA asserts that it will proceed with issuing the audit report and attempting to collect the €57 million it claims is owned, plus additional penalties and interest.  The ITA has also stated that it will forward its audit to the Italian criminal prosecutor…."[190]  The reference to €57 million in back taxes, and to possible criminal prosecution, clearly denotes a threat

---

[186] CE-85 at 6.

[187] SoDC ¶¶ 61-63, 186; O-PHB ¶ 78; Rejoinder ¶¶ 179, 186-189.

[188] V-PHB ¶ 205 (citing the testimony of Prof. Maisto).

[189] Reply ¶ 10, 107, 110, 114-115; V-PHB ¶¶ 76, 109-113.

[190] CE-89 (Revised) at 2.

by the Authorities to proceed on the anti-abuse theory, not on the transfer pricing theory. There is no evidence suggesting that the Authorities had *not* made such a threat, or that it was an entirely empty threat because in reality, the Authorities already had "abandoned" any interest in an anti-abuse claim, which is what OTMTI contends.[191]

146.    In the absence of such evidence, the Tribunal cannot conclude that earlier notice to OTMTI would have eliminated any exposure to VimpelCom, even if OTMTI (as it contends) could have successfully forestalled a transfer pricing charge.  If the result of doing this simply would have been that the Italian Tax Authorities maintained their threat of a higher value anti-abuse charge, it follows that OTMTI has not demonstrated any substantive prejudice to it from VimpelCom's alleged failure to involve it more fully in the description of the call option, or to involve it in discussions with the Authorities about the validity of any transfer pricing assessment.

147.    For these reasons, the Tribunal concludes that earlier notice to OTMTI would not have enabled OTMTI to eliminate all potential Wind Telecom exposure from the Wind Telecom Audit or from any tax assessments the Authorities might make as a result of that audit.  So long as the exposure remained, VimpelCom is entitled to discretion under New York law in weighing the risks and benefits of having Wind Telecom settle rather than litigate. As discussed in Section IV.C above, this discretion is subject only to the deferential New York standard that the settlement itself must have been "reasonable," and to VimpelCom's separate duty to mitigate foreseeable losses, which are discussed further below.

### (6)    *Reasonableness of Settlement*

148.    As discussed in Section IV.C, under the legal framework applicable to this case, OTMTI is responsible to indemnify VimpelCom for its contractual share of settlements entered into in good faith, unless VimpelCom failed to comply with applicable notice requirements and such failure demonstrably prejudiced OTMTI – but only to the extent that VimpelCom's decision to settle, and the terms of the resulting settlement, were *objectively unreasonable*. The question of reasonableness revolves around whether "there was [a] possibility that

---

[191] SoDC ¶¶ 46, 196; Rejoinder ¶ 192; O-PHB ¶ 59; *see also* Rejoinder ¶ 184 (contending that the Authorities "ultimately conceded" the transactions were not abusive).

litigating the case to the end would result in a judgment … in an amount greater than the settlement,"[192] meaning that the settlement was within the range of possible exposure the indemnitee *might* have faced.[193]

149.   In this case, the Tribunal concludes, for the reasons discussed generally in Section IV.D.5 above, that there was a possibility VimpelCom would not have been successful in defending against an assessment brought against Wind Telecom on tax avoidance grounds. While it is easy in hindsight for OTMTI to argue that Wind Telecom "would have been fully able to rebut" any challenge on that basis,[194] VimpelCom has demonstrated sufficient doubts about the outcome in the Italian courts as to make such success, at minimum, far from a foregone conclusion.  There were disagreements between the Parties' Italian law experts regarding the probabilities of litigating, but it is unnecessary for this Tribunal to determine which experts were more correct regarding the odds of success or defeat.  It is also unnecessary to determine whether VimpelCom should have been less risk-averse in facing these odds, as OTMTI contends that it would have been in similar circumstances. The whole purpose of an indemnification agreement is to avoid having to retry the theoretical merits of a third party claim, so long as the decision to settle was within a zone of objective reasonableness.  The contemporaneous legal advice that VimpelCom received, from its internal and external tax counsel, was that there were cognizable risks of proceeding to court.  The Tribunal is unable to conclude that this was self-evidently untrue.

150.   Second, the Tribunal concludes (as discussed in Section IV.D.5) that there could have been downsides to insisting on litigation.  The Tribunal is not convinced that the Italian Tax Authorities necessarily had abandoned all intention to proceed on a tax avoidance theory, and indeed, the contemporaneous evidence is that they affirmatively *insisted* they would proceed on this basis absent a settlement.[195]  In these circumstances, there is no need to resolve the disputed question whether the cost of losing a *transfer pricing* case in court would have been higher than the cost of settling a transfer pricing case, based for example

---

[192] CLA-8, *Deutsche Bank*, 74 A.D.3d at 43.
[193] *See, e.g.*, CLA-12, *Koch Industries*, 727 F. Supp. at 222-223, 225; CLA-18, *Tokio Marine*, 803 F. Supp. 2d at 203; CLA-22, *Waltz*, 378 F. Supp. 2d at 442; CLA-13, *OneBeacon*, 2006 WL 3771010, at *10.
[194] O-PHB ¶ 23.
[195] CE-89 (Revised) at 2.

on the possibility of penalties.  The starting point for a case on *tax avoidance* grounds would be a higher level of back taxes (€57 million) than the total settlement amount of €31.3 million.  Moreover, the litigation process would have required Wind Telecom to pay a deposit of at least one-third of the assessed amount (€19 million) simply to get to a court of first instance, and twice that (€38 million) if there was a need to appeal;[196] these sums would remain unavailable to the company for years.[197]  Meanwhile, interest would accrue on the unpaid portion of back taxes at substantially above market rates.[198]  Finally, the evidence was that a taxpayer who loses in the courts must pay not only the entire assessment with interest, but also a significant "tax collection fee," which ranged at the time between 4.65% and 8% of the overall taxes, penalties and interest.[199]  Settling avoided exposure to this additional amount.  All told, VimpelCom contemporaneously estimated that its potential exposure from not settling would be *at least* €114 million, and could be "significantly higher."[200]  The sheer magnitude of these figures reasonably justified VimpelCom in adopting a risk-averse stance, given the enormous consequences to the company of otherwise making a mistake in judgment.

151.   Finally, the fact that the Italian Tax Authorities continued to threaten referral of a tax avoidance case to criminal prosecutors cannot be disregarded.[201]  VimpelCom's outside counsel had advised that "violations of this kind … are generally sent also to the criminal prosecutor's office,"[202] and management considered this threat to the security of Wind Telecom's officers and directors to be "*most important*[]" in their decision to recommend settlement.[203]  While OTMTI now contends that this was an empty threat, it was not OTMTI's personnel who would suffer the resulting fear and damage to reputation if

---

[196] CE-88 at 2; Hearing Tr. (4) 1291 (Manzitti).

[197] OTMTI's own expert testified that it could take from six to twelve years for a tax case to reach the Italian Supreme Court.  Hearing Tr. (4) 1289 (Manzitti).

[198] V-PHB ¶ 161.

[199] Maisto ¶ 8.

[200] CE-89 (Revised) at 1.

[201] CE-89 (Revised) at 2.

[202] CE-88 at 1.

[203] CE-89 (Revised), Annex at 3-4 (emphasis added).

prosecutors determined to try to press charges.  The Tribunal is unable to conclude that VimpelCom was unreasonable in taking this concern heavily into account.

### (7)     *Mitigation of Loss*

152.    As discussed in Section IV.C.6, even in the event of an otherwise reasonable settlement, OTMTI may seek to demonstrate under Article 10.7(f)(C) of the SSEA that it should not be held liable for indemnification "with respect to a Loss or the increased portion of a Loss," because VimpelCom "had not, upon learning of the situation giving rise or likely to give rise to a Loss, used or caused entities of its Group to use, all reasonable efforts to mitigate the corresponding Loss."  The reference to mitigating a "situation … likely to give rise to a Loss" means that VimpelCom had a duty to exercise due diligence in preventing foreseeable future loss, once it is has determined that such loss is likely.  This general mitigation duty did not alter the contours of the Parties' specific agreements regarding the required level of notice and participation in regard to third party claims, nor did it amount to a duty to litigate or a duty to be more aggressive in settlement negotiations, within a range of reasonable approaches.  However, it did require VimpelCom to take reasonable steps to conduct a *bona fide* evaluation of its potential liability, involving reasonable efforts of inquiry into the legal and factual bases, and to assess its options with reasonable care.  Because mitigation is an affirmative defense, OTMTI bears the burden to identify specific steps in this regard that VimpelCom should have taken but did not, and to show that such steps would have eliminated or materially reduced the Losses without at the same time creating significant additional risks.

153.    OTMTI's arguments regarding mitigation fall into three basic categories.  First, it argues that VimpelCom failed to mitigate its Losses by involving OTMTI earlier in the Wind Telecom Audit, which OTMTI contends would have revealed valid defenses to liability that VimpelCom failed to assert.[204]  Second, OTMTI argues that VimpelCom made certain affirmative mistakes in its dealings with the Italian Tax Authorities, which allowed them to seize on a transfer pricing theory OTMTI contends otherwise would have been facially

---

[204] *See, e.g.,* SoDC ¶¶ 181-182, 184-185; Rejoinder ¶¶ 147-179, 186-195.

invalid.[205]   Finally, OTMTI argues that, even after accepting to settle in principle, VimpelCom failed to take reasonable steps regarding the calculation of settlement amounts, with respect both to the core theory of liability (the absence of an appropriate premium for the put option) and the computation of interest.[206]   The Tribunal examines these three issues in turn.

154.   First, to the extent OTMTI is arguing that a *failure to notify* OTMTI earlier or to involve it more systematically was itself a violation of the duty to mitigate,[207] this is inconsistent with the notion that a general mitigation obligation cannot override specific contractual agreements regarding required notice and participation.   OTMTI's argument seeks to rewrite the Parties' contract by introducing, through the "mitigation" clause, the very same types of notice and cooperation options that the carefully negotiated contract did not provide for this type of tax exposure.   However, in principle VimpelCom could still be liable for a *failure to reasonably investigate and evaluate* the Authorities' claims, if OTMTI can demonstrate that (a) by omitting specific additional steps, the resulting inquiry fell below a reasonable level of diligence, and (b) the consequence of this inadequate diligence was a failure to discover clearly successful defenses, in light of which VimpelCom would have no reasonable discretion to settle instead.   These are difficult hurdles to meet, and the Tribunal concludes that OTMTI has not met them.

155.   OTMTI contends, for example, that VimpelCom should have ensured a timelier interview with OTMTI personnel, including principally Mr. Nasr, who OTMTI suggests was essential to any proper understanding of the challenged transactions.[208]   The Tribunal accepts that Mr. Nasr had the most direct involvement in the design of the derivative structure, and that in hindsight VimpelCom might have benefited from his earlier involvement.   But it is a large leap from this to concluding that the investigation Wind Telecom and VimpelCom conducted prior to soliciting OTMTI's input fell below reasonable levels of due diligence.   VimpelCom conferred with a number of current and

---

[205] *See, e.g.,* SoDC ¶¶ 183; Rejoinder ¶¶ 180-184.

[206] *See, e.g.,* O-PHB ¶¶ 81-83 (premium); Rejoinder ¶¶ 196-197 and O-PHB ¶ 86 (interest).

[207] *See, e.g.,* SoDC ¶ 7 (Vimpelcom's failure to mitigate "principally resulted from VimpelCom's breach of its obligation … to 'promptly' notify OTMTI of the audit"); SoDC ¶ 181; Rejoinder ¶¶ 145, 146(a), 147.

[208] *See, e.g.,* Rejoinder ¶ 127; O-PHB ¶ 69.

former Wind Telecom personnel whom it believed to have relevant knowledge (including but not limited to Mr. Shalaby, the Wind Group's General Counsel at the time of the transactions), and it made efforts to gather and review documents available to the Wind Group.[209]  An acquirer of a company does not violate its diligence obligations by focusing first on the resources most readily available to it, within the acquired company, before reaching out to the personnel of the former owner.  Moreover, OTMTI still had a full month to involve Mr. Nasr after receiving notice of the audit in mid-June 2013 and before the Rome meeting in mid-July.  The fact that this time proved insufficient for Mr. Nasr to "reconstruct[] the precise steps of, and the reasons for such a complex series of transactions that had taken years earlier"[210] does not render VimpelCom's procedures patently unreasonable.  Finally, as discussed in Section IV.D.5 above, OTMTI has not demonstrated that a fuller reconstruction of events, enabled by earlier consultation with Mr. Nasr, would have unearthed additional information that was so compelling as to eliminate all possible exposure to Wind Telecom from the audit, particularly the threatened tax avoidance claim. In these circumstances, OTMTI has not demonstrated that any delay in involving it (or Mr. Nasr) in the inquiry was the ultimate cause of the "Loss" (*i.e.*, the settlement).  This causation element is critical to the affirmative defense of a failure to mitigate.

156.   The same analysis pertains to OTMTI's criticism that VimpelCom was too hasty in responding to the questionnaire the Agenzia sent in late May 2013, with its summary draft audit report.  OTMTI argues that under the applicable rules, Wind Telecom could have taken 60 days to respond, but instead it responded in two weeks, on 14 June 2013 (the day after notifying OTMTI of the audit).[211]  VimpelCom contests that reading of the applicable rules, contending that the Italian Tax Authorities could have issued an audit report "at any time."[212]  Indeed, VimpelCom's outside tax counsel considered it "very likely that [the Authorities] would do so very soon," given that they "were clearly convinced that the Wind Hellas Transactions were executed for tax avoidance purposes."[213]  He explains that he

---

[209] *See, e.g.*, Cisternino II ¶¶ 4-5 (detailing efforts).

[210] O-PHB ¶ 69.

[211] SoDC ¶¶ 37-38; Rejoinder ¶ 131.

[212] Cisternino II ¶ 11.

[213] Cisternino II ¶¶ 11, 13.

believed it to be "crucial to respond to the [Authorities'] requests as soon as possible," to try to "influence [their] internal deliberations."[214]

157.    In general, the Tribunal accepts that, throughout the audit, the Authorities used short deadlines to ratchet up the pressure on Wind Telecom.  It is difficult to condemn VimpelCom in hindsight for reacting to the pressure thereby created.  More importantly, the Tribunal is not convinced that taking more time to complete the questionnaire would have fundamentally eliminated Wind Telecom's exposure from the audit.  The Italian Tax Authorities by this time already had reached a preliminary conclusion that the derivative transactions were a "maneuver to avoid taxes ... which ... allowed [Wind Telecom] to achieve undue tax reductions."[215]    OTMTI has not demonstrated that insisting on additional time to respond to the questionnaire would have enabled Wind Telecom to include such qualitatively different information in its response as to necessarily satisfy the Authorities' considerable suspicions.

158.    As to OTMTI's complaint that VimpelCom rushed in mid-July 2013 to accept the Authorities' settlement offer,[216] the evidence is that the Authorities stated they had "finalized their analysis" and were "ready to issue the tax report."[217]  The Authorities also presented the offer as a take-it-or-leave-it proposal that would expire by 31 July 2013, a position that VimpelCom contemporaneously shared with OTMTI.[218]  It was rational – and certainly not patently unreasonable – for VimpelCom to believe the Authorities' statement in this regard.  In these circumstances, the Tribunal cannot conclude that VimpelCom fell below any reasonable level of diligence in deciding to accept the offer within the time period demanded, rather than declining to do so in the hope that continued investigation might reveal defenses so compelling as to eliminate any possible future exposure greater than the amount for which VimpelCom agreed to settle.

---

[214] Cisternino II ¶¶ 11, 13.

[215] CE-25.

[216] See, e.g., O-PHB ¶ 49.

[217] CE-88 at 1.

[218] CE-88 at 3; Hearing Tr. (2) 553 (V. Petrella).

159.   OTMTI's second category of mitigation arguments involves alleged affirmative mistakes by VimpelCom, in its discussion of the put and call structure, that allowed the Italian Tax Authorities to use the transfer pricing theory as the basis for the settlement proposal. OTMTI's criticism of Wind Telecom's description of the call option is essentially one about negligence, not deliberate misconduct:  it describes VimpelCom as providing the Authorities with "mistaken information,"[219] as having "bumble[d] its way" into suggesting the basis for a transfer pricing assessment,[220] as having committed an "error" that it later failed to correct,[221] and as having made "missteps,"[222] all of this related to not sufficiently explaining the elimination of the cross-border component when the call option was replaced in 2009.  As discussed above, VimpelCom argues that it made no such mistakes, citing its 3 April 2013 statement to the Authorities that the 2007 call option had been "modified …, providing for [Wind Telecom] to be able to exercise it" on the shares owned by Wind Telecomunicazione.[223]   However, even if one were to accept that VimpelCom misused the word "modif[y]" and did not emphasize the significance of Wind Telecom's holding the 2009 call option, this would not suffice to meet OTMTI's burden on its affirmative defense to indemnification.  The obligation to take reasonable steps to mitigate losses does not equate to a requirement to make no errors in an appreciation of facts or an evaluation of law, such that any later proof of a mistake or failure to raise an argument obviates a contractual right to indemnification.  Moreover, as the Tribunal discussed in Section IV.D.5, the evidence demonstrates that VimpelCom understood at the time that the Authorities were using the transfer pricing theory as a tool to propose a settlement at a lower level of payment than they could have offered under an abuse or avoidance theory, and that the Authorities expressly threatened to proceed with an assessment on the latter basis if the settlement offer was not promptly accepted.  In these circumstances, and given the Tribunal's conclusion that Wind Telecom was not without some remaining exposure on an anti-avoidance charge, OTMTI has not made the required *causal connection* between

---

[219] Rejoinder ¶ 146.
[220] Rejoinder ¶ 185.
[221] O-PHB ¶ 38.
[222] O-PHB ¶ 41.
[223] CE-81 at 2.

VimpelCom's alleged "mistake" and its sustaining a "Loss" within the scope of the SSEA's indemnification requirement.

160.    Finally, OTMTI argues that VimpelCom failed to mitigate losses by challenging the Authorities' calculation of the settlement amounts, both as to any hypothetical premium for the put option and as to the computation of interest. With respect to the former, the Tribunal accepts that neither the Authorities nor VimpelCom engaged in a rigorous evaluation of an appropriate premium, precisely because the transfer pricing theory was simply a tool to justify settlement at a figure that had been determined independently of such calculations. The evidence shows that VimpelCom was the one that first floated the idea of settling at repayment of roughly 50-75% of the €57 million in tax savings that Wind Telecom had achieved through the derivative transactions. [224] The Authorities' concrete proposal of 17 July 2013 simply placed this notion within a convenient analytical framework. In these circumstances, and given the Authorities' express threat to revert to an anti-abuse charge if the proposal was not promptly accepted, it was unlikely that any response by VimpelCom insisting on a more rigorous valuation of a hypothetical premium would have "mitigated" the broader exposure.

161.    With respect to the interest component, the evidence does show that the Authorities' 26 July 2013 calculations increased the overall settlement amount by €1.6 million, by raising the interest component beyond the level VimpelCom previously had understood would be due. OTMTI argues that VimpelCom itself believed the higher figure was in error, because the Authorities had calculated interest from 2010 rather than 2012, the date on which Wind Telecom could first use its earlier tax deduction to offset tax gains. The evidence supports this point, demonstrating that VimpelCom considered the Authorities' calculation to be wrong.[225] However, the evidence also shows that VimpelCom did push back on this basis, with its counsel reporting that "we had a *tough discussion* with them." Counsel reported that the Authorities nonetheless "are *immovable*" because the calculation "comes from their

---

[224] RE-162, Annex at 3.

[225] RE-196 ("[w]e disagree with the [Authorities'] computation … Their computation starts from 2010 instead of 2012 (the date of the real use of the losses and therefore the date of the lower payment of taxes.)").

system," and "[u]nfortunately I *do not have the chance* to do more."[226] Based on this advice from counsel, VimpelCom management reported internally that "we have pushed this and we are told there is no way to change it."[227] In these circumstances, the Tribunal cannot find a failure to take reasonable steps to mitigate losses. While mitigation may have required VimpelCom to raise arguments with the Authorities against their calculation of interest, it does not require that such efforts be successful. Nor does it require that VimpelCom refuse to give in on the point in the face of the Authorities' resistance, with the possible result of jeopardizing the broader settlement then just days away from the Authorities' expressed final deadline.

162. At a broader level, the Tribunal observes that the decision to settle itself can be seen as a form of mitigation. It is clear that the Parties had different views of the strength of the Authorities' claims and of Wind Telecom's potential defenses, as well as different levels of risk-aversion, but also that both Parties' views and attitudes were formed in good faith. This happens in many cases. However, the fact that an indemnitor may be less risk-averse than an indemnitee does not obligate the latter to adopt the former's views and therefore take its chances in court, particularly where the indemnitee retains significant direct exposure. That was the case here, given VimpelCom's residual 27.35% of liability and OTMTI's express notice that it would not willingly pay the other 72.65%. These factors ensured that VimpelCom had a continuing motivation to act in a reasonable manner to mitigate losses, and it chose to do so by a path that capped both Parties' exposure through settlement, rather than risking what it believed in good faith to be significantly higher exposure through litigation. Had it done otherwise and subsequently lost in court, OTMTI equally could have accused VimpelCom of failing to mitigate by not accepting the earlier settlement offer. In these circumstances, the Tribunal is unable to conclude that either the mitigation requirement in the SSEA, or general mitigation duties under New York law, imposed a duty on VimpelCom to contest the Authorities' claims more aggressively than its own good faith judgment, and the contemporaneous legal advice it received from counsel, suggested was warranted.

---

[226] RE-196 (emphasis added).
[227] RE-196.

### E.     The WAHF Audit Claim

#### (1)     Background on the Transactions and the Audit

163.     The second audit at issue concerns the non-application of withholding taxes on the interest that WAHF, a Wind Telecom subsidiary, paid in 2009 in connection with certain inter-company loans.   In December 2006, WAHF took out "payment in kind" loans in the amount of US$500 million and €1.35 billion (the "**2006 PIK Loans**") from an affiliate in Luxembourg (Wind Acquisition Holdings Finance S.A., or "**WAHF Luxembourg**"); WAHF Luxembourg had borrowed the funds to make the 2006 PIK Loans from lenders based outside of Italy.   WAHF guaranteed WAHF Luxembourg's loans from the lending banks.   When WAHF repaid the 2006 PIK Loans in 2009, WAHF Luxembourg in turn repaid the matching principal and interest on its loans to the foreign lenders.[228]   WAHF did not apply withholding taxes in Italy on the interest paid to WAHF Luxembourg, on the basis that these were inter-company loans.   WAHF Luxembourg claimed exemption from withholding taxes in Luxembourg, under that country's tax laws which exempted outbound interest payments from withholding tax.[229]

164.     On 17 September 2013, the Italian financial police (the Guardia) notified WAHF of an audit regarding its non-payment of withholding taxes for the loan interest paid in 2009.[230] Following certain additional inquiries, document requests and discussions, on 19 December 2013 the Guardia issued an audit report concluding that the non-payment of withholding taxes was improper.   Had WAHF borrowed funds directly from the foreign banks, it would have been liable for withholding taxes in Italy, but instead, the Guardia concluded, WAHF Luxembourg was interposed in the structure to enable WAHF to avoid paying such taxes, by availing itself of the Italian law exemption for inter-company loans. The Guardia found "a series of circumstances that are perfectly in line with the typical character of the so-called 'conduit companies'" discussed in a 1986 OECD report on

---

[228] SoC ¶¶ 63-64.  As discussed further below, WAHF took out new PIK loans in December 2009 with a maturity date of 2017, using a similar structure involving WAHF Luxembourg (the "**2009 PIK Loans**").  In 2014, WAHF refinanced the 2009 PIK Loans, resulting in 2014 repayments of principal and interest accrued from 2010 to 2014.  SoC ¶¶ 64, 78.

[229] SoC ¶¶ 63-64; SoD n.4.

[230] CE-29.

74

"Double Taxation Conventions and the Use of Conduit Companies." It observed that WAHF Luxembourg lacked significant assets or operations, passed on all costs to WAHF, and was not the true "beneficial owner" of the interest, which it was obligated to pass on to the foreign lenders who had extended financing for the purpose of WAHF Luxembourg's making concomitant loans to WAHF.[231] Accordingly, the Guardia concluded, WAHF owed back taxes of more than €199 million, calculated by applying a 27% withholding rate due on "notes" issued by Italian resident companies, with interest and penalties of up to a further €498 million. The Guardia referred the matter to the Italian revenue agency (the Agenzia) for further proceedings.

165.   Following certain additional inquiries and discussions, on 14 May 2014 the Agenzia offered WAHF a settlement under which WAHF would be required to pay approximately €73 million plus interest, but would not be assessed any penalties.[232] On 19 May 2014, WAHF (with VimpelCom's concurrence) agreed to settle the audit on these terms, totaling approximately €83.77 million to be paid in installments over several years.[233] VimpelCom demanded that OTMTI indemnify it for 72.65% of the settlement amount under the SSEA, which OTMTI refused.

### (2)   Whether the Audit Falls Within the Scope of Indemnification Obligations

166.   OTMTI contends that the WAHF Audit falls outside the scope of its indemnification obligations under Section 10.2(d) of the SSEA, which addresses indemnification for "any Italian Withholding Tax Liability." This phrase is defined in Article 1.1 of the SSEA to mean "any assessment of any deficiency in, or claim for, Italian withholding taxes made by the Italian Taxing Authority (other than with respect to Italian withholding taxes … covered by the Excluded PVCs)," the latter a reference to two tax claims specifically identified by the Parties. OTMTI focuses on the words "assessment" and "claim," and contends that these refer to formal steps which *postdate* a final audit report by the Agenzia, which is not required to adopt the Guardia's own prior report. Rather, OTMTI contends,

---

[231] CE-34.
[232] CE-14.
[233] CE-3.

"the Agenzia office in charge of assessments is ultimately empowered to decide whether to issue an [assessment] or dismiss [the audit report's] findings."[234]  As a result, according to OTMTI, settlement agreements reached prior to the Agenzia's decision to issue an assessment are premature under Section 10.2(d).  According to OTMTI, VimpelCom "agreed to settle the WAHF Audit before the tax authorities had actually made any assessment or claim, ... thus taking the settlement outside the scope of the indemnity, which covers only claims that have actually been assessed."[235]

167.    The Tribunal disagrees.  The indemnity obligation contains the disjunctive "or," meaning that it covers a payment in response either to an "assessment" *or* to a "claim" by the Italian Tax Authorities with respect to Italian withholding taxes.  Whatever the proper meaning of the term "assessment,"[236] the term *"claim"* is a generic one; it normally carries with it an assertion by one person that another person is legally obliged to pay over certain sums of money.[237]  Nothing in Section 10.2(d) alters the general nature of this term, by specifying for example that it refers only to claims asserted in court proceedings after the formal tax assessment has issued.

168.    In the absence of any such specific definition, a common-sense interpretation of the word "claim" leads to the conclusion that the findings of the Guardia embodied in its final report sent to the Agenzia constituted a "claim" creating a risk of exposure for WAHF.  The Guardia's report concluded with the clear statement that WAHF owed withholding taxes in a specified amount.  Although the Agenzia had autonomy to decide whether to adopt these findings in its own final audit report and thereafter pursue tax recovery by formal "assessment," this does not mean that no "claim" against WAHF existed until that process

---

[234] Rejoinder ¶ 51.

[235] SoD ¶ 5; *see also id.* ¶ 124 ("no formal tax assessment or claim was ever made before VimpelCom and WAHF agreed to settle the WAHF Audit"); Rejoinder ¶ 50 ("VimpelCom rushed into the settlement before any formal assessment or claim was issued").

[236] VimpelCom contends that "assessment" should be interpreted in the ordinary meaning of the term – as a "[d]etermination of the ... amount of something, such as a tax or damages" – rather than in its more technical and formal sense in the Italian tax system.  SoC ¶ 185 (citing CLA-23, *Black's Law Dictionary*).  The Tribunal need not resolve this issue, given its view that a "claim" in any event remains a general term, not tied to any specific step in the Italian tax system.

[237] CLA-16, *Ragins v. Hospital Ins. Co. Inc.*, 22 N.Y.3d 1019 (undefined contractual term should be interpreted logically in accordance with "its widely used meaning"); CLA-23, *Black's Law Dictionary* (10th ed. 2014) (defining "claim" as "[a] demand for money, property or a legal remedy to which one asserts a right").

was complete, such that any earlier settlement of *anticipated* liability *ipso facto* destroys VimpelCom's contractual right to indemnification.    In this case, the Agenzia communicated through WAHF's outside counsel that it essentially agreed with the Guardia's findings and was prepared to proceed against WAHF for the tax deficiency. These communications indicated that the claim previously asserted by the Guardia was being pursued rather than abandoned.  As discussed further below, VimpelCom also understood that absent a settlement, the Agenzia would assert liability at a level higher than the offered settlement amount.  The SSEA did not require VimpelCom to reject the Agenzia's settlement offer when it was proffered, and instead wait for the Agenzia's completion of the further threatened steps.  Indeed, VimpelCom's concern was that the settlement offer was time-sensitive and might not be available later when the Agenzia could have less discretion for compromise.  To require VimpelCom to run this risk in order to maintain its right to indemnification would be neither logical nor reasonable, when such a requirement is not stated in the SSEA and could expose both Parties to potentially greater liability.

169.    If there were any doubt about this conclusion based on the natural meaning of the term "claim," two other features of the SSEA's definitions resolve it.  First, Article 1.1's definition of "Italian Withholding Tax Liability" is defined in terms of "assessment[s] … or claim[s] … made by *the Italian Taxing Authority*" (emphasis added), with that term further defined to "mean[] *any* Taxing Authority in Italy" (emphasis added).  The word "any" confirms the Parties understood there was *more than one* such potential "Taxing Authority."  This is further confirmed by Article 1.1's definition of "Taxing Authority" as "*any* Governmental Entity responsible for the administration or collection of any Tax" (emphasis added).  There is nothing in these encompassing definitions to suggest that a covered "claim" only may come into being following the Agenzia's issuance of a formal assessment, and not following the Guardia's earlier issuance of its own formal audit report – particularly coupled with the Agenzia's indication that it was prepared to move forward with similar conclusions regarding WAHF's liability.

170.    Second, Article 1.1 carefully excluded from the scope of the covered "assessment[s] … or claim[s]" the Italian withholding taxes "covered by the Excluded PVCs."  The term

"Excluded PVCs" was defined in Article 1.1 as "(i) the *processo verbale di constatazione* notified by the Rome office of the Italian Taxing Authority to Wind on May 31, 2010 and (ii) the *processo verbale di constatazione* notified to Wind Acquisition Finance S.p.A. on May 31, 2010, both including all related interest, penalties or fines." The dates referenced refer to audit reports (known as "**PVCs**") issued in connection with a withholding tax investigation that was known to the Parties at the time of the SSEA. That prior investigation had also involved loan structures utilizing a Luxembourg-based entity between the ultimate borrower and the ultimate lender, and there is evidence that the Withholding Tax Indemnity was specifically included in the SSEA because the Parties recognized the likelihood that WAHF's PIK loans also would be audited in due course by the Italian Tax Authorities.[238] There would have been no need to carve out the two prior PVCs (audit reports) from the scope of that indemnity if future audit reports generally were insufficient to create a duty of indemnification, but rather formal assessments were required before any settlement could qualify. The Tribunal is unpersuaded by OTMTI's counter-argument that the reference in Article 1.1 to "Excluded PVCs" becomes relevant only *to the extent* that such PVCs thereafter ripened into formal assessments by the Agenzia.[239] The Tribunal considers this to be a strained reading of the syntax, since the parenthetical exclusion of the Excluded PVCs follows right after the reference to indemnifiable "claims," and not after the reference to "assessments." At most, the term modifies and qualifies *both* "assessments" and "claims"; it would be too tortuous to read it as if it carved out the Excluded PVCs only from the term "assessments."

171. For these reasons, the Tribunal concludes that the settlement of the WAHF Audit falls within the scope of the SSEA's indemnification obligations.

### (3)     *Good Faith*

172.   In accordance with the legal principles discussed in Section IV.C.2, and as with the Wind Telecom Audit, a presumption of good faith applies to the settlement of the WAHF Audit, given that VimpelCom at all times retained at least 27.35% of the exposure from any

---

[238] *See, e.g.*, Lemke I ¶¶ 18, 20; Lemke II ¶ 10-12.
[239] Rejoinder ¶ 52; O-PHB ¶ 101.

settlement, and given its understanding at the time of the settlement that OTMTI did not concur in its actions.[240]  These facts demonstrate that VimpelCom understood it faced the risk of bearing the full consequences of its settlement decision, and VimpelCom therefore is presumed to have subjectively believed that the settlement was reasonable in the circumstances.

173.  As with the Wind Telecom Audit, that presumption of subjective good faith is further supported by the fact that VimpelCom engaged in a process to evaluate WAHF's exposure prior to concluding the settlement.  This included an effort to gather documents and consult with personnel involved in the loan structuring, in order to determine the reasons for the structure and the evidence that might be presented to the Italian Tax Authorities regarding its *bona fides*.  VimpelCom also consulted with Italian tax counsel regarding the applicable legal principles, the nature of the judicial proceedings WAHF would face if it chose to litigate, and the potential outcomes and risks of that course of action.

174.  The evidence further indicates that VimpelCom's decision to settle the WAHF Audit was based at least substantially on its perception, supported by the views of outside counsel, that the company otherwise faced significant exposure from not doing so.  On 29 April 2014, counsel prepared a memo stating that "the [Agenzia] has received the Tax Report by the [Guardia]" and that "in our experience, the conclusions (in their main terms) of the tax auditors are generally confirmed by the body responsible for the assessment," even though it may be "possible to obtain a partial review … in the framework of a settlement."[241]  Regarding the specific case, counsel advised that there were various "[d]efensive arguments" which could be pursued, but also various "weaknesses."  The latter included the reality that (a) while applicable OECD directives were designed to eliminate double taxation, "it is of equal concern that such payments should not escape taxation at all" in any Member State, which seemed to be the case for this transaction; (b) the WAHF loan from WAHF Luxembourg and the WAHF Luxembourg loan from the foreign lenders were "factually and contractually strictly linked (mirrored indeed)"; (c) WAHF Luxembourg had limited capital or presence of its own, ran no apparent risk in the transaction, "appears as

---

[240] CE-14 at 2.

[241] CE-142 at 3.

'passive'," and had "never carried on activity other than borrowing financial resources to be extended (in exactly the same amount and under the same conditions)" to WAHF; and (d) "the structure seems not to substantially divert from the one already assessed in 2011" in another challenged transaction in the Wind Group.[242]

175.   Counsel also advised that litigation regarding these issues would be subject to "uncertainties" due to a lack of uniform case law, and "in our experience the current approach of Italian tax courts are generally very tough against taxpayers in relation to complex intra group transactions implying cross border payments generating an overall tax erosion in Italy without a very strong (and documented) valid business reasons other than the tax saving and this could affect the judgment in a case like that one at stake...." On this basis, counsel concluded that "it seems unlikely that the company would succeed in litigation. Moreover, substantial deposits (1/3 of the assessed amount plus interest) most likely would have to be paid even to proceed to litigation.[243]

176.   This advice of counsel was subsequently reflected in a 16 May 2014 memorandum from VimpelCom's management to its Supervisory Board, which addressed also the Wind Telecomunicazione Audit that was under consideration at the same time. With respect to the WAHF Audit, management reported that the Agenzia as well as the Guardia "have … concluded that …WAHF violated Italian tax law by not applying withholding taxes" on the interest payments, and that the Agenzia "has indicated that it is considering to issue a number of formal tax assessments," including up to €199 million plus penalties and interest. Management's contemporaneous understanding was that "penalties could be as high as 250%" but "the most commonly used rate" was 150%,[244] which could mean penalties of almost €300 million for the WAHF Audit. WAHF would also be exposed to additional interest obligations in the tens of millions of Euros.[245]

---

[242] CE-142 at 8-10.

[243] CE-142 at 10-11.

[244] CE-148 at 1.

[245] The memorandum estimated the combined interest exposure for both the WAHF Audit and the Wind Telecomunicazione Audit at €50 million; the interest for the WAHF Audit component would be the higher of the two, based on the significantly higher back tax amount. CE-148 at 1.

177.    With respect to the likelihood of such exposure, VimpelCom's contemporaneous understanding – again based on the advice of its external tax counsel – was that "under current Italian laws and jurisprudence [there was] a lot of uncertainty" attached to concepts like 'beneficial ownership' and 'interposing special purpose companies,'."[246] There were "valid defensive arguments that can be brought forward in court, but the Italian courts are currently rather tough towards alleged tax-offenders. This is particularly so in cases where 'beneficial ownership' and 'special purpose companies' schemes were used." Given these factors, "it seems rather difficult to assess" the ultimate outcome in the courts, and therefore "it is tricky to recommend" taking chances with court proceedings, so that a settlement proposal "should be seriously considered."[247]  Management reported that outside counsel advised "it is unlikely that we would end up with a better result" from litigating, and "[i]t is therefore probable that a settlement proposal (as currently negotiated) will lead to a better end-result."[248]  Moreover, VimpelCom understood that challenging an eventual tax assessment would require it first to pay 1/3 of the assessed amount (totaling roughly €67 million for the WAHF Audit) plus interest, and twice that if it were necessary to proceed to the court of second instance.[249]

178.    Balanced against this risk was a pending settlement offer for a "significantly reduced amount of taxes and without application of penalties."[250]  For the WAHF Audit, the proposal involved withholding taxes at a 12.5% (rather than 27%) rate, no application of a so-called "gross-up" clause, and "penalties … reduced to 0%," resulting in a total settlement amount of €84 million (including roughly €11 million in interest), to be paid in quarterly installments over three years.[251]

179.    With this understanding of the options, VimpelCom's management recommended that WAHF accept the settlement proposal, "because there is a significant risk of higher liability if we challenge the audit report[] in the Italian tax courts" and outside counsel "have

---

[246] CE-148 at 3.
[247] CE-148 at 3.
[248] CE-148 at 3.
[249] CE-148 at 2-3.
[250] CE-148 at 1.
[251] CE-148 at 4.

analyzed the matter and concluded that it is not probable that … WAHF [would] win in court if it were to challenge ITA's position."[252]  Management referenced the possibility of a 72.65% indemnity by OTMTI,[253] which "is helpful and we believe will mitigate our losses.   However, we would recommend settlement *even if there was no indemnity available* in view of the significant risk of higher liability if we do not settle."[254]  By the time of this memorandum, OTMTI already had informed VimpelCom that it was "not in a position to provide [it] an informed view on the settlement proposals" and that, "should you decide to accept them, you will bear all the responsibility thereof."[255]  VimpelCom's Supervisory Board nonetheless unanimously approved the recommended settlement,[256] and the Italian Tax Authorities issued their final report regarding the WAHF Audit, to which WAHF formally "adhered."[257]

180.   OTMTI contends that VimpelCom "accelerat[ed] settlement discussions" with the Agenzia,[258] the clear implication being that such discussions were premature and that taking additional time might have enabled it to present compelling substantive defenses.[259]  However, it is clear that VimpelCom had been genuinely concerned since February 2014 that the Agenzia might issue the tax assessment at any time,[260] and the record reflects that, in the months that followed, the Agenzia put substantial time pressure on WAHF, summoning it to meetings often on a day's notice or less.  There is no indication that the Agenzia would have granted much more time, particularly if it sensed that the purpose was not to engage in genuine settlement discussions but rather for WAHF to develop further defense arguments.

---

[252] CE-148 at 6.

[253] CE-148 at n.2

[254] CE-148 at 6 (emphasis added).

[255] CE-14 at 2.

[256] CE-149.

[257] CE-3.

[258] SoDC ¶ 88.

[259] SoDC ¶ 101.

[260] *See, e.g.*, CE-126 (noting on 26 February 2014 that since 60 days already had expired since the Guardia's report, "they can issue the tax assessment at any time"); CE-130 (observing on 13 March 2014 that "[w]e should aim to submit the memo to the [Agenzia] as soon as possible before they issue the assessment").

181.   It is also unclear that additional time would have changed the Agenzia's analysis
       materially, given that it already had considered – and evidently found unpersuasive – the
       arguments that WAHF already had presented.   These arguments directly reflected
       OTMTI's input to date:  the record demonstrates that, before settlement discussions got
       underway, VimpelCom solicited OTMTI's comments on a draft memorandum contesting
       the Guardia's conclusions,[261] and incorporated those comments into a second draft,[262] only
       submitting the final version to the Agenzia on 20 March 2014 after OTMTI confirmed that
       it had "no further comments."[263] VimpelCom and WAHF thereafter focused only on the
       issue of penalties, and solicited OTMTI's comments on that issue for a supplemental
       memorandum submitted to the Agenzia on 13 May 2014.[264]

182.   This history does not suggest either that OTMTI contemporaneously identified specific
       additional arguments that VimpelCom and WAHF refused to present, or that the Agenzia
       would have granted them significant additional time to try to develop other arguments.  The
       contention that VimpelCom therefore truncated an otherwise available window to advance
       defense arguments is not well grounded.  But even if the facts had suggested some room to
       develop further arguments, any failure by VimpelCom to fully appreciate this possibility,
       or to give it substantial weight as promising a material difference in the outcome, would
       not amount to bad faith.  Nor it would it be bad faith for VimpelCom to be less confident
       than OTMTI that the arguments already advanced unsuccessfully to the Agenzia might fare
       better before the Italian courts.

183.   OTMTI's most emphatic argument regarding an alleged lack of good faith is not about the
       "acceleration" of settlement discussions as such, but that VimpelCom allegedly had an
       "ulterior motive" for settling at all.[265]  OTMTI argues that VimpelCom's decision to settle
       the WAHF Audit was motivated by a wish to protect itself from potential withholding tax
       exposure in connection with another set of loans (the 2009 PIK Loans, also structured

---

[261] CE-128.  VimpelCom similarly had solicited OTMTI's input for purposes of the Guardia's initial investigation.
CE-9; CE-11; CE-92; CE-93; CE-95; CE-96; CE-97; CE-102; CE-105; CE-295.
[262] CE-41.
[263] CE-41; CE-42.
[264] CE-45; CE-41.
[265] SoDC ¶¶ 88, 89; Rejoinder ¶ 226.

through WAHF Luxembourg) that WAHF was "looking to refinance" in 2014, but that were not subject to any SSEA indemnification requirement.[266]   OTMTI repeatedly characterizes VimpelCom's consideration of this issue as denoting a sacrifice of OTMTI's interests for the sake of a "true agenda" that furthered VimpelCom's "parochial interests" at OTMTI's expense.[267]

184.   The evidence does indicate that VimpelCom considered WAHF's exposure with respect to interest payments on the 2009 PIK Loans as part of its calculus regarding the WAHF Audit. At the same time, the evidence shows that the linkage was primarily one of *timing*, not of a change in outcome, and that VimpelCom believed it was pursuing a "win-win" strategy for *both* exposures, not a "trade-off" involving the surrender of a better approach to the WAHF Audit for the sake of advancing its interests with respect to the 2009 PIK Loans.

185.   Specifically, and as VimpelCom advised OTMTI at the time, VimpelCom considered that "[g]iven the stance adopted by the [Agenzia] on the current WAHF audit," it was "inevitable that the [Agenzia] will at some point make a claim" for similar withholding taxes on interest paid between 2010 and 2014 on the 2009 PIK Loans.[268]   VimpelCom's internal documents show that it believed a proactive approach was in its best interest, involving voluntarily approaching the Agenzia about this issue and offering to pay withholding tax on the "most recent PIK interest payments" in 2014.  This would enable it to pay only a 5% rate, which "in our view is the lowest possible WHT that can be claimed for this payment."[269]   However, achieving that rate would mean making a decision promptly, in order to invoke a time-limited tax amnesty program.  It would also require WAHF to admit that WAHF Luxembourg was *not* the beneficial owner of the interest payments, which was the same issue in play in the WAHF Audit but which would be contrary to the position WAHF thus far had been asserting (unsuccessfully) in its defense. VimpelCom considered that "in the context of the discussion with ITA a settlement for

---

[266] SoDC ¶ 88; CE-141.

[267] SoDC ¶¶ 90, 93, 97, 126, 202, 208; Rejoinder ¶¶ 20, 209, 226, 315, 324, 325.

[268] CE-140.

[269] CE-148 at 4.

WAHF should ideally be concluded on or before the deadline for the payment of this 5% WHT [on the 2014 interest payments], which is May 16, 2014."[270]

186. VimpelCom contends that there were benefits to *all* Parties by coordinating the timing of WAHF's voluntary tax payment on the 2009 PIK Loans interest with a settlement of the WAHF audit – namely, that doing the former promptly could help earn "good will" from the Agenzia with respect to the latter, at a time that it was still considering the issue of penalties.[271]   OTMTI characterizes this as "self-serving revisionism."[272]   However, the evidence indicates that this was a viewpoint VimpelCom communicated to OTMTI at the time,[273] so at minimum it is not "revisionism." VimpelCom's Supervisory Board memorandum also reflects its own contemporaneous internal belief that linking the timing of the two issues was in the best interests of the WAHF Audit, and not just its own interests in connection with the 2009 PIK Loans.  Specifically, VimpelCom management informed the Board that "[a]pplication of 5% WHT [on the 2014 interest payments] has potentially *facilitated a favorable settlement* with ITA for the 2009 payment" at issue in the WAHF Audit.[274]  There is no evidence to suggest that this was not a genuine belief.  VimpelCom's decision to act on this belief is not indicative of subjective bad faith.

187. Most importantly, the evidence does not suggest that VimpelCom was motivated by self-interest to accept a settlement of the WAHF Audit that it did not *otherwise believe* to be reasonable in the circumstances.  This is not a case in which an indemnitee abandoned what it genuinely believed to a valid and strong defense, and conceded liability for a spurious claim solely or primarily to obtain a collateral advantage for a different exposure.  Rather, the contemporaneous documents show that VimpelCom (together with its counsel) saw a genuine risk that WAHF Luxembourg would be viewed as a mere conduit to the foreign

---

[270] CE-148 at 4.

[271] Reply ¶ 197(e).

[272] Rejoinder ¶ 228.

[273] CE-140 (explaining to OTMTI on 16 April 2016 that "by making this goodwill gesture and engaging with them proactively, the [Agenzia] may be more inclined" not only to disapply any penalties on the 2010-2014 interest paid on the 2009 PIK Loans, but also to "eliminate/reduce any penalties that we are liable to pay under the present audit"); CE-141 (further explaining on 24 April 2014 that in raising this issue with the Agenzia at this time, "[w]e wanted to get a sense of whether making such payment would buy us some goodwill with the [Agenzia] and encourage them to exercise leniency with the penalties on the current audit").

[274] CE-148 at 4 (emphasis added).

lenders and not as the beneficial owner of the interest payments. VimpelCom also genuinely believed the settlement terms presented a reasonable means of avoiding the risks of litigation, including the possibility of greater liability (for which, under the SSEA, it would bear at least 27.35%). In these circumstances, it was not improper for VimpelCom to conclude that, where there was a substantial prospect of liability in any event, it was a prudent business judgment to reach a settlement that managed the WAHF Audit exposure appropriately, but did so jointly with resolving the identical issue with respect to another exposure. The presence of a *mixed*-motive involving the other exposure does not eliminate the existence of a *valid* motive for the WAHF Audit settlement. The Tribunal concludes that VimpelCom acted subjectively in good faith in settling the WAHF Audit, even if it had additional reasons for doing so that were related to an independent exposure.

### (4)    *The Adequacy of Notice and Opportunity to Participate*

188.    As discussed in Section IV.C.3, VimpelCom's obligation regarding notice with respect to the WAHF Audit is governed by Article 10.7(h)(i) of the SSEA, which applies "[i]n the event of a Tax audit or inquiry by any Taxing Authority that may lead to an Italian Withholding Tax Liability." In this context, VimpelCom is required to notify OTMTI "as soon as reasonably practicable but in any event within ten (10) Business Days after VimpelCom or any of its Subsidiaries has been informed in writing of the beginning of such procedure," except to the extent it is restricted from doing so by "any obligation of confidentiality."[275] There is no dispute that VimpelCom complied with this requirement. The Guardia notified WAHF of the beginning of its audit on 17 September 2013, and VimpelCom notified OTMTI of this event on 27 September 2013.[276] This was in eight business days, well within the ten business days referenced in the SSEA.

189.    The debated issue is whether VimpelCom thereafter complied with the obligations that followed the provision of notice. Under Article 10.7(h)(ii) of the SSEA, VimpelCom was required to "coordinate" with OTMTI "in the taking of any action relating to the conduct of such Tax audit or inquiry actions"; to provide OTMTI "such information and access to

---

[275] SSEA Article 10.7(h)(i).
[276] CE-29; CE-9.

personnel, premises, documents and records" as OTMTI may reasonably request; and to "use its reasonable efforts to include a representative appointed by [OTMTI] in any meeting or material telephone call arranged by VimpelCom … with a representative of the relevant Taxing Authorities."[277]   As discussed in Section IV.C.4, these obligations are distinct from participation in or control of the defense, additional rights that were separately identified in Article 10.7(h)(ii) for *non*-tax claims, but for which tax claims were specifically excluded.

190.   OTMTI contends that VimpelCom breached these various duties.   The Tribunal concludes otherwise.

191.   First, during the roughly seven months between mid-September 2013 (when the Guardia initiated the WAHF Audit) and mid-April 2014 (when it appears settlement discussions with the Agenzia got underway), VimpelCom repeatedly reached out to OTMTI to inform it of developments, to seek OTMTI's input on documents to be submitted to the Italian Tax Authorities, and to notify it of upcoming meetings.   Thus, for example, with respect to the Guardia investigation:

- On 29 October 2013, VimpelCom wrote to OTMTI noting that it had not yet heard back following its 27 September 2013 notice about the initiation of the WAHF Audit, invited OTMTI again to discuss the issue, and inquired whether OTMTI would like to attend any meetings with the Guardia.[278]   The parties thereafter met on 7 November 2013 to discuss the WAHF Audit.[279]

- On 19 November 2013, VimpelCom notified OTMTI that the Guardia wished to meet to discuss "the preliminary findings of their investigations," thereafter notified OTMTI of the specific time and place for the meeting, and proposed a call to "discuss the approach for the meeting"; after the meeting, VimpelCom proposed another "update call" with OTMTI.[280]

- On 25 November 2013, VimpelCom requested information from OTMTI, explaining that "[w]e will need to be able to provide the [Guardia] with adequate explanations to these questions and why Weather took the

---

[277] SSEA Article 10.7(h)(ii).
[278] CE-11.
[279] CE-92.
[280] CE-93; CE-95.

decisions it did."[281]  While VimpelCom was waiting for OTMTI's response, the Guardia requested another meeting, and VimpelCom invited OTMTI to attend.[282]

- On 3 December 2013, VimpelCom asked OTMTI to share its "arguments to support that WAHF was beneficial owner of the relevant payments," in advance of the next meeting with the Guardia.[283]   VimpelCom also forwarded "the list of documents requested" by the Guardia.[284]

- VimpelCom thereafter arranged for OTMTI to attend the next meeting with the Guardia on 12 December 2013.[285] OTMTI received the same document from the Guardia that VimpelCom did, setting out its "conclusion" that a 27% withholding tax amounting to €199 million should have been applied, because "[t]hey considered the Luxco as a conduit … and in general the structure an abusive construction."[286]  The Guardia was to issue its final report soon to the Agenzia, and OTMTI advised that "[a]t this point our thinking is that there is little to be gained by trying to change their mind and that our arguments should be presented to the [Agenzia] in due course."[287]

192.   The record reflects that VimpelCom likewise reached out to OTMTI once the Agenzia become involved in reviewing the Guardia's audit report.  While the Parties had certain disagreements regarding the *strategy* for handling the initial meetings with the Agenzia, this is not the same as being *excluded* from such meetings, or a failure by VimpelCom even to *attempt* to coordinate.  The evidence shows, for example, that:

- On 21 February 2014, the same day VimpelCom learned that the Agenzia had agreed to meet,[288] it asked OTMTI if it wished to attend.  OTMTI confirmed that it would do so and proposed a preparation call to "discuss the findings of the audit and the approach to take with the tax administration."  OTMTI indicated that it believed the Guardia's findings were "wrong," and that "there is room" to rebut those findings, through arguments about the "genuine" role of WAHF Luxembourg. These would be along the same lines that it had just argued in the Wind

---

[281] CE-96.  VimpelCom also sought answers to the same questions from Wind personnel, but was told that the "WIND finance team was only marginally involved" in the structuring of PIK loans, "as it was mostly managed by the Corporate Finance Team" of OTMTI.  CE-289.

[282] CE-97.

[283] CE-102.

[284] CE-295.

[285] CE-105.

[286] CE-299.

[287] CE-107.

[288] CE-312.

Telecomunicazione Audit with respect to another challenged transaction, referred to in the correspondence as the "2005 Senior."[289]

- Following further discussions between the Parties, OTMTI suggested asking the Agenzia to postpone the scheduled meeting, whereas VimpelCom was concerned that this "could lead to a more aggressive approach from them," and preferred to proceed with the meeting, at minimum to ask the Agenzia to explain "on what basis [the Guardia's report] is grounded." OTMTI believed that approach would not suffice since "we have had this report for over 2 months now, so supposedly have plenty of time to review it," even though the reality was that in the interim "the Senior issues took precedence" in the Parties' mutual preparations. OTMTI therefore considered it "preferable to take the time" first to review arguments (including those soon to be circulated by its outside counsel), "before engaging with" the Agenzia. It concluded that "[h]owever you are best placed to weight the risk of antagonizing the [Agenzia] by delaying the meeting, versus that of coming to them somewhat unprepared, and *we will defer to you[r] final judgement* here."[290]

- VimpelCom responded that, since 60 days already had expired following the Guardia's report, "they can issue the tax assessment at any time," so it believed it best to proceed with the meeting. OTMTI confirmed its outside counsel would attend. VimpelCom in turn confirmed that "[i]n the event that we are compelled to discuss possible defensive arguments, we intend to outline the points of objection [that its outside counsel] mentioned on the call [with OTMTI]," and if OTMTI's outside counsel "believes there are further arguments which we should advance to help our position, *we would certainly welcome her raising them* with the [Agenzia] at the meeting."[291] OTMTI's outside counsel then circulated an executive summary of possible defense arguments to be considered.[292]

193. These exchanges have been summarized in some detail, as they epitomize a general difference in approach towards the Agenzia, with VimpelCom generally preferring a strategy of engagement and OTMTI a more aggressive posture. At the same time, the exchanges also evidence a reasonable *effort* to coordinate, not an exclusion from discussions. The same is true of the exchanges over the next two months:

- On 5 March 2014, OTMTI requested a meeting to "better understand your estimates of potential claim and/or settlement amount under different

---

[289] CE-313.

[290] CE-126 (emphasis added).

[291] CE-126 (emphasis added).

[292] RE-10.

scenarios," and "review the action plan on the various open cases," and VimpelCom proposed a meeting two days later.[293]

- Following that meeting, the Parties scheduled a further call "to resume discussions on possible settlement scenarios for the Senior and on the PIK," and VimpelCom responded by circulating "for your review a first draft of the memo that we intend to submit to the [Agenzia] on WAHF … in case you had any substantive comments." VimpelCom noted however that "[w]e should aim to submit the memo to the [Agenzia] as soon as possible before they issue the assessment." It also advised OTMTI that the Agenzia had requested another meeting, and invited OTMTI's counsel to attend.[294]

- OTMTI's counsel thereafter submitted its comments on the draft memo,[295] VimpelCom returned a revised second draft which "takes into account the comments which [OTMTI's counsel] had provided on the first draft, and OTMTI confirmed, "no further comments from our side."[296] The resulting defense memorandum, reflecting this process of coordination, was submitted to the Agenzia on 20 March 2014.[297]

- Following submission of the defense memo, VimpelCom notified OTMTI of the Agenzia's request for another meeting, and proposed another call to discuss.[298] During this 26 March 2014 meeting, the Agenzia apparently continued to assert that WAHF Luxembourg was not the beneficial owner of the WAHF interest payments, so a withholding tax should have been paid.[299]

- Over the next week, it appears that the only communications with the Agenzia were about its parallel inquiry in relation to the Wind Telecomunicazione Audit.[300]   Thereafter, when the Agenzia proposed another meeting on the WAHF Audit, VimpelCom on 9 April 2014 notified OTMTI of this fact, as well as its "sense that there may be some appetite on their part to explore settlement of the audit without the application of penalties."[301]   VimpelCom also informed OTMTI that it was important to follow up with the Agenzia soon, since "there will be several holidays in Italy" beginning 18 April 2014 through early May 2014, and the Agenzia officer responsible for the WAHF Audit "will soon be leaving and will be

---

[293] CE-127.

[294] CE-128.

[295] CE-130.

[296] CE-41.

[297] CE-42.

[298] CE-132.

[299] V. Petrella I ¶ 58.

[300] CE-135.

[301] CE-136.

replaced with someone else."[302]  VimpelCom invited OTMTI's counsel to
participate in a meeting then scheduled for 11 April 2014.[303]

- The Agenzia thereafter postponed the meeting to the morning of 14 April
  2014, a time when OTMTI's counsel could not attend, but she confirmed
  that if the meeting could not be postponed further, "*we are fine with you
  and [your outside counsel] meeting with them on your own.*"  VimpelCom
  nonetheless attempted to get the meeting postponed to 15 April 2014, but
  the Agenzia ultimately declined to do so and asked to proceed on 14 April
  2014.  VimpelCom proceeded with the meeting on its own, as OTMTI had
  expressly consented to its doing.  It also informed OTMTI of its desire to
  arrange a "second meeting" that week with the Agenzia, tentatively on 17
  April 2014, before the start of the holiday period.[304]

194.  OTMTI now claims that "VimpelCom's misconduct in connection with the WAHF Audit
started as early as February 2014."[305]  However, the chronology above demonstrates no
such misconduct.  Nor do the contemporary documents reflect any complaint by OTMTI
about non-coordination or non-inclusion, prior to mid-April 2014.  Indeed, OTMTI's 15
May 2014 letter declining to offer any opinion on the Agenzia's settlement offer
complained only that "*in recent weeks*" VimpelCom had not "fully complied" with its
SSEA obligations.[306]  The Tribunal therefore focuses below on events in the final period
between mid-April 2014 and mid-May 2014, when settlement discussions with the Agenzia
were underway.

195.  As discussed above, VimpelCom informed OTMTI on 9 April 2014 of its sense that the
Agenzia was open to exploring a settlement involving no penalties, and that it wished to
follow up on this possibility in meetings prior to the holiday period commencing 18 April
2014.[307]  On 16 April 2014, VimpelCom informed OTMTI that of its view that this
objective could be furthered by proactively raising with the Agenzia, concomitant with the
ongoing discussions about the WAHF Audit, the possibility of WAHF's paying
withholding taxes for 2010-2014 interest paid on the 2009 PIK Loans.  It provided this

---

[302] CE-136.
[303] CE-136.
[304] CE-139 (emphasis added).
[305] Rejoinder ¶ 211.
[306] CE-14 (emphasis added).
[307] CE-136.

notice to OTMTI, however, only when its counsel already was *en route* to a meeting with the Agenzia "to have this exploratory discussion."[308]   OTMTI accuses VimpelCom of "deliberately and strategically exclud[ing]" its counsel from the 16 April 2016 meeting.[309] The evidence of such "deliberate" exclusion is not compelling, however, since VimpelCom already had notified OTMTI that it hoped to schedule a second meeting with the Agenzia that week,[310] prior to the national holidays.[311]   VimpelCom apparently tried to arrange a meeting on 17 April 2014 – the day it had previously had told OTMTI it was targeting for this "second meeting"[312] – but the Agenzia insisted it was available only on 16 April 2014. VimpelCom acknowledged that this did not allow much (if any) notice to OTMTI's counsel, but reminded OTMTI that "[u]nfortunately … we do not always have the luxury of time when dealing with" the Agenzia and that "effectively, you knew of the meeting when we did."  It provided OTMTI with a debriefing the next day.[313]

196.   While this explanation may explain the short notice of the 16 April 2014 meeting, it does not fully explain why VimpelCom never previously alerted OTMTI to the possibility (even in principle) of raising the 2009 PIK Loan issue with the Agenzia, particularly given VimpelCom's admission that it had been "discuss[ing] the position *internally* at length."[314] VimpelCom's explanation for not mentioning this previously to OTMTI was that "it was not something we had fully considered or reached a view on internally."  It contended that "[o]nce we did reach a view, we immediately called the [Agenzia]" to try to arrange a meeting, and notified OTMTI as soon as the meeting time had been scheduled.[315]

197.   Be that as it may, the decision to interject the 2009 PIK Loans issue into discussions with the Agenzia occurred (a) only *after* VimpelCom already had worked collaboratively with OTMTI in March 2014 to provide a substantive defense memorandum reflecting both

---

[308] CE-140.
[309] SoDC ¶ 90.
[310] CE-139.
[311] CE-136.
[312] CE-139.
[313] CE-141; Cisternino II ¶ 47.
[314] CE-141 (emphasis added).
[315] CE-141.

Parties' views,[316] and (b) only *after* the Agenzia nonetheless continued to maintain that a withholding tax should have been paid.[317]  This supported VimpelCom's view that the Parties' collective arguments against liability had been insufficient to persuade the Agenzia.  That view was corroborated by its outside counsel's advice later that month that "the tax authorities appear to be quite confident of their position," not least because the underlying loan structure at issue in the WAHF Audit "seems not to substantially divert from the one already assessed" in a prior audit involving the Wind Group, which the company had settled in 2011.[318]  In these circumstances, VimpelCom appears to have genuinely believed that the best outcome it could obtain from the Agenzia would be a settlement at the lower 12.5% tax rate and without penalties, and that offering a voluntary payment of taxes in connection with the 2009 PIK Loans (without waiting for an a later assessment) would facilitate rather than hamper that goal.  While VimpelCom presumably could have raised this tactical judgment with OTMTI somewhat earlier than it did, any delay in notification of this point alone (after fully collaborating on the substantive defense arguments to little apparent success) is unlikely to have significantly altered the conclusions of the Agenzia.  Moreover, VimpelCom's decision to inject the 2009 PIK Loans into the discussions did not negate its prior consultations with OTMTI over the legal and tactical approaches to defending or minimizing liabilities in the WAHF Audit.  OTMTI's suggestion that the Agenzia was materially emboldened by VimpelCom's approach to the settlement discussions is not supported by the evidence, which indicates that the Agenzia already had reached certain conclusions about "beneficial ownership" along the lines of the Guardia's earlier audit report.

198.   Following this exchange, the discussions with the Agenzia continued to focus on the issue of penalties.  It is true that one meeting on this issue (on 8 May 2014) was attended by WAHF's outside counsel without invitation to OTMTI, but the evidence is that the Agenzia summoned him on such short notice that day that no company representative was able to

---

[316] CE-42.

[317] V. Petrella I ¶ 58.

[318] CE-142 at 10-11.

attend for WAHF either.[319]  OTMTI was briefed on the meeting the same day it occurred.[320] A few days later, the Agenzia requested a memorandum on the non-application of penalties but provided an overnight deadline; VimpelCom nonetheless sent OTMTI a draft to review. OTMTI advised that it had "no substantive comments on the memo," approved its submission "as is," and noted that it "understand[s] the approach taken to seek a waiver of the penalties."[321]   The supplemental memorandum was promptly submitted to the Agenzia.[322]

199.   The same day, VimpelCom sent OTMTI a draft request to the Agenzia to enter into a "mutual agreement procedure," requesting "any comments on the draft."[323]  VimpelCom advised OTMTI that "if we receive an acceptable settlement offer on the current audit within the next couple of days, it would make little sense to delay in accepting it," particularly in light of the impending 16 May 2016 deadline it faced with respect to the 2014 interest payment on the refinanced 2009 PIK Loans.  OTMTI reiterated its concern about any "accelerated settlement" to accommodate any deadline tied to the 2009 PIK Loans issue, but indicated it would "in due course consider any reasonable settlement proposal that the tax authorities may provide to you, notwithstanding the reservations."[324]

200.   The next day, the Agenzia offered to close the WAHF Audit without application of penalties,[325] which was the objective VimpelCom had notified OTMTI five weeks earlier (on 9 April 2016) that it hoped to achieve.[326]  VimpelCom informed OTMTI that it intended to accept the offer since "[t]his … achieves the objective that we have been pursuing extensively," and "this is the best possible outcome that we can expect to achieve."  OTMTI replied that, because it believed that VimpelCom had violated its SSEA obligations regarding coordination and inclusion, OTMTI was "not in a position to provide you with

---

[319] Cisternino II ¶ 55.

[320] Cisternino II ¶ 56; Hearing Tr. (2) 572-573 (V. Petrella).

[321] CE-45.

[322] CE-41.

[323] CE-145.

[324] CE-45.

[325] CE-14.

[326] CE-136.

an informed view of the settlement proposals … [and] cannot evaluate the appropriateness of these proposals," so VimpelCom "will bear all the responsibility" for the settlement if it decided to proceed.[327]

201.   Based on this record, the Tribunal concludes that, while the Parties evidently had different views of the advantages and drawbacks of a settlement versus a subsequent litigation, the differences were not due to an alleged failure to coordinate or to use reasonable efforts to include OTMTI representatives in meetings with the Italian Tax Authorities.[328]  OTMTI has not shown a breach of these SSEA provisions, nor of the predicate obligation to notify it within ten business days of a "Tax audit or inquiry."[329]

### (5)   *Reasonableness of Settlement*

202.   The next step in the analysis is to assess whether VimpelCom's decision to settle, and the terms of the resulting settlement, were *objectively reasonable*, in the sense that "there was [a] possibility that litigating the case to the end would result in a judgment … in an amount greater than the settlement."[330]

203.   The Tribunal concludes that there was indeed such a possibility – in other words, that WAHF might not have been successful in defending against an assessment brought on the ground that WAHF Luxembourg was simply a conduit for interest payments that in "substance" (rather than form) belonged to foreign lenders.  Even crediting OTMTI's position that there were arguments to try to justify WAHF Luxembourg's status as a true beneficial owner, (a) the structure of the back-to-back loan transactions; (b) the evidence of how and when they were put in place, coupled with the evidence about WAHF Luxembourg's extremely thin assets and operations; and (c) and the Italian courts' increasing adoption of a "substance over form" approach to deny beneficial ownership

---

[327] CE-14.

[328] SSEA Article 10.7(h)(ii).

[329] As discussed in Section IV.C.5, Section 10.7(h) of the SSEA does not specifically address the consequences of any inadequate notice with respect to a potential Italian Withholding Tax Liability, the way Article 10.7(a) and Section 10.7(b) address that issue, with reference to the possibility of actual prejudice.  Given the Tribunal's conclusions regarding the lack of any breach, however, it is unnecessary to explore further the relevance of any potential prejudice from a breach.

[330] CLA-8, *Deutsche Bank*, 74 A.D.3d at 43.

status to intermediary companies, particularly when the consequence is the absence of tax payments both in Italy and abroad,[331] all combined to create a significant risk that WAHF's arguments ultimately might not be successful. At the very least, the circumstances fell significantly short of an absolutely or even strongly compelling case for defending against the tax claims. It is unnecessary to determine what the odds of success ultimately might have been, so long as they remained cognizable. VimpelCom received contemporaneous legal advice, from both its internal and external tax counsel, that this was definitely the case. The Tribunal is unable to conclude that this was self-evidently untrue, which would be required for it to find the decision to settle objectively unreasonable.

204.    The only other basis upon which the settlement decision could be objectively unreasonable is if there were no objective downside to WAHF's *taking its chances* on litigation, rather than agreeing to settle. OTMTI contends that this is the case because there was no realistic chance anyway of WAHF's being assessed taxes at a rate higher than 12.5% or of penalties being applied following court proceedings. The Tribunal is unable to accept such categorical arguments about the absence of risk.

205.    First, while OTMTI claims that during a 26 March 2014 meeting the Agenzia indicated it was abandoning any claim for the higher 27% rate,[332] WAHF's outside counsel denies that any such statement was made.[333] What does seem clear is that in late April 2014, outside counsel advised WAHF in writing that in the event of litigation rather than settlement, the 12.5% rate "cannot be considered as granted."[334] The issue turned on whether WAHF could establish that the lending banks and the holders of the PIK notes that were used to finance the loans were located in jurisdictions that Italy deemed sufficiently transparent, or whether some were located in "black-listed" jurisdictions that were not adequately transparent. As of the time of the settlement, it appeared that at least some of the note holders were located in black-listed jurisdictions, and others could not be identified given

---

[331] *See, e.g.,* Rejoinder ¶¶ 174-176; V-PHB ¶¶ 212-219.
[332] V. Petrella I ¶ 58.
[333] Cisternino II ¶ 49.
[334] CE-142 at 11-12.

trades on the secondary markets.[335]   The two Italian law professors presented as experts in this case – Profs. Manzitti and Maisto – differed on the extent of the residual risk in these circumstances.[336]

206.   The contemporaneous documents also show that VimpelCom's counsel considered WAHF would face a risk of penalties absent a settlement.   One reason was precisely *because* the Wind Group in 2011 had settled a prior withholding tax audit involving a "substantially" similar structure challenged on beneficial ownership grounds.   The 2011 settlement waived penalties "based on the uncertainties of the concept of beneficial owner" in 2011, and OTMTI invokes this as proof that a similar outcome was inevitable even in litigation.[337] However, VimpelCom's counsel contemporaneously advised it in 2014 that "[a]t this stage it is not predicable if the Wind case will allow them or not to reduce penalties also in this case (or only partially), considering that *after the 2011 settlement the group did not change anything* in the WAHF structure."[338]   The Tribunal accepts it as objectively reasonable for VimpelCom to worry that, with each successive instance of non-payment of withholding taxes in connection with a particular structure repeatedly challenged by authorities, the risk of being perceived as a "repeat offender" might increase, as therefore would the risk of penalties.   Certainly, from 2011 on, the Wind Group was on notice that *the Agenzia* took a dim view of these sorts of structures, and at some point (absent a settlement) the Italian *tax courts* might prove unwilling to accept that the Group nonetheless had a credible basis for continuing to claim conditions of "uncertainty."

207.   Moreover, even aside from the implications of the 2011 settlement, it appears that the issue of penalties was not without risk.   Despite Prof. Manzitti's contention that continuing "uncertainty" about the meaning and application of the beneficial ownership standard would have protected WAHF from penalties,[339] Prof. Maisto produced several Italian court decisions, around the time of the WAHF settlement and afterwards, in which the courts

---

[335] Rejoinder ¶¶ 184-186; V-PHB ¶¶ 222-223.

[336] *Compare* Manzitti ¶¶ 91-92 *with* Maisto ¶¶ 123-125; *see also* Cisternino II ¶ 60.

[337] Rejoinder ¶ 257.

[338] CE-142 at 10-12 (emphasis added); *see also* Cisternino II ¶ 69.

[339] Manzitti ¶ 90.

sustained the application of penalties in withholding tax cases involving intermediate entities used as conduits.[340]  While Prof. Manzitti believed these decisions "do not resolve the uncertainties,"[341] at minimum the decisions illustrate that the courts were not uniform in rejecting such penalties.  In light of these decisions, the Tribunal cannot deem the risk of a similar outcome in this case to have been entirely negligible.  Moreover, the sheer magnitude of any potential penalties, in the event they were assessed and upheld, justified a risk-averse approach as objectively reasonable.  The penalties threatened by the Italian Tax Authorities were apparently over five times the value of WAHF itself and, if assessed, could have forced WAHF into bankruptcy.[342]

208.  Finally, the fact remains that even to challenge an assessment, WAHF would have had to make a court deposit for the WAHF Audit of some €67 million plus interest.  It was not objectively unreasonable in these circumstances for VimpelCom to accept a settlement for a total €84 million, to forestall any possible risk of liability for additional back taxes, with more interest, plus a significant tax collector's fee.

### (6)    Mitigation of Loss

209.  Finally, OTMTI has not demonstrated that VimpelCom failed to exercise due diligence in preventing foreseeable loss, and therefore violated its obligation under Article 10.7(f)(C) of the SSEA to use "all reasonable efforts to mitigate the corresponding Loss."  The evidence demonstrates that VimpelCom took reasonable steps to evaluate WAHF's potential liability, including investigating the facts of the challenged transaction and obtaining outside legal advice on the relevant issues of Italian tax law.  OTMTI has not met its burden of demonstrating specific additional steps that VimpelCom should have taken but did not, which could have eliminated or materially reduced the exposure from the WAHF Audit.

210.  OTMTI's principal arguments with respect to mitigation are that VimpelCom (a) did not prepare diligently enough to defend the WAHF Audit, (b) failed to "ensure that OTMTI

---

[340] Maisto ¶¶ 126-129.
[341] Rejoinder ¶ 257.
[342] Rejoinder ¶ 180.

and its counsel would be in as strong a position as possible to assist" in the defense, by providing it more time to comment on draft submissions to the Italian Tax Authorities, (c) rushed to settle the WAHF Audit instead of "tak[ing] full advantage of the time periods allowed by Italian law," and (d) most fundamentally, failed to present additional defenses to the Agenzia, or to litigate the defenses of which it was aware, which it allegedly could have pursued before the tax courts with no risk of greater liability.[343]

211.   The evidence with respect to most of OTMTI's contentions has been discussed above. With respect to diligent preparation, it is almost always possible in hindsight to identify additional avenues that might have been explored, or to contend that those actually explored should have been investigated earlier or pursued more aggressively.   These arguments do not suffice, however, to prove a failure to mitigate sufficient to defeat a contractual right to indemnification, so long as the evidence demonstrates a good faith and reasonable effort to evaluate potential defenses and weigh potential risks.   As to the limited time provided to OTMTI to comment on VimpelCom's draft defense memos, this was partially a function of the pressure generated by the Agenzia, combined with the advice of outside tax counsel that a tax assessment could be issued at any time.   OTMTI's argument that longer time periods were allowed by law is a non-sequitur, as this relates to the *last date* the Agenzia could have issued an assessment consistent with the statute of limitations, not the *earliest date* on which it might have done so after receiving the Guardia's detailed report.   VimpelCom was not required by the SSEA to run the risk of postponing any settlement discussions when offered by the Agenzia, after it determined in good faith that WAHF faced substantial risks.

212.   As for OTMTI's argument that VimpelCom failed to present additional defenses to the Agenzia, the fact remains that OTMTI signed off on VimpelCom's revised defense memorandum, after its first-round comments on an earlier draft had been incorporated.   OTMTI did not object to the defense submission as incomplete or inaccurate.   An indemnitor cannot void its contractual obligations by arguing that the indemnitee should have divined additional legal defenses that it also failed to appreciate at the time.   In any

---

[343] *See, e.g.,* SoDC ¶¶ 200; Rejoinder ¶¶ 244-245; O-PHB ¶ 124, 144.

event, none of the arguments OTMTI now says VimpelCom should have presented appear so conclusive as to remove the considerable risk of an adverse tax assessment, given the basic structural elements of the challenged back-to-back loan structure. And absent a complete surrender by the Italian Tax Authorities on their underlying "beneficial ownership" theory, there appears to have been no *more favorable* settlement terms that VimpelCom could have sought to negotiate, than the 12.5% tax rate and waiver of all penalties which it actually achieved.[344]

213.  Finally, the Tribunal cannot accept the contention that mitigation required VimpelCom to make WAHF litigate the beneficial ownership issue before the tax courts, rather than accept the settlement offer presented by the Agenzia. The outcome in court was not preordained, nor was it certain that a negative outcome would be no less onerous than the settlement proposal. In these circumstances, the decision to settle itself was a form of mitigation of risk.

### F.   Wind Telecomunicazioni Indemnification Claim

214.  The issues presented in the final indemnification claim, concerning non-application of withholding taxes by Wind Telecomunicazione, are somewhat similar to the withholding tax issues involved in the WAHF Audit. The Tribunal therefore focuses below on the key points, without repeating in full the analysis above.

#### (1)   *Background on the Transactions and the Audit*

215.  The final matter for which VimpelCom seeks indemnification concerns a settlement with the Italian Tax Authorities, in connection with withholding taxes that its subsidiary Wind Telecomunicazione had not applied to interest payments on certain loans from Italian lenders, primarily backed by foreign credit providers.

216.  In May 2005, Wind Telecomunicazione borrowed some €7.5 billion using an "Italian Bank Lender of Record" ("**IBLOR**") financing structure. While the Italian banks served as lenders of record, their loan agreement (known as the Credit Facilities Agreement)

---

[344] Indeed, OTMTI's outside counsel conceded during the hearing that the settlement WAHF ultimately obtained featured all the concessions that the Parties had set out to achieve. *See* Hearing Tr. (2) 580-583 (Petrella).

expressly contemplated that the lenders in turn would execute Credit Support Agreements with "Credit Support Providers" ("**CSPs**"), to obtain financing for the loans to Wind Telecomunicazione.[345]  In September 2005, the Italian lenders executed such agreements with foreign CSPs, covering most of the amounts being lent to Wind Telecomunicazione. The terms obligated the Italian banks to relay to the CSPs, within days of receipt, the interest payments they received from Wind Telecomunicazione.[346]  Over fiscal years 2008, 2009 and 2010, Wind Telecomunicazione repaid the loans with interest, and the Italian banks channeled the payments to the CSPs.  Wind Telecomunicazione did not apply withholding taxes on any of the interest payments, taking advantage of Italian tax law provisions that exempted interest payments to resident lenders; by contrast, under Italian law, interest paid directly to foreign lenders would have been subject to withholding tax. Following repayment of the original loans, Wind Telecomunicazione took out new loans in November 2010 through a similar IBLOR structure, but this time it withheld taxes on the interest payments that would be passed on to ultimate non-resident CSPs, in what is known as a "transparent" (versus an "opaque") IBLOR structure.

217.   On 28 November 2013, the Agenzia initiated the Wind Telecomunicazione Audit, requesting certain information and documents related to the 2005 financing structure and the 2008, 2009 and 2010 loan payments.[347]  As discussed below, the basic issue in this audit was whether the IBLOR structure in *substance* (even if not in form) constituted loans from the foreign CSPs to Wind Telecomunicazione – albeit passed through intermediate Italian banks – and accordingly whether the CSPs (rather than the Italian lenders) were the true "beneficial owners" of the interest payments.

218.   The Agenzia made its answer to these questions clear on 24 December 2013, roughly a month after initiating the Audit, when it issued a formal tax assessment for the fiscal year 2008.  The assessment reflected the Agenzia's conclusion that the Italian banks were mere intermediaries, that the foreign CSPs were the true beneficial owners of the interest payments, and that the IBLOR structure had been devised to avoid payment of withholding

---

[345] CE-52, Art. 5.
[346] CE-53.
[347] CE-31.

taxes that properly were due under Italian law. Among other things, the Agenzia emphasized that the financing had been "*ab initio* intended for syndication through an IBLOR structure"; that the was a "strong connection, in fact and in law," between Wind Telecomunicazione's "Senior Facility Agreement" with the Italian lenders and the Credit Support Agreement those lenders had with the CSPs; that "the structure was chosen in order to be 'fiscally efficient,' particularly with regard to the non-application of withholding taxes on outgoing funds"; that the interest payments were not "effectively available" to the Italian lenders, which was relevant under Italian law "more than legal ownership"; and that the Italian lenders maintained no "decision-making autonomy with respect to the lifecycle of the loan."[348] Based on these findings, the Agenzia declared a fiscal year 2008 assessment of more than €30 million in withholding taxes plus interest, along with administrative penalties of 150%.

219. On 14 May 2014, following certain additional discussions with Wind Telecomunicazione (under the guidance of VimpelCom), the Agenzia offered a settlement which would cover withholding taxes for all three years (2008-2010), in a combined amount of €52 million plus interest, but without any penalties.[349] On 22 May 2014, Wind Telecomunicazione (with VimpelCom's concurrence) agreed to settle the audit on these terms, for a total of approximately €61.7 million.[350] VimpelCom demanded that OTMTI indemnify it for 72.65% of the settlement amount under the SSEA, which OTMTI refused.

220. In contrast to the WAHF Audits, there is no dispute that the Wind Telecomunicazione Audit (which followed a formal tax assessment by the Agenzia) fell within the scope of the SSEA's indemnification obligations. OTMTI does contest any indemnification obligation on separate grounds, discussed below.

### (2)   *Good Faith*

221. First, as with the Wind Telecom and WAHF Audits, OTMTI contends that the Wind Telecomunicazione settlement was not in good faith. The analysis starts in the same place,

---

[348] CE-35 at 10, 11, 31, 35-36.
[349] CE-14.
[350] CE-4.

with a presumption of good faith given that VimpelCom at all times retained at least 27.35% of the exposure, and further understood at the time of settlement that OTMTI disagreed with its decision and would not voluntarily indemnify it for the remaining 72.65%.[351]

222.   As with the other audits, the presumption of good faith is further supported by the fact that VimpelCom engaged in a process to evaluate Wind Telecomunicazione's exposure prior to concluding the settlement.    This included an effort to investigate the underlying transaction, by meeting with attorneys involved in structuring the underlying loans and the lenders who made those loans, consulting with its internal tax advisors, and obtaining the views of two different outside Italian law firms.    VimpelCom's regular outside counsel in Italy emphasized the prudence of seeking an appropriate settlement.    It identified a series of "[d]efensive arguments" that "in principle one could try to argue,"[352] but also identified a series of "weaknesses," connected both to the structure of the transaction, the language of the transaction documents, and the "substance over form" approach likely to be followed by the Italian authorities.[353]    Counsel also noted that the Agenzia was in possession of a presentation that one of the lending banks (BNP Paribas) had made to Wind Telecomunicazione, which specifically highlighted that "a Full IBLOR mechanism will be very difficult to maintain" due to the "high risk of recharacterisation of this structure by tax authorities as [a] mere pass-through designed to optimize withholding tax treatment."[354] On balance, given that "the current approach of Italian tax court are generally very tough against taxpayers" in such complex cross-border transactions, counsel advised that "the Company seems to have not high chances to succeed in litigation."[355]

223.   The second law firm provided two memoranda.    The first identified a series of arguments "to demonstrate that the Lenders may not be disregarded and that CSPs may not be considered as beneficial owners of interest" paid by Wind Telecomunicazione.    This firm

---

[351] CE-14.

[352] CE-112 at 5, 7.

[353] CE-112 at 8-11.

[354] CE-112 at 10 (referencing RE-161 at 2, 3).

[355] CE-112 at 11.

concluded that "the tax authorities' thesis … seems to be groundless."[356]   However, following further meetings about "the discussions so far with the Italian tax authorities," the same firm acknowledged that:

> when deciding whether to settle or to pursue litigation on a very complex matter, which also involve[s] considerable amounts … it may be not sufficient to evaluate whether strong arguments are available to resist the claim.  Unfortunately, as far as complex and international transactions are concerned, the taxpayer runs the risk that its own arguments, even if reasonably grounded, would not be properly understood and evaluated by the Tax Court.  This is because Italian judges are not normally familiar with such complex tax issues.  Moreover, the recent case-law developments show that, especially when complex and international financial transactions are concerned, the Tax Courts often rule in favor of the Tax Authorities.[357]

The firm suggested that the defensive arguments previously outlined in any event "may be used strategically in the tax settlement procedure to achieve a satisfactory agreement," which counsel characterized as "at least" (a) distinguishing between "the amounts effectively paid to resident CSPs" and the larger amount passed on to foreign CSPs, (b) as to the latter, obtaining any lower withholding tax rates provided under applicable tax treaties, and (c) obtaining an agreement involving no penalties, which otherwise could be significant.[358]

224.   The evidence indicates that VimpelCom's decision to settle the Wind Telecomunicazione Audit was based at least substantially on this appreciation of risk.  The same 16 May 2014 Supervisory Board memorandum that addressed the WAHF Audit also summarized management's concerns about the Wind Telecomunicazione Audit.  These included the reality that it was difficult to predict the outcome, because "with respect to IBLOR structures such as ours, no formal position has been taken by the appropriate Italian Governmental bodies."  Management understood that there were "valid defensive arguments that can be brought forward in court," but worried that "the Italian courts are currently rather tough towards alleged tax offenders," and were "most skeptical towards complex cross-border financial structures which caused tax erosion from Italy, and which

---

[356] CE-131 at 1, 16.
[357] CE-138 at 1.
[358] CE-138 at 2, 4.

lack solid business reasons (other than saving Italian taxes)." Management noted that both Wind Telecomunicazione's own head of tax and its regular outside counsel "have advised that it is unlikely that we would end up with a better result" from litigating than from the settlement, and that a "second opinion from other Italian tax counsel [had] reached the same conclusion (although not always based on the same line of thinking). It is therefore probable that a settlement proposal (as currently negotiated) will lead to a better end-result."[359]

225.   Specifically, management worried that the potential exposure from litigating and losing with respect to all three years of potential assessments (the 2008 assessment already received, and the 2009 and 2010 ones expected) could be in the range of €82 million in unpaid withholding taxes, plus interest and penalties "most commonly" set at 150%, for potential exposure in the range of €205 million.[360] As with the other audits, a challenge to the assessment would have required an upfront deposit of roughly 1/3 of the assessment amount, plus interest, and twice that if resort to a court of second instance was required. Balanced against this unpalatable option was the pending settlement offer, predicated on the Agenzia's agreement "to not apply WHT to Italian recipients and to apply 10% to non-residents," with "[t]he penalties … reduced to 0%," for a total liability of roughly €62 (of which roughly €10 million was interest). Management noted that the Agenzia had imposed a deadline of 20 May 2014 to accept the offer.[361]

226.   With this understanding of the options, VimpelCom's management recommended that Wind Telecomunicazione accept the settlement proposal. As with the WAHF Audit, management referenced the possibility of a 72.65% indemnity by OTMTI, which "is helpful and we believe will mitigate our losses. However, we would recommend settlement *even if there was no indemnity available* in view of the significant risk of higher liability if we do not settle."[362] VimpelCom's Board accepted this recommendation on 19 May 2014

---

[359] CE-148 at 3.
[360] CE-148 at 1.
[361] CE-148 at 4.
[362] CE-148 at 6 (emphasis added).

and Wind Telecomunicazione's Board followed on 21 May 2014[363]; the settlement was concluded on 22 May 2014. By this time, OTMTI already had informed VimpelCom that it considered the Agenzia's claims "groundless" and that VimpelCom would "bear all responsibility" for any settlement.[364]

227.  OTMTI contends that in settling for fiscal years 2009 and 2010 in addition to 2008, Wind Telecomunicazione "deliberately increased its exposure."[365] The Tribunal disagrees. The Agenzia had made clear from the commencement of its audit that it was targeting all three fiscal years, for which the exact same IBLO structure was at issue.[366] While the December 2013 tax assessment was limited to the 2008 interest payments, apparently because the five-year statute of limitations on assessments for 2008 was about to expire, the contemporaneous evidence demonstrates that VimpelCom believed similar assessments for 2009 and 2010 "will undoubtedly be issued in due course."[367] This was hardly an irrational belief, particularly as VimpelCom's outside counsel had advised it that "[i]t is reasonable that [the Agenzia] will assess, on the same ground, also interest paid in 2009 and 2010."[368] The duty of good faith did not require VimpelCom to reject a global settlement offer when presented, and instead insist on the Agenzia's first pursuing Wind Telecomunicazione for each successive year with a formal tax assessment.

228.  OTMTI's other contentions about bad faith are echoes of its arguments with respect to the other audits, namely that if VimpelCom were truly proceeding in good faith, it would have (a) more fully involved OTMTI in the defense of the audits,[369] and (b) litigated rather than settled, because the available defenses were allegedly so strong – and any "downside" to litigation allegedly so spurious – that declining to litigate cannot have been in good faith. The Tribunal has already discussed these types of contention in connection with the WAHF Audit. The issue of participation will be discussed more below, but on the facts of this

---

[363] CE-149, CE-150.

[364] CE-14.

[365] SoDC ¶ 22; *see also id.*, ¶ 114; O-PHB ¶ 156.

[366] CE-31.

[367] CE-148 at 2.

[368] CE-112 at 3.

[369] SoDC ¶ 177; Rejoinder ¶ 283; O-PHB ¶ 333.

case, OTMTI certainly cannot bootstrap an argument about alleged breach of participation rights into a demonstration of bad faith.  As for the merits of litigating versus settling, it is not necessary for purposes of a "good faith" analysis to determine which company had a more accurate view of the likelihood of success.  So long as VimpelCom *in fact* believed that Wind Telecomunicazione faced cognizable risks from litigating the assessment, and it formed that belief at least in part on the contemporaneous advice of counsel, there is no basis for finding an absence of good faith.

### (3)    *The Adequacy of Notice and Opportunity to Participate*

229.   As with the WAHF Audit, there is no dispute with respect to the Wind Telecomunicazione Audit that VimpelCom complied with its notice obligation to OTMTI under Article 10.7(h)(i) of the SSEA.  The Agenzia notified Wind Telecomunicazione of the beginning of its audit on 28 November 2013, and the following day (29 November 2013) VimpelCom forwarded the Agenzia's notice to OTMTI.[370]   OTMTI confirmed receipt of this notice on 1 December 2013.[371]

230.   Again, the debated issue is whether VimpelCom thereafter complied with the obligation to "coordinate" with OTMTI "in the taking of any action relating to the conduct of such Tax audit or inquiry actions," and to "use its reasonable efforts to include a representative appointed by [OTMTI] in any meeting or material telephone call arranged by VimpelCom … with a representative of the relevant Taxing Authorities."[372]  OTMTI contends that VimpelCom breached these various duties, and thus failed to provide it with a "meaningful opportunity to participate in the defense and settlement."[373]  Specifically, OTMTI argues that VimpelCom "repeatedly and consistently excluded OTMTI from participating in the preparation of submissions to, and meetings and telephone conferences with, the Agenzia."[374]

---

[370] CE-13.
[371] CE-100.
[372] SSEA Article 10.7(h)(ii).
[373] SoDC ¶¶ 12, 222.
[374] Rejoinder ¶ 5; O-PHB ¶ 7.

231.    The evidence does not support this assertion.  During the initial period between notice of the audit and the Agenzia's issuance of the tax assessment, VimpelCom primarily was engaged in gathering materials to respond to a questionnaire the Agenzia had provided, with a two-week deadline.  VimpelCom sent OTMTI a copy of that questionnaire on 29 November 2013, the day after the Agenzia sent it, and suggested a call for the Parties to "work out how best to handle the request amongst themselves."[375]  The Parties thereafter continued to communicate regarding gathering relevant documents, and VimpelCom invited OTMTI to participate in calls with tax counsel and one of the lenders involved in structuring the loans.[376]  While OTMTI complains that VimpelCom only provided it a draft response to the questionnaire on 12 December 2013, the day before it was due,[377] there is no evidence suggesting that the draft had been prepared much earlier than that, and indeed this seems unlikely given the Parties' struggle over the last two weeks to locate the relevant information.  OTMTI's complaint that the draft initially was sent without attachments does not advance its cause, particularly given the evidence that this was because of difficulty uploading large files and that VimpelCom instead invited OTMTI's counsel to view the attachments in its office.[378]  While it is unfortunate that this combination of events resulted in OTMTI's comments not being received in time to incorporate them in the questionnaire response, there is no reason to believe that these comments would have shifted the Agenzia's views so dramatically as to ward off the assessment it issued on 24 December 2013.

232.    Following that assessment, the Parties had numerous communications regarding how to respond, and VimpelCom invited OTMTI to attend meetings and calls with the lenders and their counsel to develop further information and arguments; VimpelCom also invited OTMTI to attend meetings with the Agenzia in January and February 2014.[379]  In February 2014, OTMTI agreed to VimpelCom's suggestion that Wind Telecomunicazione submit a "request for mutual agreement" to the Italian Tax Authorities, although it expressed its

---

[375] CE-101.

[376] CE-101, CE-103, CE-104, CE-110.

[377] SoDC ¶¶ 104, 222; Rejoinder ¶ 270; O-PHB ¶ 159.

[378] CE-32, CE-106, CE-110.

[379] CE-113, CE-114, CE-115, CE-116, CE-117, CE-118, CE-119, CE-120, CE-122, CE-123, RE-12.

view that such discussions should not bind Wind Telecomunicazione to accept a settlement, and that "litigation may well be the best option available to Wind, eventually."[380] Thereafter, VimpelCom sought and incorporated OTMTI's input on a legal memorandum regarding penalties,[381] and invited OTMTI to attend further meetings with the Italian Tax Authorities in March 2014.[382]   The Parties met to discuss "estimates of potential claim and/or settlement amount[s] under different scenarios,"[383] and VimpelCom passed on to OTMTI the Agenzia's views on the appropriate withholding tax on the interest paid for the years 2008, 2009 and 2010.[384]

233.   As with the WAHF Audit, OTMTI's principal complaint appears to involve the April and May 2014 time period, in which it alleges that VimpelCom "began to exclude OTMTI from meetings" about the two audits and did not "fully disclos[e] … the substance" of settlement discussions.[385]   With respect to the allegation of deliberate exclusion, OTMTI focuses on the same 14 April 2014 meeting with the Agenzia that the Tribunal discussed in connection with the WAHF Audit, but the evidence (discussed in Section IV.E.4) shows that VimpelCom tried to reschedule this to accommodate OTMTI's participation.

234.   Beyond this meeting, which clearly does not reflect any actionable failure to coordinate, the real issue between the Parties was not lack of coordination, but simply divergent views on the advisability of presenting certain arguments to the Agenzia.   Specifically, in mid-to-late April 2014, VimpelCom debated internally the potential validity of certain additional defense arguments that one of the outside law firms had raised, the principal one of which was referred to in short-hand as the "lender" argument.   The thrust of this argument was that it was the Italian bank lenders that had the obligation to withhold any taxes based on their contractual relationship with the CSPs, and not Wind Telecomunicazione's obligation to do so.[386] The argument apparently had been included

---

[380] CE-36.
[381] CE-39, CE-124.
[382] CE-58, CE-128, CE-129, CE-132.
[383] CE-127, CE-129.
[384] CE-133, CE-134, CE-135.
[385] SoDC ¶ 11; Rejoinder ¶ 276.
[386] RE-181.

in a prior memorandum to the Agenzia, and the question was whether to now emphasize it more forcefully. VimpelCom's regular outside counsel did not consider it likely to "sway" the Agenzia, particularly in the context of a "mutual agreement" procedure. VimpelCom's internal counsel likewise felt "the argument may not hold," given the Agenzia's consistent view that "the IBLOR structure is an artificial imposition of Italian banks," but agreed that it could be emphasized as a further point to try to obtain a favorable approach towards penalties.[387]

235.    While the issue was being discussed internally, on 2 May 2014 OTMTI sent VimpelCom a summary of the same potential arguments. VimpelCom responded that "we have already considered these arguments … in detail and have advanced them verbally in meetings" with the Agenzia, but the Agenzia "has stated unequivocally on a number of occasions that the procedure in course is aimed at discussing a possible settlement and trying to reach an agreement on the figures as opposed to discussing an annulment of the assessment," and that "[t]he appropriate forum to seek an annulment is the tax courts,"[388] the litigation course that settlement discussions were trying to avoid. VimpelCom explained to OTMTI that "[h]aving been given this clear message, our objective to date in discussing these and other defensive arguments with the [Agenzia] has been to give the a firm indication of how we would challenge the audit before the tax courts in order to encourage the [Agenzia] to reduce penalties as much as possible." As a matter of strategy, VimpelCom believed that submitting further written memoranda at this point on liability issues "could prejudice our chances of obtaining a favorable settlement offer," and in any event VimpelCom did not consider the additional arguments strong in their substance.[389] Nonetheless, the next day VimpelCom apparently *did* reach out to the Agenzia to request a meeting "to discuss these arguments." The Agenzia advised that "they do not see any reason to meet again until they have completed their analysis because they already have a very clear view on our arguments," including this argument.[390]

---

[387] RE-181, RE-182.

[388] CE-143.

[389] CE-143.

[390] CE-143.

236.    This exchange demonstrates a difference in opinion about the strength of potential arguments, and the tactical impact of raising them further at a given point.  What it does not reflect is a breach of VimpelCom's duties under the SSEA. The SSEA does not require the Parties to reach *agreement* on issues of strategy, only that reasonable efforts be made to coordinate with OTMTI, while OTMTI retained the ultimate right to decide in good faith whether to reach a reasonable settlement.

237.    Finally, OTMTI makes much of an internal VimpelCom discussion on 20 May 2014, after VimpelCom's Board already had approved the settlement proposal, about whether to share with OTMTI a draft appeal VimpelCom had prepared to file in court, in the event the settlement was not concluded within the applicable window for the "mutual agreement" procedure.[391]   As OTMTI notes, VimpelCom debated not sharing the document with OTMTI, because it feared this would "complicate things" by emboldening OTMTI to argue that the strength of the arguments included in the draft appeal demonstrated the viability of litigating rather than settling.[392]   There is nothing nefarious about having this debate, in circumstances where the Parties already had staked out opposite positions on whether to litigate or settle, and where it was clear that VimpelCom viewed the document only as a contingency in the face of a pending appeal deadline.[393]   In any event, VimpelCom *did* end up sharing the document with OTMTI the next day, along with an explanation that any filing would be "purely as a technical matter in order to safeguard our position and preserve our rights."[394]   In other words, VimpelCom portrayed the document to OTMTI in precisely the same terms as it viewed it internally.  Ultimately, it proved unnecessary to file the document at all, as the Agenzia concluded the settlement within the applicable time window and on the terms that VimpelCom had found reasonably acceptable.  Nothing in this episode reveals a failure to coordinate in breach of VimpelCom's SSEA obligations.

---

[391] Rejoinder ¶¶ 6, 281-283, 333; O-PHB ¶ 160.

[392] RE-184.

[393] RE-184.

[394] CE-46.

### (4)   *Reasonableness of Settlement*

238.   The Tribunal likewise concludes, as with the WAHF Audit, that VimpelCom's decision to settle and the terms of the resulting settlement were objectively reasonable, in the sense that exposure was lower than Wind Telecomunicazione possibly might face as an adverse judgment, if it declined to settle and insisted on litigating in court.

239.   OTMTI's principal objection is that the defense arguments "would have prevailed" in litigation.[395]   It identifies a series of arguments that, in its view, were bound to succeed in court.[396]   As alleged confirmation of the inevitability of success, OTMTI invokes a late 2015 decision of a first-instance Italian court (referred to as the "***Seat***" decision),[397] which successfully challenged an assessment of withholding taxes on interest paid under an IBLOR structure.   The *Seat* case was litigated by the same outside counsel VimpelCom had consulted for a second opinion with respect to the Wind Telecomunicazione Audit, and who (as discussed above) had provided two memoranda for its consideration.   According to OTMTI, the *Seat* case demonstrates that "the Agenzia's challenge to Wind Telecomunicazione's use of this well-established financing structure was meritless," and that Wind Telecomunicazione similarly "would have prevailed in a litigation challenge to the Agenzia's assessment."[398]

240.   The Tribunal is unable to accept this outcome as a categorical certainty or even as highly likely and carrying minimal risk.   While OTMTI summarizes the strengths of the potential defense arguments, VimpelCom sets forth the counter-arguments that potentially supported the Agenzia's position in support of a substance-over-form analysis of the IBLOR structure.[399]   When VimpelCom was weighing these various arguments and counter-arguments, there was no particularly applicable case-law on the issue, a fact that its regular

---

[395] Rejoinder ¶ 5(c), 337.

[396] *See, e.g.*, Rejoinder ¶¶ 287-300; O-PHB ¶ 164-187.

[397] RLA-63 (decision involving Seat Pagine Gialle S.p.A.).

[398] Rejoinder ¶¶ 267, 302; *see also id.* ¶ 337 ("VimpelCom would have prevailed, just as Seat did"); O-PHB ¶ 189 ("Seat's victory corroborates that, if Wind Telecomunicazioni has resisted the Agenzia's assessment, [it] would have succeeded").

[399] V-PHB ¶¶ 233-249.

outside counsel expressly emphasized in delineating the risks.[400]  The future decision in the *Seat* case by definition was not available for consideration in 2014.  The IBLOR structure in the Wind Telecomunicazione Audit also had certain distinguishing features, including that the Italian banks bore less risk than those in the *Seat* IBLOR structure.  The presence of these risks was a significant factor, to the *Seat* court, in recognizing the Italian banks as true beneficial owners of the interest payments.[401]  Even apart from these distinguishing features, the fact is that the outcome was far from pre-ordained at the time VimpelCom was facing a decision about whether to settle or litigate.  Indeed, the very outside counsel who eventually brought the *Seat* challenge, and who initially appeared enthusiastic about assisting Wind Telecomunicazione to assert similar defenses,[402] subsequently cautioned that the outcome was far from certain.  Among other things, he acknowledged that "as far as complex and international transactions are concerned, the taxpayer runs the risk that its own arguments, even if reasonably grounded, would not be properly understood and evaluated by the Tax Court," and that "recent case-law developments show that, especially when complex and international financial transactions are concerned, the Tax Courts often rule in favor of the Tax Authorities.[403]  In these circumstances, it was not unreasonable for VimpelCom to adopt a conservative approach towards risk management.  The fact that Seat may have been less risk averse, and willing to take its chances in court, does not render VimpelCom's contrary judgment call beyond the realm of reasonable discretion.

241.   Nor, for the reasons generally discussed in connection with the other audits, can the Tribunal accept OTMTI's argument that there was no objective downside to Wind Telecomunicazione's attempting litigation.   OTMTI argues that "even if Wind Telecomunicazione's litigation challenge failed, its exposure would not have increased,"[404] because the settlement terms were "equivalent to its worst case scenario in litigation."[405]

---

[400] CE-112 at 4-5, 11.

[401] V-PHB ¶ 251; RLA-63 at 4.

[402] CE-131; RE-181.

[403] CE-138 at 1.

[404] Rejoinder ¶ 5(c).

[405] Rejoinder ¶ 306.

But this depends on accepting several propositions which are neither clear today, nor more importantly were highly likely and carrying minimal risk at the time VimpelCom faced its decision.   The first proposition is that there was no scenario under which Wind Telecomunicazione could have faced a higher withholding tax rate than the 10% rate with which the settlement was calculated.[406] But the Agenzia's assessment for 2008 had started out asserting entitlement to the higher statutory rate of 12.5%, and it appears that the 10% rate was achieved by convincing it to take into account tax treaties in force with the various jurisdictions where the foreign CSPs were based, even absent formal requests from the CSPs to apply the treaties and certificates from their revenue agencies.[407] This reduction was one of the key objectives identified for the negotiations by the outside counsel brought in for a second opinion – the one who later litigated the *Seat* case[408] – and there is no guarantee that a tax court ruling against Win Telecomunicazione after protracted litigation would have been as willing to recalculate the rates from the amounts set forth in the formal assessment.[409]

242.   The second proposition on which OTMTI's "no downside" argument depends is that any penalties would have been waived following a court proceeding, due to the uncertainty of the tax rules applicable to IBLOR structures.[410]   However, the Agenzia had begun by claiming penalties at 150% in its 2008 assessment.  In a litigation context, it could have countered Wind Telecomunicazione's arguments about "objective uncertainty" by invoking   the   BNP   Paribas   memorandum,   which   expressly   warned   Wind Telecomunicazione at the time of the transaction of the "high risk" the authorities would recharacterize   an   opaque   IBLOR   structure   as   a   "pass-through"   designed   to   avoid withholding taxes.[411]   It was certainly reasonable to worry that a tax court might be disinclined to waive penalties in the face of concrete evidence that a company had been

---

[406] Rejoinder ¶ 223; O-PHB ¶ 191.

[407] V-PHB ¶ 252.

[408] CE-138 at 2, 4.

[409] Given this finding about the 10% versus 12.5% rates, there is no need to evaluate VimpelCom's further argument that the Agenzia also could have sought to apply an even higher 27% withholding tax rate for the eventual 2009 and 2010 assessments, on the theory that the lenders might be resident in black-listed jurisdictions.  Reply ¶ 223; V-PHB ¶ 253.

[410] Rejoinder ¶ 305; O-PHB ¶ 192.

[411] RE-161 at 2, 3.

cautioned about the risk of tax scrutiny but evidently disregarded that warning. Whatever the contours of the doctrine of "objective uncertainty," a court might well factor in any significant countervailing proof of *subjective* foreknowledge, which the Agenzia had ready to deploy in this case.

243.    In these circumstances, it was reasonable for VimpelCom to conclude that losing a challenge in the courts might expose it to substantially higher liability than settling the case. The settlement offer achieved the specific goals that outside counsel had identified for such negotiations, namely reduction of the tax rate to account for tax treaties applicable to the foreign CSPs and a complete waiver of penalties.[412] There is no evidence that Wind Telecomunicazione could have achieved better terms in the settlement, and no basis for concluding that a complete victory in litigation was self-evident or highly likely with minimal risk. The fact that (as with the other Audits) Wind Telecomunicazione would have had to make a court deposit of 1/3 of the assessed amount plus interest, even to challenge the assessment, and then could face a significant tax collector's fee if it lost in court, also factors into the reasonableness of the settlement decision.

### *(5)    Mitigation of Loss*

244.    Finally, OTMTI has not demonstrated that VimpelCom failed to exercise due diligence in preventing foreseeable loss, and therefore violated its mitigation obligation under Article 10.7(f)(C). The evidence demonstrates that VimpelCom investigated the challenged transaction and obtained outside legal advice on the relevant issues of Italian tax law.

245.    OTMTI's contention that VimpelCom failed to mitigate rests primarily on two assertions that parallel its objections with regard to the WAHF Audit: (1) that mitigation required VimpelCom to do more to "obtain[] OTMTI's assistance with … the substantive issues,"[413] and (2) that mitigation required VimpelCom to "pursue aggressively .. the persuasive defenses that [it] should have asserted, including in litigation."[414] As to the former, the

---

[412] CE-138 at 2, 4.

[413] Rejoinder ¶ 271; *see also* SoDC ¶ 11 (alleging failure to mitigate by "failing to take steps to ensure that if fully availed itself of OTMTI's assistance").

[414] SoDC ¶ 11; *see also id.* ¶ 18 (VimpelCom violated its SSEA obligations "by failing to litigate against the assessment"); O-PHB ¶ 155.

Tribunal already has noted that the SSEA's mitigation clause cannot be read as requiring more participation than the SSEA's consultation and coordination provisions themselves require. OTMTI could have bargained for the greater option of participating in or even assuming the defense, as it did in Article 10.7(b) for non-tax claims, but it chose to accept lesser rights. It cannot undo that choice by arguing that a general duty to mitigate foreseeable losses required VimpelCom to involve OTMTI more meaningfully in conducting the defense.

246. With respect to OTMTI's insistence that "VimpelCom's obligation to 'use[] all reasonable efforts to mitigate' Losses required that it litigate the strong defenses available … rather than agree to a settlement,"[415] the Tribunal likewise has rejected the equation of mitigation with a duty to litigate. Moreover, given that the outcome in court was not pre-ordained, and that it was not clear that a negative outcome in court would be no more burdensome than the settlement proposal on the table, the decision to settle itself may be seen as a form of mitigation of risk.

### G.  Quantification of Damages

247. For the reasons set forth above, the Tribunal has found that OTMTI breached its obligation to indemnify VimpelCom for 72.65% of Losses resulting from a good faith and reasonable settlement of the Wind Telecom, WAHF, and Wind Telecomunicazione Audits. The quantification of indemnifiable Losses follows from the SSEA's definition of the term, which covers "any and all liabilities, losses, damages, claims, fines, penalties, costs and expenses, including, without limitation, reasonable attorneys' and accounting fees."[416] The only potential reduction to indemnifiable Losses is to the extent any portion of VimpelCom's Losses was not "effectively … sustained", because it was offset by tax savings or carry-forward deductible tax losses from which VimpelCom benefitted or could have benefited.[417] Beyond this issue, the Parties agree that, with respect to any liability

---

[415] Rejoinder ¶ 306.
[416] SSEA Article 10.2(a) (definition of Losses).
[417] SSEA Article 10.7(d).

determined by this Tribunal, VimpelCom is entitled to an award of interest, although they differ on an appropriate rate. These issues are addressed in turn below.

### (1)    OTMTI's "Losses" for Audit Settlement Amounts and Related Costs

248.    The amounts paid in settlement of the three Audits are not in dispute. While the settlement amounts were paid in installments, each installment has now been paid in full. For the Wind Telecom settlement, the total amount paid to the Italian Tax Authorities (rounded to the nearest Euro as per CE-359, the interactive Excel spreadsheet provided by VimpelCom's expert for calculation of damages)[418] was €31,464,594[419]; for the WAHF Audit, it was €83,769,224; and for the Wind Telecomunicazione Audit, it was €61,759,373, consisting of €29,702,419 for fiscal year 2008, €19,369,909 for fiscal year 2009, and €12,687,045 for fiscal year 2010.[420] The total amount paid in settlement of the three audits was thus €176,993,191.[421]

249.    There is no dispute that the indemnification obligation also covers "reasonable attorneys' and accounting fees" incurred in connection with the Italian Tax Audits, consistent with the definition of Losses in SSEA Article 10.2(a).[422] VimpelCom presented evidence of such fees and associated taxes, for a total amount of €3,187,889 (rounded to the nearest

---

[418] Meyer I, ¶ 7 (describing CE-359).

[419] The value for the Wind Telecom Audit in CE-359 has been adjusted as per VimpelCom's direction in V-PHB, n. 5, to input €1,541,885 in place of €1,329,375 in cell F18 of the Audit settlements tab to reflect a correction to the last installment payment. The Tribunal notes that inputting this change to cell F18 results in a total Wind Telecom settlement figure of €31,464,594, which is slightly different than the €31,464,558 VimpelCom elsewhere references in the same filing (see V-PHB ¶ 260). The Tribunal trusts that resolving the source of the minor €36 discrepancy would not be cost-effective for the Parties. As between the two very similar figures, the Tribunal adopts the one resulting from the specific requested adjustment in the interactive spreadsheet, in order to permit it utilize this spreadsheet for other purposes, including the calculation of interest.

[420] CE-359 (column F, as adjusted, see note above).

[421] CE-359 (column F, as adjusted). This figure likewise departs by about €36 from the total referenced in V-PHB ¶ 259. The Tribunal notes a further discrepancy between the resulting sum and that shown in V-PHB Appendix A, which purports to add the settlement sums for each Audit (separately corresponding to the figures in the adjusted spreadsheet) to obtain a sum that is nonetheless different from that in the adjusted spreadsheet. The Tribunal has independently added the figures shown in the first column of V-PHB Appendix A, and confirmed the error in the computation set forth therein. The Tribunal therefore uses the figures in CE-359, as adjusted, rather than the erroneous sum in V-PHB Appendix A.

[422] This is a different issue than the allocation under the LCIA Rules of Arbitration Costs and Legal Costs for this arbitration, a subject that is addressed in Section VI below.

Euro), again subject to any potential offset for tax savings.[423]  The Tribunal accepts these as reasonable in the circumstances.

250.   Pursuant to the SSEA, OTMTI's indemnification obligation will be 72.65% of these total VimpelCom costs, after any offsets for tax savings, an issue that is first discussed below.

### (2)   The Tax Savings Issue

251.   The next issue is whether VimpelCom's total Losses should be adjusted to reflect any tax savings that were obtained or were available to it as a result of the settlements.  Under Article 10.7(d) of the SSEA,

> a Loss shall be eligible for indemnification to the extent and only to the extent such Loss has effectively been sustained by the Indemnitee.  Any indemnification due by the Indemnitor shall be calculated taking into account the value of (i) any Tax savings obtained by the Indemnitee Group and/or (ii) any increase in the amount of Tax losses available to them for carry-forward or carry-back and, in each case, resulting from the tax deductibility of the relevant Loss.

252.   As evident from the structure of this Article, it addresses potential offsets in two different scenarios.  The first, covered by clause (i) of Article 10.7(d), is where the Wind Group actually "*obtained*" tax savings, because of "the tax deductibility of the relevant Loss."  This is a straightforward factual question, which looks solely to past events, *i.e.*, whether the Wind Group in fact claimed and received any tax deductions on account of any component of an otherwise indemnifiable Loss.  In this case, there is no dispute that it has not done so with respect to the amounts paid in settlement of the Audits.[424]  VimpelCom admits, however, that the Wind Group did take a tax deduction in connection with the professional fees incurred in connection with the Audits.[425]  By straightforward application of Article 10.7(d), first clause, VimpelCom's indemnifiable Losses must be reduced for "the value" to the Wind Group of this tax deduction.  The Tribunal considers the reference

---

[423] Reply ¶ 255-257 and CE-359 (original calculation of €2,956,622); V-TS ¶¶ 54-55 and Table 2 (explaining revised calculation to include taxes paid on professional fee invoices).  The Tribunal has adjusted Column A of CE-359 to reflect the revised figures set forth in V-TS, Table 2.

[424] V-TS ¶ 6.

[425] V-TS ¶¶ 10, 52.

to "value" to refer to the amount of tax savings actually achieved, taking into account the tax consolidation regime that was in place for the Wind Group even prior to SSEA.[426] VimpelCom has demonstrated that "the effects of tax consolidation meant that the deductions resulted in no tax savings or valuable tax benefits to the Wind Group" with respect to the professional fees, except for €33,884 (rounded to the nearest Euro) in regional tax savings obtained by Wind Telecomunicazione.[427] An offset should be allowed for these savings, reducing VimpelCom's total Loss associated with professional fees from €3,187,889 to €3,154,005.[428]

253.    However, clause (ii) of Article 10.7(d) also covers a second scenario, which is where tax savings from an otherwise indemnifiable Loss have not yet been "obtained," but where the Loss results in "any increase in the amount of Tax losses *available to* [the Wind Group] for carry-forward or carry-back" (emphasis added).  This is a more complicated provision, as it presents the question of what it means for the losses to be "*available … for carry-forward*"[429] use as a tax deduction, and for the Parties to "tak[e] into account *the value of*" such "available" tax-deductible losses.  The Parties agree that the threshold requirement is that the particular loss be *legally* available, in the sense of being of a *tax-deductible nature* under Italian law.[430]  The harder question is whether, if a particular loss is *legally* of such a deductible nature, the references to "availability" and "value" also contemplate an inquiry into whether tax savings would be (or could have been) achievable as a practical matter, in the sense that the Wind Group could obtain actual benefit from such a carry-forward loss.

254.    In principle, this could require a several-step inquiry.  The first step would be to determine, *as of the date of the Award*, not only whether the Wind Group actually had applied the carry-forward loss to its benefit in any tax filings, but also whether it could have achieved

---

[426] As the Wind Group's prior owner, OTMTI would have been aware of the tax consolidation regime at the time of the SSEA.  VR-TS ¶ 15.  It is notable in that regard that Article 10.7(d) refers to tax savings "by the Indemnitee *Group*" (emphasis added), seemingly confirming the Parties' expectation that the issue of offsets would be addressed by looking at consolidated returns.

[427] V-TS ¶¶ 10, 52, 55; VR-TS ¶¶ 20, 24.

[428] The Tribunal has adjusted column E of the professional fee tab of the interactive Excel spreadsheet, to match the figures shown in V-TS, Table 2, to account for these tax savings.

[429] It is undisputed that there is no possibility of carry-back tax savings under Italian law.  V-TS ¶¶ 8, 13.

[430] V-TS ¶ 19; O-TS ¶ 17.  As discussed below, while the Parties agree that this is a threshold inquiry, they disagree on the outcome of the inquiry on the facts of this case.

any "value" from doing so, given other aspects of its performance and its applicable tax regime.   The Tribunal sees logic to undertaking this inquiry, which could have been foreseeable to the Parties at the time they agreed to arbitration under the SSEA.  It ensures that an indemnitee does not benefit at the indemnitor's expense from failing to take a legally available deduction from which it demonstrably would have derived "value," in amounts that a tribunal can calculate with reasonable certainty as of the date of the Award. The incentive is on the indemnitee to try to pursue all legally available deductions, with the understanding that if it does not and an arbitral tribunal later finds that it could have obtained value by doing so, the consequence is for its account.   VimpelCom does not challenge this conclusion, at the level of principle.[431]

255.    However, the Tribunal has greater reluctance regarding further steps that look *beyond the date of the Award*, to consider not only whether there are scenarios under which the Wind Group still might be able to obtain value from any future carry-forward of past deductible losses, but also what the projected future "value" of such theoretical future offsets might be, or what mechanisms might be used in future to determine that question.  This analysis could lead the Tribunal down a tricky path requiring it to decide (a) how many years should be covered by such a forward-looking inquiry, particularly given the Parties' agreement that under Italian law, tax-deductible losses in principle can be carried forward indefinitely; (b) how to address the reality that any future tax benefits inevitably will depend not only on future taxable income, but also on future tax planning, made in the context of the known content of an arbitration award; (c) how certain the likelihood of future taxable income and the amount of such income must be, to avoid utter speculation about the value of any future tax savings; and (d) how to manage the contingency that the future expected savings might not materialize *in toto* or to the same degree as previously anticipated.  It is far from clear that the Parties intended an arbitral tribunal to delve into such issues, which would also create an inevitable recipe for further (post-Award) disputes.

256.    On balance, the Tribunal concludes that the second clause of Article 10.7(d) should be given more circumscribed focus.  It will consider the *legal inquiry* about tax deductibility

---

[431] *See, e.g.,* V-TS ¶¶ 18, 20 (acknowledging at least in theory that an "adjustment to damages" could be made for any demonstrated "value" to the Wind Group that is "available" to it through a carry-forward of past tax-deductible losses).

under applicable law, and the non-speculative *factual inquiry* into whether the Wind Group could have achieved any "value" up through the date of the Award by taking advantage of legally available tax deductions.  As discussed further below, the Tribunal also will address certain immediately foreseeable issues the Parties have briefed with respect to possible tax savings from deferred interest payments made in 2016 and 2017.  It declines, however, to engage in the far more speculative analysis of whether there are scenarios under which the Wind Group might obtain further tax savings beyond that.

257.   Beginning this analysis with the issue of deductibility, there is no dispute that back taxes and any penalties paid in connection with back taxes are not deductible under Italian law.[432]  The question of deductibility therefore focuses only on the interest component of the settlement amounts.  There are two types of interest at issue:  "late payment interest" on back taxes, and "deferral interest" paid on settlement installments.[433]  OTMTI contends that both are deductible under Italian law;[434] VimpelCom contends that deductibility is "uncertain under Italian tax law."[435]  The Tribunal considers it notable, however, that this is not the view the Wind Group apparently adopted at the time it was considering the Wind Telecom settlement, when one of its senior internal tax advisors remarked that the company could take "comfort" from the tax deductibility of the interest component.[436]  There is no evidence to suggest that VimpelCom was subsequently advised otherwise prior to this arbitration, nor indeed that it even made an effort to consider the question, at the time the relevant tax returns were being compiled.  Certainly, the record is devoid of any suggestion that VimpelCom actively determined, at any time prior to this arbitration, that the Wind Group had no legitimate basis for claiming an interest deduction.[437]  Given its obligations under Article 10.7(d), and that it was placed on notice of a potential tax deduction by its own senior tax professional, VimpelCom at minimum was obliged to explore the possibility of such a tax saving.

---

[432] V-TS ¶¶ 6, 22.

[433] V-TS ¶ 23.

[434] O-TS ¶¶ 6, 17-23; OR-TS ¶¶ 25, 45, 36-37.

[435] V-TS ¶¶ 7, 29-37.

[436] RE-196.

[437] OR-TS ¶¶ 8, 27.

258.   The fact that it evidently did not do so puts the Tribunal in the position of evaluating deductibility solely on the basis of non-contemporaneous assessments by the two expert witnesses presented by the Parties.   The Tribunal concludes that ultimately OTMTI's expert is more persuasive on this issue, particular in light of certain Italian law materials cited in support of deductibility.   The fact that the contemporaneous "first reaction" of the Wind Group's senior tax advisor also was to assume deductibility further corroborates the conclusion, drawn from the relevant Italian law materials, that a deduction was more likely to be allowed than to be disallowed.[438]

259.   Accordingly, the Tribunal concludes that a claim for deduction of interest payments more likely than not would have been accepted as *bona fide*.   The question then turns to whether taking such a deduction would have led to any "value" for the Wind Group, over the non-speculative period of time represented by the years between the accrual of the Losses and the Tribunal's Award.   The Tribunal accepts the analysis of VimpelCom's expert that under the accrual principle in Italian law, the "late payment interest" accrued in fiscal year 2013 for the Wind Telecom settlement, and no later than fiscal year 2014 for both the WAHF and Wind Telecomunicazione settlements, rather than in the later periods when such interest payments actually were paid.[439]   By contrast, VimpelCom accepts that the "deferral interest" accrued over the duration of the installment payment periods for each settlement, which ranged from 2013 to 2017, and that the relevant portions accruing in 2015, 2016 and 2017 could at least "hypothetical[ly]" have "value" as tax deductions.[440]

260.   First, with respect to the late payment interest and deferral interest that accrued in 2013 and 2014, the Tribunal accepts that even a retrospective amendment of the returns for 2013 and 2014 would achieve no tax savings for the Wind Group in those years, because the Group had other operating losses and deductions for 2013 and 2014 that left it with no tax liability in any event.[441]   Orascom does not dispute the showing that, on an accrual basis, the Wind Group could not have realized any tax savings in 2013 or 2014.   On the other

---

[438] The Parties dispute which bears the burden of proof with respect to deductibility. The Tribunal considers the issue largely academic, given its finding that a preponderance of the evidence supports OTMTI's view on the issue.
[439] V-TS ¶ 24.
[440] V-TS ¶¶ 9, 24.
[441] V-TS ¶¶ 8, 39-41; VR-TS ¶¶ 14, 17.

hand, because Italian law apparently allows a taxpayer to carry forward losses indefinitely – at least to the extent of using such losses to offset up to 80% of taxable income for a subsequent year – it is relevant that the Wind Group apparently did have taxable net income in 2015. However, it apparently claimed the 80% maximum carry-forward that year based on other losses. Because its prior years' losses were so great, the 80% limitation meant that even enhancing the earlier loss carry-forwards – by adding the 2013 and 2014 interest payments – would not have generated any tax saving for 2015.[442]

261. By contrast, with respect to the deferral interest that accrued in 2015, VimpelCom appears to concede that, because the Wind Group had net income in that year, there would have been certain tax savings if it had claimed deductions.[443] Its decision not to do so is therefore for its account, and its indemnifiable Losses must be reduced to reflect the tax savings that it *could* have achieved. VimpelCom calculates these savings for fiscal year 2015 as €92,067.[444] By contrast, OTMTI calculates the 2015 savings as €212,897.[445] While the respective calculations are somewhat murky, the Tribunal notes that OTMTI cites to underlying documents, while VimpelCom offers its figure through an expert who does not cite any underlying evidence for his figures. On balance, the Tribunal is willing to credit OTMTI's figures for this purpose. VimpelCom's indemnifiable Losses therefore should be reduced for a further €212,897 that it could have obtained in connection with the 2015 deferral interest.[446]

---

[442] V-TS ¶¶ 43-44.

[443] V-TS ¶ 46.

[444] VR-TS ¶ 17.

[445] OR-TS ¶ 48 and Table B.

[446] It is not clear to the Tribunal where to insert this reduction into the interactive Excel spreadsheet (CE-359), since the underlying deferral interest presumably accrued across multiple settlement installments paid during the course of 2015, but the hypothetical tax deductions could have been made in tax filings in the second half of 2016. The placement of the reduction will have implications for interest calculations, but the Parties have not provided any guidance on this issue. Exercising its discretion regarding damages calculations, the Tribunal adopts a single interest accrual date of 31 December 2015, as per note (3) in the adjusted spreadsheet, and utilizes the general functions of the spreadsheet first to apply the 72.65% indemnification formula, and then to calculates interest from the presumed accrual date to the date of the Award, at the same interest rate as used for all other elements of the interest calculations. The Tribunal then manually deducts the resulting offset figure from the total amounts otherwise shown through operation of CE-359, rather than attempting to adjust the programming formulas in CE-359 to perform this single deduction. While the result of this work-around may not be precisely the same as an alternative calculation that first deducts the putative tax savings from each individual settlement payment with a range of different interest accrual

262.   Given when the evidentiary record in this case closed – the final submissions on the tax savings issue were provided in April 2017 – the Tribunal has no information before it with regard to taxable income or deductions for fiscal year 2016, for which tax filings in Italy apparently were due only in the second half of 2017.   By definition, the Tribunal likewise has no information about the future tax position for fiscal year 2017 (when the last settlement instalment was made).   As for these periods, OTMTI correctly notes that VimpelCom's duty to try to obtain available tax savings does not end in 2015, because the SSEA requires it to undertake "all reasonable steps to try to recover from a 'third party'" any sums which could be the subject of an indemnification claim,[447] and if so recovered, to share such recovery with OTMTI *pro tanto*.[448]   The Tribunal accepts that, if circumstances were to make it possible for the Wind Group to obtain tax savings in connection with the Audits for fiscal years 2016, 2017 or beyond – either through a further carry forward of the 2013-2014 accrued late payment interest, or through deductions of the final 2016-2017 deferral interest instalments – then VimpelCom would have a duty either to take steps to cause the Wind Group to achieve that value, or alternatively to make OTMTI whole for the consequences to OTMTI of any decision not to do so.

263.   As to the first of these categories – a potential further carry-forward of the 2013-2014 late payment interest on the Wind Teleom settlement – VimpelCom declares this to be an entirely illusory possibility.   It points to (a) a 2016 decision to "deconsolidate" the Wind Group tax regime, and (b) a corporate restructuring resulting in Wind Telecom (the prior owner of any carry-forward losses) having no operations of its own or any continuing equity stake in WAHF or Wind Telecomunicazione, that could enable it (on a Group basis) to offset its past carry-forward losses against their potential income.[449]   OTMTI responds that, under Article 10.7(f)(B) of the SSEA, OTMTI's right to a tax offset must be calculated as if no such changes had taken place.[450]

---

dates, the Tribunal considers its approach to be a reasonable exercise of its discretion, given the limitations of the information provided.

[447] SSEA Article 10.7(g).

[448] SSEA Article 10.7(e).

[449] V-TS ¶ 45; VR-TS ¶¶ 17, 28-29.

[450] OR-TS ¶ 56.

264.    The Tribunal is unpersuaded by OTMTI's interpretation.  Article 10.7(f)(B) provides that OTMTI "shall not be held liable for indemnification with respect to a Loss or increased portion of a Loss" to the extent attributable to "any change in accounting methods (including consolidation methods) or policies of the Indemnitee after Closing."  Had VimpelCom or its subsidiaries taken accounting steps after the SSEA which either *triggered* a tax audit or *increased exposure* in a pending audit, the provision might apply. In this case, however, the indemnifiable "Losses" were defined and fixed by the 2013-2014 Audit settlements, and the 2016 change in consolidation policies and corporate restructuring did not alter the amount of those Losses.  Even if those changes might affect the Wind Group's theoretical ability to use loss carry-forwards, it is far from clear that Article 10.7(f)(B) was intended to cover such circumstances, and force the Parties to undertake for each future year a *pro forma* reconstruction of the tax situation, as if what actually occurred had never occurred.  There is no contention (much less evidence) that VimpelCom made any of these changes in order to enhance OTMTI's indemnification burden, nor that the Wind Group is itself somehow enjoying a tax benefit that it is not sharing with OTMTI.  Moreover, it appears that the policy of retaining any tax losses at the level of the individual business units, such as Wind Telecom, was adopted back in 2009, when OTMTI still owned the Wind Group.[451]  The fact that several years after the Audit Losses were fixed – and several years after OTMTI repudiated its obligation to contribute 72.65% of the Audit settlement amounts – Wind Telecom came to no longer own equity in other Group companies, is not a development for which the SSEA requires VimpelCom to prepare alternate-university tax computations to compensate OTMTI for its share of alternate-universe deductions from which the Wind Group itself did not obtain any value.

265.    This leaves the question of the final 2016-2017 deferral interest installments for the WAHF and Wind Telecomunicazione settlements, which VimpelCom appears to concede would be deductible *if* those entities had net taxable income in those years (which the Tribunal cannot determine).  Using OTMTI's calculations for the same reason stated with respect to the 2015 deferral interest, VimpelCom's maximum tax savings for these years (rounded to

---

[451] V-TS ¶ 40.

the nearest Euro) would be €354,726 for 2016 and €79,208 for 2017,[452] which – after applying the SSEA's 72.65% formula – would result in a further reduction in OTMTI's obligations of €257,708 and €57,545, respectively (prior to application of any interest). The Tribunal already has noted VimpelCom's duty to take reasonable steps to achieve tax savings on these payments, or to make OTMTI whole for the consequences to OTMTI of any decision on its part not to do so.  It trusts that VimpelCom will ensure a prompt payment or credit to OTMTI, if these entities *do* prove to have net taxable income in these years.  However, it is not the role of the Tribunal to create mechanisms to enable the Parties to police compliance with such future obligations.  For this reason, the Tribunal declines OTMTI's request that it impose specific reporting obligations on VimpelCom regarding its taxable income, other deductible losses, or tax filings for 2016, 2017, or the years beyond.[453]

266.  In conclusion, and for the reasons stated above, the Tribunal declines any offsets under Article 10.7(d) to VimpelCom's total Losses, for purposes of calculating OTMTI's 72.65% share, except for (a) an offset of €33,884 to VimpelCom's full cost incurred in connection with professional fees, to reflect its actual tax savings; and (b) an offset of €212,897 to VimpelCom's total Losses for the tax savings the Wind Group could have achieved had it claimed an available deduction in 2015 for the the deferral interest accruing in that year. The Tribunal has taken these into account in calculating OTMTI's resulting indemnification obligations, with adjustments noted on the interactive Excel spreadsheet provided for its use.[454]  With respect to the 2016 and 2017 deferral interest, the Tribunal maks no adjustment to the Excel spreadsheet or to the damages calculations in this Award, but confirms VimpelCom's contingent duty to reimburse OTMTI for €257,708 and €57,545 respectively, plus applicable interest, *if* WAHF and/or Wind Telecomunicazione

---

[452] OR-TS ¶ 48 and Table B.

[453] OR-TS ¶¶ 4, 57, 61.

[454] As previously explained, the offset for professional fees was reflected by an adjustment to column E of the professional fees tab of CE-359 to match the figures shown in V-TS, Table 2, with the 72.65% and the interest calculations thereafter performed within the interactive spreadsheet.  The offset for the 2015 deferral interest is noted in a new note (3) to CE-359, but the adjustment (after application of the 72.65% and interest calculations) is manually deducted from the amounts otherwise shown through operation of CE-259, because of the Tribunal's lack of guidance from the Parties as to how to spread the 2015 deferral interest offset among multiple settlement installments.

turn out to have net taxable income in those years for which deductions could have been taken.

267.   Pursuant to the calculations above and as shown in the adjusted Excel spreadsheet, OTMTI's 72.65% indemnification obligation for VimpelCom's adjusted Losses, *prior to the inclusion of pre-Award interest*, is (a) €22,859,027 for the Wind Telecom Audit, (b) €60,858,341 for the WAHF Audit, (c) €44,868,184 for the Wind Telecomunicazione Audit, and (d) €2,291,385 for professional fees associated with these Audits, less (e) €154,670 for 72.65% of the €212,897 that VimpelCom could have saved through a tax deduction for 2015 deferral interest.   The sum of these before-interest obligations is €130,722,268.   The impact of adjustments for pre-Award interest is addressed further below.

### (3)   *Pre-Award and Post-Award Interest*

268.   The Parties agree that the LCIA Rules grant the Tribunal broad discretion to determine an appropriate award of interest.[455]   Unlike many commercial contracts, the SSEA does not provide any guidance on such matters as the appropriate interest rate on amounts due under an arbitral award enforcing its terms, or the method of calculating interest in and on an award.   Article 13.7(a) of the SSEA does, however, contain the Parties' broad agreement to the LCIA Rules.   Article 26.4 of those Rules authorizes an award of "simple or compound interest … at such rates as the Arbitral Tribunal decides to be appropriate (without being bound by rates of interest practiced by any state court or other legal authority) in respect of any period which the Arbitral Tribunal decides to be appropriate ending not later than the date upon which the award is complied with."

269.   VimpelCom seeks pre- and post-award interest at a rate of 9%, compounded annually.[456]   It sources this rate to its expert's computation of VimpelCom's Weighted Average Cost of Capital ("**WACC**"), the theory being that "OTMTI's failure to indemnify VimpelCom for the losses incurred in the Italian Tax Audits required VimpelCom to fund the amount of its capital needs that would otherwise have been paid by OTMTI at a cost equal to its

---

[455] Reply ¶ 262; Rejoinder ¶ 345.
[456] Reply ¶ 261.

WACC."[457]  VimpelCom observes that its expert's calculation of the WACC rate is similar to New York State's statutory pre-judgment interest rate, although that provides for 9% simple interest, not compound interest.[458]   According to VimpelCom, compounding – rather than simple interest – is required to achieve full compensation.  It contends that it is also "now standard practice" to award post-judgment interest as the same rate as pre-judgment interest.[459]

270.  OTMTI "agrees that pre-award and post-award interest should be available to a party if it prevails on its claims,"[460] and that the same rate should be applied to both periods.[461] OTMTI also agrees that compound rather than simple interest is appropriate.[462]   It contends, however, that the rate sought by VimpelCom is "highly excessive, both legally and economically,"[463] and would "overcompensate[e] it" rather than making it whole.[464] It contends that, if VimpelCom had proved that "it actually borrowed funds and paid interest on its borrowings" to make the settlement payment, the appropriate rate should be the rate that it *could* have obtained, which OTMTI's expert suggests likely was between 2.88% and 3.54%, based on VimpelCom's prior use of three-year credit facilities.[465] However, since VimpelCom has not presented any evidence of such borrowing, OTMTI argues it should be awarded interest "at a commercial rate" applicable to Euros.[466]  OTMTI suggests this should be either (a) the European Central Bank rate plus 1% (which English courts use for Euro-denominated obligations), resulting in rates between 1% to 1.5%, or (b) the rate of return VimpelCom's subsidiaries could have earned on bank deposits in

---

[457] Reply ¶ 264.

[458] Reply ¶ 265.  VimpelCom initially contended that the New York statutory rate was relevant because the SSEA is governed by New York law and New York law recognized pre-judgment interest as a substantive (and not merely procedural) obligation.  Reply ¶ 265.  It later clarified that it "does not seek application of the New York statutory rate" as such, nor does it contend that such rate is legally binding; rather, it cites the New York rate as evidence that awarding VimpelCom a WACC rate of 9% compound interest "would not be excessive."  V-PHB ¶ 271.

[459] Reply ¶ 263.

[460] Rejoinder ¶ 342.

[461] Rejoinder ¶ 348.

[462] Rejoinder ¶ 348.

[463] Rejoinder ¶ 342.

[464] Rejoinder ¶ 24.

[465] Rejoinder ¶¶ 343, 349, 372; O-PHB ¶ 198.

[466] Rejoinder ¶¶ 350, 364; O-PHB ¶¶ 196-197.

Italy, measured by the the Italian Civil Code default interest rate which ranged for the applicable period from 0.2% to 2.5%.[467]  As an alternative, OTMTI suggests, the Tribunal might apply interest based on the U.S. prime rate – which U.S. federal courts often use in actions to confirm international arbitral awards – which ranged between 3.25% to 3.5% in the relevant time period.[468]  Finally, even if a WACC-based rate were to be used, OTMTI contends that VimpelCom's calculations are inflated, as average WACC rates in the relevant industries range from 6.4% to 6.6%.[469]  Using VimpelCom's requested 9% "would result in a windfall to [it] and an unjustified penalty to OTMTI," it contends.[470]

271.    The Tribunal has carefully considered both Parties' positions.  First, the Parties' agreement to the LCIA Rules removes the need to determine the relevance of the New York State statutory rate to a London-seated arbitration between non-U.S. parties, arising out of indemnification obligations governed by New York law but flowing from Italian tax audits. Absent the agreement to the LCIA Rules, the choice of law question could require some discussion, as the issue is much debated and not clearly settled.[471]  Here, however, the Parties agreed to a Rules provision that expressly authorizes the Tribunal to award interest "at such rates as [it] decides to be appropriate (*without being bound by rates of interest practiced by any state court or other legal authority*)."[472]  In these circumstances, the Tribunal agrees with OTMTI that New York law does not control the determination of the proper interest rate to be applied in this case.[473]  VimpelCom does not contend otherwise,

---

[467] Rejoinder ¶¶ 344, 366, 370, 371.

[468] Rejoinder ¶ 362; O-PHB ¶ 203.  OTMTI contends that other U.S. federal courts have applied the federal post-judgment interest rate in actions to confirm international arbitration awards, which ranged from 0.09% to 0.65% for the relevant time period.  Rejoinder ¶ 363; O-PHB ¶ 203.

[469] Rejoinder ¶ 357; O-PHB ¶ 202.

[470] Rejoinder ¶ 358.

[471] *See, e.g.*, NYC Bar Committee on International Commercial Disputes, "Awards of Interest in International Commercial Arbitration: New York Law and Practice" (June 21, 2017), available at http://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/awards-of-interest-in-international-commercial-arbitration-new-york-law-and-practice (collecting cases and commentary about the relevance of the substantive law of the contract, the law of the seat, and the currency in which contractual obligations are denominated).

[472] LCIA Rules, Article 26.4 (emphasis added).

[473] Rejoinder ¶¶ 360-362.

despite referencing that law as one factor to be considered in the Tribunal's exercise of discretion.[474]

272.   The Tribunal equally agrees with OTMTI that the compound annual rate of 9% VimpelCom seeks is excessive under current market conditions.   Taking into account a variety of factors, including a reasonable cost of borrowing, and exercising the full discretion open to it under the LCIA Rules, the Tribunal considers that a rate of 3% compounded annually is appropriate for this case, for both pre-award and post-award interest.

273.   With respect to pre-award interest on damages for the indemnification claims, the Tribunal performs the necessary calculations by adapting VimpelCom's interactive Excel spreadsheet (CE-359, as adjusted per the discussion above) to reflect the 3% compound interest rate and an approximate Award date of 30 September 2017.   The resulting calculations are attached as Annex A, including notes added regarding the various adjustments discussed above.   As shown in Annex A, OTMTI's final indemnification obligations to VimpelCom, *inclusive of pre-Award interest* (but before any allocation of Arbitration Costs and Legal Costs as defined in Section VI below), are (a) €25,123,479 for the Wind Telecom Audit, (b) €64,548,972 for the WAHF Audit, (c) €47,583,355 for the Wind Telecomunicazione Audit, and (d) €2,526,042 for professional fees associated with these Audits, less (e) €162,885 for the after-interest value that VimpelCom could have saved through a tax deduction for 2015 deferral interest.   The sum of these obligations is €139,618,964.[475]

274.   With respect to post-award interest, interest at the same rate (3%) will continue to accrue and compound annually, on the full amounts awarded herein, until the Award is paid or is reduced to judgment, and in the latter event the accrual of additional interest at any different

---

[474] V-PHB ¶ 271.

[475] This figure reflects the €139,781,849 resulting from the various adjustments the Tribunal has made within the interactive CE-359, less a €162,885 offset to reflect the impact of a hypothetical tax deduction for 2015 deferral interest, for the reasons discussed above.  (The €162,885 figure was derived by utilizing the functions of CE-259; if the date of 31 December 2015 were inserted in column D of the Audit settlements tab, and the putative tax savings of €212,897 were inserted in column F, then column J would reflect a 72.65% figure of €154,670, and column R would reflect an after-interest figure of €162,885, with interest calculated at the same rate and to the same Award date as all other figures.)

rate will be governed by the law applicable to judgments in the jurisdiction in which judgment is entered confirming or enforcing the Award.

## V.    OTMTI'S COUNTERCLAIM REGARDING NAME RIGHTS

### A.    Background Facts Related to OTMTI's Counterclaim

275.    As with VimpelCom's indemnification claims, the Tribunal assumes the Parties' familiarity with the underlying facts with respect to OTMTI's counterclaim regarding name rights.  It describes herein only such background facts as are a useful predicate to the discussion of the issues in dispute.

276.    First, by acquiring Wind Telecom, VimpelCom not only acquired its Italian telecom assets, but also indirectly acquired Orascom Telecom, an Egyptian holding company that owned telecom businesses in various emerging markets.  VimpelCom initially acquired control of telecom businesses in Algeria, Pakistan, Bangladesh, Zimbabwe, the Central African Republic, Burundi, Namibia and Canada; following subsequent divestitures, VimpelCom continued to own Orascom Telecom's former telecom operations in Algeria, Pakistan, Bangladesh and Zimbabwe.[476]

277.    As part of the 2011 transaction, however, certain *other* Orascom Telecom operations and assets were spun off into a separate Egyptian company, Orascom Telecom Media & Technology S.A.E. ("***Orascom TMT***"), which was controlled by the Sawiris family, the ultimate owners of OTMTI.  The assets remaining under their control included interests in telecom operations in Egypt, Lebanon and North Korea, as well as various non-telecom assets in various other companies.[477]

278.    The Parties had an alignment of interests regarding the future use of the "Orascom" name. OTMTI, whose ultimate owners had developed the name, wished to retain rights to use it,[478] notwithstanding that the name otherwise would transfer to VimpelCom with Orascom

---

[476] SoDC ¶¶ 245, 271; Reply ¶ 276.
[477] SoDC ¶ 246.
[478] SoDC ¶ 271; Rejoinder ¶ 391; Rejoinder-CC ¶¶ 2, 19.

Telecom and the rest of the Wind Telecom assets being sold.   Correspondingly, VimpelCom was not interested in retaining the Orascom name for its own use.[479]   The Parties recognized, however, that a certain transition period would be needed to implement a name change, with respect to Orascom Telecom itself as well as various subsidiary operations being taken over by VimpelCom.   This included, *inter alia*, the telecom operations in Algeria, which were under the company name of Orascom Telecom Algérie S.p.A. ("**OTH**"), although marketing services publicly under the brand name "Dzezzy."

279.   As discussed below, the Parties therefore negotiated, first in the various iterations of the SSEA[480] and in the 15 April 2011 Separation Agreement,[481] and thereafter in the 15 November 2011 Closing Memorandum,[482] certain provisions addressing their respective rights with respect to the Orascom name (referred to in the documents as the "**Name Rights**").   OTMTI's counterclaim alleges that VimpelCom breached these provisions through continued use of the Orascom name, primarily in Egypt and Algeria.

280.   There is no dispute that certain uses of the name did continue beyond the dates specified in the relevant agreements, although the Parties disagree on the extent and significance of that use.   In the Tribunal's view, analysis of the extent and significance of use would be relevant only to the issue of damages in the event of breach.   The threshold issue is whether any such breach occurred.   VimpelCom contends (and OTMTI denies) that its continued use of the Orascom name was permitted by an exception for circumstances in which termination of its use of the Name Rights "would, or would be reasonably expected to, result in the loss of a material Permit or any material Loss."   OTMTI contends (and VimpelCom denies) that even if this exception applied, VimpelCom independently breached a concomitant obligation to "in good faith negotiate appropriate modifications to

---

[479] Reply ¶ 268; Rejoinder-CC ¶¶ 2, 19, 24.

[480] The Parties agree that earlier versions of the SSEA, denominated in this case as the "Original SSEA" (CE-188) and the First Amended SSEA (RE-222), were later superseded by the 15 April 2011 version the Parties refer to as the "SSEA" (CE-1 and RE-1).   For this reason, the Tribunal does not separately interpret the similar language in the earlier documents, although it notes the Parties' agreement that such language was included.

[481] RE-2.

[482] RE-3.

the Name Rights with a view to their termination as soon as practicable."[483]  The Tribunal turns to these issues below.

## B.      The Relevant Contract Provisions

281.    The SSEA contains a number of covenants by one Party to the other. Among these is Article 6.2(e), through which VimpelCom covenanted as follows, in relevant part:

### *Change of Business Name; Use of Retained Name and Marks.*

(i)     As promptly as reasonable after the Closing Date, VimpelCom shall use its commercially reasonable efforts to cause the name of the businesses and trade names, in each case, specifically identified on Annex 6.2(e) to be changed to names that do not constitute Retained Names and Marks except as provided in Section 4.6(a) of the OTH Separation Agreement; provided that in no event shall VimpelCom's obligation in this Section 6.2(e) require VimpelCom to take any action that would, or would be reasonably expected to, result in the loss of a material Permit or in any material Loss....

(ii)    As promptly as reasonably practicable following the Closing Date and provided that names are changed pursuant to Section 6.2(e)(i), VimpelCom shall remove or obliterate all such Retained Names and Marks from the businesses conducted by Weather I, including from signs, purchase orders, invoices, brochures, labels, letterheads, shipping documents, packaging material and other materials.  Notwithstanding the foregoing, the use by VimpelCom or its Affiliates of such materials during the eighteen (18) months following the Closing Date (or during any extension of such period), shall not constitute a breach of the foregoing obligation so long as VimpelCom is using reasonable efforts to terminate any and all further use thereof....[484]

282.    As noted above, Article 6.2(e) of the SSEA cross-referenced Section 4.6(a) of the Separation Agreement.  That provision stated the following, making specific reference to

---

[483] Closing Memorandum, Article 11.

[484] Article 6.2(e)(ii) also provided:  "Anything contained in this Agreement to the contrary notwithstanding, VimpelCom and its Affiliates shall have the right (i) for a period of eighteen (18) months following the Closing Date, to include a factual statement indicating that, prior to the Closing, the business conducted by Orascom was conducted by Orascom using the Retained Names and Marks, to the extent reasonably required in connection with the conduct of such business after the Closing and (ii) as required by applicable legal requirements, to indicate by footnote or other similar device information concerning the transactions contemplated by this Agreement or the prior performance results or other similar historical information about the business operated by Orascom that arose prior to the Closing Date."

both Orascom Telecom (the Egyptian holding company) and OTA (the Algerian subsidiary):

> In furtherance of Section 6.2(e) of the SSEA and notwithstanding any provision set forth therein to the contrary, [Orascom Telecom] shall at its own cost:
>
> (a) Use commercially reasonable efforts to procure that, to the extent legally permissible, the company names of [Orascom Telecom] and of any other member of the Orascom Group which includes the Rump Names are changed within 90 Business Days of the Demerger Closing Date, <u>provided</u>, however, that [Orascom Telecom] agrees not to change the company names of [Orascom Telecom] and [OTA] during the 180-day period following the Closing Date without the prior written consent of [OTMTI], following which the name changes for such entities shall be undertaken within 90 Business Days (unless such 180-day period is further extend by mutual agreement of the parties) …[485]

283. It is undisputed that VimpelCom eventually requested an extension of time to complete the transition away from use of the Orascom name, and that OTMTI agreed to such an extension. In order to document the extension, Article 11 of the Closing Memorandum provided in relevant part:

> Notwithstanding anything to the contrary in Clauses 4.6 and 4.7 of the Separation Agreement or in the SSEA, [Orascom Telecom] shall retain non-exclusive rights to use, reproduce, display and exploit the company names of [Orascom Telecom] and [OTA] and all other uses of "Orascom" (including as trade names, trademarks, logos, designs, domain names or otherwise) (the "Name Rights") to the same extent and in the same ways that [Orascom Telecom] has used and exploited any Name Rights prior to the Demerger Closing Date. These Name Rights shall terminate at midnight on December 31, 2012, unless termination or any action required by VimpelCom would, or would be reasonably expected to, result in the loss of a material Permit or any material Loss, in which case [Orascom Telecom] and [Orascom TMT] shall in good faith negotiate appropriate modifications to the Name Rights with a view to their termination as soon as practicable.…

---

[485] The term "Rump Names" was defined to include a list of names, one of which was "Orascom." RE-2, Article 1.1.

### C.    The Parties' Obligations Arising from These Contract Provisions

284.    In construing these provisions, the Tribunal follows the same approach that it did with respect to the SSEA indemnification provisions, in accordance with general principles of New York law.  As before, this includes the principle that "words and phrases … should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."[486]

### *(1)    Scope of Name Rights*

285.    As a threshold issue, the Tribunal observes that the scope of the "Name Rights" granted to VimpelCom – while such rights remained in effect – is very broad.  While OTMTI claims that it granted VimpelCom only a "*limited permission …, and* for a very limited period of time,"[487] in fact the grant is restricted only by time, and not by scope.  According to Article 11 of the Closing Memorandum, the "Name Rights" are defined as the "non-exclusive rights to use, reproduce, display and exploit the company names of [Orascom Telecom] and [OTA] and *all other uses* of "Orascom" (including as trade names, trademarks, logos, designs, domain names *or otherwise*)."[488]  The only limitation is that these uses were to be a continuation, rather than a theoretical expansion, of prior uses:  Orascom Telecom "shall retain … (the "Name Rights") *to the same extent and in the same ways* that [it] has used and exploited any Name Rights prior to the Demerger Closing Date."[489]  There was no curtailment whatsoever of the scope of prior use, during the applicable time period.

286.    The applicable time period, in turn, was defined as until "midnight on December 31, 2012," but this was subject to an express exception ("*unless*…."), as discussed further below.  If that exception did not come to pass, then the Name Rights "*shall* terminate,"[490] with the word "shall" denoting a mandatory outcome.  On the other hand, if the exception was

---

[486] RLA-31, *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

[487] SoDC ¶ 270.

[488] Closing Memorandum, Article 11 (emphasis added).

[489] Closing Memorandum, Article 11 (emphasis added).

[490] Closing Memorandum, Article 11 (emphasis added).

applicable, the Name Rights would not terminate.  However, an additional obligation would then attach ("*in which case*"); this obligation is also discussed below.

### (2)    *The Material Loss Provision*

287.    The agreed exception to termination of Name Rights on 31 December 2012 was for a situation in which "termination or any action required by VimpelCom would, or would be reasonably expected to, result in the loss of a material Permit or any material Loss" (the "**Material Loss Provision**").

288.    The first observation is that the exception applies in either of two scenarios, which are listed in the disjunctive ("*or*").  The first scenario is where termination "*would* ... result" in the specified outcome.  The second scenario is where the specified outcome "would be *reasonably expected* to" so result.  The latter scenario combines subjective and objective requirements.  There must be a *subjective* "expect[ation]" of the adverse "result," but this subjective view also must be *objectively* "reasonabl[e]."

289.    As to the "*result*" about which there must be a reasonable expectation, this is defined also in the disjunctive.  It may include "the loss of a material Permit," with "Permits" defined as "all telecommunications licenses and other licenses, frequency permits and other permits, certifications, registrations permissions, consents, franchises, concessions, variances, exemptions, orders, approvals and authorizations of all Governmental Entities necessary for the ownership and conduct of its business."[491]  Alternatively, it may result in "any material Loss," with "Losses" defined as "any and all liabilities, losses, damages, claims, fines, penalties, cost s and expenses."[492]  Under either scenario, there is a materiality requirement:  a "*material* Permit" or a "*material* Loss."  The provision does not define materiality, an issue to which the Tribunal returns further below.

290.    The provision is also silent on *how* the exception may come to pass.  It does not incorporate any specific procedural requirements, such as an obligation to seek an extension (*i.e.,* non-termination) of Name Rights by any particular date or by any particular method.  Nor does

---

[491] SSEA, ¶ 3.5(a).
[492] SSEA, ¶ 10.2(a).

it address whether there are any applicable non-procedural preconditions to a Party's right to invoke the exception.

291. In this case, OTMTI suggests that that certain preconditions are implicit, or may be supplied by reference to various doctrines of New York law.  First, it argues that VimpelCom *was aware* prior to the Closing Memorandum of the local laws and conditions it now invokes, but it *nonetheless agreed* to the 31 December 2012 deadline.[493]  The implication is that VimpelCom should not later be allowed to invoke the Material Loss Provision for such situations.  However, nothing in Article 11 limits its applicability to entirely *new* circumstances (*i.e.,* situations of surprise).  It is equally logical to see the provision as an agreed escape valve where *previously known* situations turn out in good faith not to be resolved by the target date.

292. Second, OTMTI contends that by the time of the Closing Memorandum, VimpelCom already had *formed an intent* to rely on the Material Loss Provision with respect to both Egypt and Algeria, and *failed to disclose* this intention to OTMTI.[494]  These allegations are troubling to the Tribunal, which sees little reason that such an intent (if proven) could not have been disclosed previously.  On the other hand, OTMTI has not stated a claim for fraudulent inducement.  Nor does OTMTI seriously contend that *had* VimpelCom timely disclosed concerns about being unable to meet the 31 December 2012 deadline, OTMTI would not have agreed to the Name Rights provision in Article 11, or would not have agreed to close the transaction.  In the absence of any such showing of material detrimental reliance, the Tribunal ultimately considers this issue to be of more atmospheric than legal relevance.

293. Third, OTMTI objects to VimpelCom's *failure to notify it* even after the Closing Memorandum, but *prior to 31 December 2012*, of an intention to invoke the material Loss

---

[493] SoDC ¶¶ 282 (objecting that "the local laws on which VimpelCom relief in an attempt to excuse its breach were well known to VimpelCom when it signed the Memorandum of Closing, yet it nevertheless agreed to be bound" by the 31 December 2012 deadline), 351 (objecting that VimpelCom "plainly knew, or should have known," about a 2001 ordinance in Algeria containing a "foreign ownership rule"); Rejoinder ¶ 421; O-PHB ¶ 293.

[494] SoDC ¶ 351 (complaining that VimpelCom raised its concerns "only <u>after</u> it had already agreed" to the relevant deadline); Rejoinder ¶¶ 421, 429, 467; O-PHB ¶¶ 211, 240, 293.

exception.[495]   VimpelCom responds that OTMTI was already aware of the underlying situations in both Egypt and Algeria, and therefore should not have been surprised to learn, not long after 31 December 2012, that this target had proved to be unachievable.[496]   The Tribunal sees no need to delve into the Parties' respective degrees of knowledge, at various points of time, about circumstances in those two countries.   The Parties easily could have incorporated an advance notice requirement into Article 11, as a condition of invoking the Material Loss Provision.   They did not do so.   The Tribunal declines to read into their silence a procedural requirement that is absent, particularly one with the significant consequence of preclusion that OTMTI appears to urge.

294.   Finally, OTMTI argues that VimpelCom bears *responsibility* for the circumstances it now invokes, as it "did not take timely steps" to try to resolve (or at least fully investigate) the obstacles to completing a name change.[497]   As a consequence of its "lack of diligence," OTMTI argues that VimpelCom "was not entitled" to invoke the Material Loss Provision.[498]   OTMTI draws analogies to New York law, under which a breaching party may not excuse its breach by reference to a failure of a "condition precedent" or a circumstance of "impossibility," if its own actions frustrated the occurrence of the condition or contributed to the circumstances of impossibility.[499]   VimpelCom argues that these doctrines are legally irrelevant, because it has not asserted either of these affirmative defenses, but rather relies on an express provision of the Closing Memorandum.[500]   The Tribunal accepts that neither the "condition precedent" nor "impossibility" doctrines apply in this case.   On the other hand, it also accepts that the duty of good faith, implicit in any contract, requires that a Party not be permitted to benefit from an exception to agreed contractual terms, if the grounds for that exception would not have existed but for its own conduct.   The relevant question, therefore, is not whether there was *any* lack of due diligence on VimpelCom's part with respect to the situations it faced in Egypt and Algeria

---

[495] SoDC ¶ 351 (complaining that VimpelCom raised its concerns "only <u>after</u> [the] deadline had already passed); Rejoinder ¶¶ 422, 467; O-PHB ¶¶ 211, 240.

[496] *See, e.g.,* Reply ¶¶ 304, 307, 381.

[497] SoDC ¶¶ 282, 347-349, 351; Rejoinder ¶¶ 397, 432; O-PHB ¶¶ 213, 314.

[498] O-PHB ¶ 314.

[499] *See, e.g.,* Rejoinder ¶¶ 453-455; O-PHB ¶¶ 316-320.

[500] Rejoinder-CC ¶¶ 127, 145-149; V-PHB ¶ 295.

(which OTMTI asserts and VimpelCom denies), but rather whether any such lack – even if accepted *arguendo* – made a material difference.  Unless more dispatch on VimpelCom's part would have *obviated any reasonable expectation* that it faced either a loss of a "material Permit" or "any material Loss," then the issue is not germane to the applicability *vel non* of the contractual exception.

### (3)       The Obligation of Good Faith Negotiation of Appropriate Modifications

295.   This brings the Tribunal to the final issue regarding the Parties' respective legal obligations, before applying those obligations to the facts of the case.  As noted above, the exception in Article 11 triggers an additional obligation on both Parties, prefigured by the words "*in which case*."  The obligation is defined as to "in good faith negotiate appropriate modifications to the Name Rights with a view to their termination as soon as practicable."

296.   Several legal issues arise in construction of this provision.  The threshold issue is to whom the obligation to negotiate attaches.  Article 11 speaks of a duty of Orascom Telecom and Orascom TMT to negotiate; these are the Egyptian holding companies controlled by VimpelCom and OTMTI, respectively.  VimpelCom contends that it is the wrong Party to face a counterclaim about a failure to negotiate properly, and that OTMTI (or perhaps Orascom TMT) should have asserted any claims against Orascom Telecom rather than against VimpelCom.  OTMTI rejects this proposition.  Beyond this threshold issue, there is also a question about what it means to be required to "in good faith negotiate appropriate modifications," which involves two interlocking elements, that of negotiating "in good faith" and that of negotiating with an eye towards "appropriate" modifications.  These issues arise in the context of OTMTI's contention (which VimpelCom denies) that a negotiation could not be in good faith unless VimpelCom accepted at least in principle that monetary compensation (for example, in the form of a license fee or "reasonable royalty") should be paid for any further extension of Name Rights.  The Tribunal discusses these two issues separately below.

**a.** VimpelCom's Status with Respect to the Obligation

297. As noted above, VimpelCom argues that because Article 11 commands its acquired Egyptian subsidiary (Orascom Telecom) to negotiate with OTMTI's own Egyptian subsidiary (Orascom TMT), any claim for breach of this obligation must be brought against Orascom Telecom, not VimpelCom.[501]  OTMTI argues, by contrast, that VimpelCom is bound as a signatory to the relevant agreements (a number of which bear on Name Rights obligations), and that VimpelCom previously manifested its intention to be bound by Article 11 of the Closing Memorandum.[502]

298. The Tribunal determines that in the broader context of the Parties' transactions, VimpelCom must be read to have a duty to cause Orascom Telecom to negotiate pursuant to Article 11 of the Closing Memorandum, just as OTMTI must be read to have a duty to cause Orascom TMT to negotiate.   VimpelCom and OTMTI are the named parties to the SSEA, which is the primary transactional document to which the subsequent documents (the Separation Agreement and Closing Memorandum) relate.   The SSEA imposed obligations directly on VimpelCom with respect to changes in company names, including a duty under Article 6.2(e) to "use its commercially reasonable efforts to cause" such name changes to occur "[a]s promptly as reasonable after the Closing Date."   While the Separation Agreement and the Closing Memorandum contain additional language directed at Orascom Telecom, these documents cross-reference the underlying SSEA, with Section 4.6 of the Separation Agreement starting with the words "[i]n furtherance of 6.2(e) of the SSEA."   Indeed, VimpelCom itself characterizes the Separation Agreement as containing provisions by which "the parties were required to cooperate" in respect of name change issues.[503]

299. Moreover, Article 11 of the Closing Memorandum has the potential to provide broad protection to VimpelCom's subsidiaries, in the face of a reasonable expectation of Material Loss:  namely, a continued right to "*all … uses*" of the name Orascom "*to the same extent*

---

[501] Reply ¶¶ 271, 360, 364-368; Rejoinder-CC ¶ 124.
[502] Rejoinder ¶¶ 389, 666-686.
[503] Rejoinder-CC ¶ 27.

*and in the same ways*" as prior to the Demerger Closing Date,[504] subject only to good faith negotiations about appropriate modifications to these otherwise broad Name Rights. It is neither logical nor equitable to assume that the Parties negotiated and agreed to this broad extended protection of VimpelCom's subsidiaries, without VimpelCom undertaking any reciprocal obligations whatsoever. A more logical interpretation is that the Material Loss Provision permitting a continuation of Name Rights triggers ensuing obligations on *both* Parties to the SSEA (who are *also* parties to the Closing Memorandum) to cause the requisite good faith negotiations between Orascom Telecom and Orascom TMT to occur. While such negotiations as a practical matter might be conducted directly by the relevant subsidiaries *or* by their parent companies acting on their behalf,[505] the Parties to the SSEA themselves have an implicit obligation of good faith to ensure that some good faith negotiations transpire.

300.   Moreover, even were this not the case, VimpelCom and OTMTI have now fully litigated their positions regarding the substantive content of Article 11, in the context of the alleged Material Losses being faced in Egypt and Algeria. OTMTI has not indicated that it (or its subsidiary Orascom TMT) would articulate any different substantive arguments if the claim were being litigated directly against Orascom Telecom, and VimpelCom has not indicated that it believes Orascom Telecom would have any different substantive defenses beyond the ones that VimpelCom has presented to this Tribunal. The Tribunal therefore resolves those arguments and defenses as presented on their merits. It considers that the same analysis would be equally valid if the identical breach of contract claim had been stated against Orascom Telecom. As a result, the Tribunal would expect its ruling to have collateral estoppel effect, such that neither OTMTI nor Orascom TMT in future could seek to re-litigate the same allegations, in a proceeding directly against Orascom Telecom.

---

[504] Closing Memorandum, Article 11 (emphasis added).

[505] In this regard, OTMTI correctly notes that it was employees of VimpelCom, and not Orascom Telecom, who consistently "engaged in discussions with OTMTI concerning performance" under the Closing Memorandum. Rejoinder ¶ 683. It does not appear that, at any time during these discussions, VimpelCom ever asserted that it had no obligations under Article 11, or that OTMTI instead should be seeking to negotiate directly with Orascom Telecom employees. Rejoinder ¶ 684.

**b.**     The Content of the Obligation

301.   With respect to the content of the obligation, the first observation is that it is to "in good faith negotiate."[506]  This is a process obligation, not an outcome obligation.  The Parties are required to *attempt* in good faith to negotiate, even if their positions ultimately remain too far apart to reach an agreed resolution.  The negotiations may not be merely a pretense, however, suggesting a willingness to negotiate without actually doing so; a requirement of good-faith negotiations means more than simply receiving and responding to letters from the other party, or participating in meetings, without any genuine openness to finding a solution.  But at the same time, a duty to negotiate in good faith does not require that a party agree with the other party's *position*, or even that it agree with the other party's view of the appropriate *focus* of the negotiation.  The fact that negotiations may fail does not indicate that one or the other party (or both) necessarily negotiated in bad faith.[507]

302.   In this context, it is important to note that Article 11 links the notion of good faith negotiation with a description of what it is that the Parties are to negotiate: "appropriate modifications to the Name Rights with a view to their termination as soon as practicable...."[508]  The SSEA is silent on what type of modifications may be "appropriate," and therefore as to what a Party must demonstrate that it was willing to entertain, in order to show that it acted in good faith to try to negotiate "appropriate modifications."

303.   OTMTI argues that in order to constitute a good faith attempt at negotiation, VimpelCom would be required to indicate its openness at least in principle to some form of *monetary compensation* to OTMTI for the further extension of Name Rights – and that the appropriate way to measure such compensation would be a license fee or "reasonable royalty" for the continued use of the Name Rights.[509]  According to OTMTI, this could be

---

[506] Closing Memorandum, Article 11.

[507] *See* Rejoinder-CC ¶ 187 (citing **CLA-197**, *Mode Contempo, Inc. v. Raymours Furniture Co., Inc.*, 80 A.D.3d 464 (N.Y. App. Div. 1st Dep't 2011), and **CLA-165**, *Bayerische Landesbank v. 45 John St. LLC*, 102 A.D.3d 587, 688 (N.Y. App. Div. 1st Dep't 2013)).

[508] Closing Memorandum, Article 11.

[509] SoDC ¶ 283 (contending that "VimpelCom refused to engage in discussions about any sort of fee ... thereby violating ... the requirement that the parties 'in good faith negotiate' an appropriate modification where needed"); *id.*, ¶ 354.

the *only* type of modification anticipated by Article 11.[510]   This is because there allegedly is no need to negotiate the *duration* of an extension period, given Article 11's proviso already that the negotiation take place "with a view to ... termination [of the Name Rights] as soon as practicable."   OTMTI also suggests there would be no need to negotiate about the *scope* of continued Name Rights, as these necessarily should only be as needed to address the particular situation of Material Loss that triggered the need for an extension in the first place.[511]   As a result, according to OTMTI, the reference to "appropriate modifications to the Name Rights" would be rendered "meaningless and without effect" *unless* it is construed to require monetary compensation.[512]

304.   In the Tribunal's view, OTMTI presumes too narrow an interpretation of the word "appropriate."   There are at least three different types of issues that could be folded into a negotiation, still consistent with the general obligation to negotiate in good faith.

305.   First, as to the issue of duration, it is true that Article 11 provides the eventual *goal*, namely that the Name Rights will "terminat[e] as soon as practicable."   But it describes this goal as a guidepost for the Parties' *negotiations*, commanding that they negotiate appropriate modifications "*with a view to* their termination as soon as practicable."   The phrasing of the obligation lends support to VimpelCom's contention that one legitimate topic of discussion would be the length of time during which the relevant subsidiary would need to continue using the Name Rights.   The fact that the clause commands the goal does not necessarily resolve a need to discuss implementation of the goal, to try to reach agreement either on measures to expedite the resolution of the Material Loss issue, or on a timetable by which further reports, negotiations or consequences might ensue.

306.   Second, negotiations could reasonably be expected to address the issue of scope.   As noted above, the Name Rights are defined in extremely broad terms, as the "non-exclusive rights to use, reproduce, display and exploit the company names of [Orascom Telecom] and

---

[510] *See, e.g.*, Rejoinder ¶ 378 ("the only" modifications "to which the parties plausibly could have agreed would have been for VimpelCom to pay OTMTI a fee"); *id.*, ¶¶ 384, 519; O-PHB ¶¶ 210, 217.

[511] O-PHB ¶¶ 228, 234.

[512] SoDC ¶ 358; *see also id.*, ¶ 359 ("for the words ... to have any effective meaning, they must be read to encompass an appropriate fee to be paid to OTMTI"); O-PHB ¶ 210.

[OTA] and *all other uses* of "Orascom" (including as trade names, trademarks, logos, designs, domain names *or otherwise*)." Without negotiation of "appropriate modifications," these Name Rights would continue "*to the same extent and in the same ways*" as existing prior to the Demerger Closing Date, meaning they would continue presumptively to cover "*all … uses*" until the Material Loss situation was resolved.[513] On its face, this could be much broader than actually required to address a particular situation of Material Loss, which might (for example) relate only to particular uses of the name in a particular country. Nothing in the text of Article 11 commands that the Name Rights terminate *other than as needed* to meet the particular contingency, with the extension therefore covering only as minimal and narrow a scope as actually required. To the contrary, the provision as written appears to operate as an "on-off" switch, with the Name Rights either terminating entirely, or continuing "to the same extent and in the same ways" as before. It stands to reason that the Parties might wish to negotiate "appropriate modifications" to more closely tailor the continued rights to the particular circumstances of need.[514] Indeed, Article 11 speaks of "appropriate modifications *to* the Name Rights," indicating that the content or definition of the Name Rights was anticipated to be a key subject for the negotiations.

307. Finally, the issue of compensation was also one that could be "appropriate" for negotiations. As VimpelCom correctly notes, nothing in the clause *commands* a discussion of monetary consideration, nor does anything else in the text of the Closing Memorandum (or any prior document) suggest that a continuation of the Name Rights *required* separate monetization through a license fee or royalty.[515] The issue of the Name Rights and the period in which they would retained was the subject of discussion on several occasions prior to the Closing Memorandum, including in the Original SSEA, the first Amended SSEA, the Second Amended and Restated SSEA (referred to otherwise in this Award simply as the SSEA), and the Separation Agreement.[516] If the Parties had contemplated

---

[513] Closing Memorandum, Article 11 (emphasis added).

[514] *See* Reply ¶ 396 (suggesting that negotiations could be appropriate, for example, to limit use of the Orascom name only to "the company names of OTA and [Orascom Holding], or only in certain markets, or only as a logo but not as a domain name, and so forth"); Rejoinder-CC ¶ 168.

[515] *See, e.g.,* Reply ¶¶ 372, 394.

[516] *See* CE-188, RE-222, RE-1, RE-2, RE-3.

that a monetary payment would be the *indispensable* feature of any "appropriate modifications," it would have been easy for them to have stated that requirement in one or more of these documents, in so many words.[517]  They did not do so.  The evidence is that they never even discussed the potential payment of a license fee or royalty for the Name Rights.[518]

308.  Nor, for that matter, does the record suggest that *OTMTI* had paid VimpelCom any additional consideration to have the Orascom name carved out of the rights that VimpelCom *otherwise* would obtain as a matter of right, when it acquired share ownership of the companies using that name.  It appears that OTMTI's request to retain rights to the name (notwithstanding the sale of the companies) was raised somewhat after the Parties had agreed on a term sheet reflecting the main elements of the transaction.[519]  The fact that there was no discussion thereafter about valuing the Name Rights, when OTMTI requested the Orascom name be *restored* to it as the selling party,[520] undermines its argument that VimpelCom's *transitional* right to use the name was one for which VimpelCom implicitly paid valuable consideration as part of overall deal.[521]  In fact, as the transaction at the macro level reflected a retrocession to OTMTI of ownership rights that otherwise would have belonged to VimpelCom as the acquiring shareholder, it would be odd to interpret the transition period as involving an OTMTI transfer of value to VimpelCom, rather than

---

[517] *See generally* Reply ¶ 399 ("The VimpelCom transaction was a multibillion-dollar, heavily-negotiated deal, in which OTMTI was represented by reputable international counsel …, and in which the terms of VimpelCom's use of the 'Orascom' name were addressed in no fewer than four contracts.  If OTMTI wished to receive a royalty fee for such use, it should have sought VimpelCom's agreement to pay one.").

[518] Reply ¶ 397 (citing Lemke II ¶ 44; Dobbie I ¶ 31); Rejoinder-CC ¶¶ 9, 29-30.  To counter this testimony, OTMTI refers to a VimpelCom email of 21 December 2011, listing various open issues:  OTMTI's contribution towards an Italian withholding tax settlement, the use of certain offices space, and extension of VimpelCom's Name Rights until 31 December 2012.  VimpelCom stated that its agreement regarding the first issue (the amount of OTMTI's Italian tax indemnity payment) "is subject to settlement of the remaining issues under discussion," namely the office space and the Name Rights extension, as well as agreement on certain payables under the Separation Agreement.  CE-209.  OTMTI argues that this exchange shows there inherently *was* a form of consideration for the Name Rights extension in the Closing Memorandum, and that, as a consequence, the Parties must have anticipated that any *further* extension would have to require further consideration.  The flaw in this argument is that when the parties eventually concluded the Closing Memorandum some eleven months later, they specifically assigned cash values to some of the *other* adjustments they were making, but did not include any similar reference to value being paid for the Name Rights extension in Article 11.  *See, e.g.,* Closing Memorandum, Articles 6 (payables under the Separation Agreement), 7 (office space), and 9 (payables under the Separation Agreement).

[519] *See, e.g.,* Abouali II ¶ 28; Lemke II ¶ 29; Lemke III ¶ 6; Rejoinder-CC ¶ 23.

[520] *See, e.g.,* Lemke II ¶ 44; Lemke III ¶ 13; Dobbie I ¶ 31.

[521] *See, e.g.,* Rejoinder ¶¶ 411-412.

simply a timetable during which VimpelCom could organize the *ceding back* to OTMTI of rights that VimpelCom otherwise would enjoy indefinitely.

309.   For these reasons, the Tribunal concludes that a license fee or royalty payment was not the *only* way to provide an appropriate modification to the Name Rights, consistent with the obligation of good faith in Article 11 of the Closing Memorandum.  At the same time, nothing in Article 11 (or the relevant clauses of any of the preceding documents) *precludes* it from being appropriate for OTMTI to have sought monetary consideration as a possible "appropriate modification," as VimpelCom suggests.[522]  Such compensation could be one appropriate way of recognizing that, during any further transitional period, OTMTI would bear a burden that the Parties had not originally expected it to bear, in a form of a longer period of shared rather than exclusive use of the Orascom name.  Just as the Parties could have specified if they wished that negotiations *should deal* with potential payment of a fee to OTMTI, the Parties could have specified that the "appropriate modifications" *would not require* payment of any fee.  They did not provide this direction either.  VimpelCom is therefore incorrect in positing that the *only* appropriate modifications within the scope of Article 11 could concern the timing and scope of the continued use, just as OTMTI is incorrect in positing the reverse, that the only appropriate modifications could concern compensation.

310.   The bottom line is that the Closing Memorandum did not confine the Parties to negotiate only about one single type of "appropriate modifications to the Name Rights," as OTMTI suggests.  There could be mutual utility in having further discussions to refine the Parties' understanding of the range of Material Loss risks, the scope of uses required to mitigate those risks, and their likely duration, just as there could be utility in discussing the burdens or costs that continued use by VimpelCom of the Orascom name might impose on OTMTI, and possible financial compensation by VimpelCom to address these burdens and costs.  It would be possible for both sides to raise their different perspectives on these issues, still consistent with their underlying obligations to negotiate in good faith.

---

[522] V-PHB ¶ 278 (contending that "[t]he negotiation contemplated by the [Closing Memorandum] pertained to the scope of the Name Rights, *and nothing else*") (emphasis added).

### (4)    The Applicable Burdens of Proof

311.   The Parties have debated who bears the burden of proof on the various contentions related to OTMTI's counterclaim.   While the Tribunal ultimately does not consider this issue dispositive, it proceeds on the basis that Article 11 envisions several shifts in the burden of persuasion regarding its various elements.

312.   First, as the Party counter-claiming for alleged breach of contract, OTMTI has the initial burden of demonstrating that VimpelCom failed to comply with the primary contractual obligation, namely that it cease using the protected name by 31 December 2012.   It is uncontested that use of the name continued, so OTMTI has met this initial burden.

313.   Second, the Tribunal views the "unless" proviso in Article 11 as an exception to a general rule, and therefore as the equivalent of an affirmative defense or excuse.   Accordingly, VimpelCom bears the burden of demonstrating that it is entitled to such an excuse, meaning that it satisfied the criteria for continuing to use the Name Rights after the cut-off date. This means that VimpelCom must demonstrate by a preponderance of the evidence that "termination or any action required by VimpelCom would, or would be reasonably expected to, result in the loss of a material Permit or any material Loss."

314.   Third, and by contrast, OTMTI bears the burden of showing that VimpelCom should be precluded by its conduct from relying on what otherwise could be an applicable excuse, permitting continued use of the Orascom name.

315.   Finally, and as noted above, Article 11 establishes a new requirement, if the Material Loss Provision is triggered.   This is a reciprocal obligation, which requires both Parties to "in good faith negotiate appropriate modifications to the Name Rights with a view to their termination as soon as practicable."   As the Party seeking to recover damages for breach, OTMTI bears the burden of demonstrating a breach of that commitment.   If that were so demonstrated, VimpelCom would bear the burden of counter-demonstrating that OTMTI likewise was in breach, and therefore does not stand as a non-breaching party entitled to claim for VimpelCom's breach.   In other words, VimpelCom would have to show that OTMTI similarly was unwilling to engage in good faith negotiations about "appropriate modifications of the Name Rights with a view to their termination as soon as practicable."

147

316.   With this understanding of the applicable standards and the burdens of proof, the Tribunal turns below to the relevant facts.

### D.   Breach of Contract by Use Without Right to Invoke Material Loss Provision

317.   First, as noted above, there is no dispute that there was continued use of the Orascom name after 31 December 2012.   The issue is whether this use was permitted by the Material Loss Provision, and whether VimpelCom might be precluded by its own conduct from relying on that provision.   Although OTMTI has referred to certain discrete incidents in which the Orascom name allegedly was used in other countries,[523] the Parties have briefed these issues primarily with respect to uses in Egypt and Algeria, and the Tribunal therefore focuses on those countries in its analysis below.

### (1)   Egypt

#### a.   Background facts

318.   The key dates regarding Orascom Telecom's change of company name are not disputed. On 19 October 2012, its Board approved a new name, Global Telecom Holding S.A.E. ("**Global Telecom**").   On 12 November 2012, Orascom Telecom held an Extraordinary General Meeting ("**EGM**") of its shareholders to approve the name change.   On 11 December 2012, Orascom Telecom submitted the Minutes of the EGM to the relevant Egyptian regulators, the Egyptian Financial Supervisory Authority ("**EFSA**").[524]   It is not disputed that the EFSA's ratification of the corporate name change was required as a matter of Egyptian law.   That ratification was forthcoming only on 21 August 2013, with the commercial register amended to reflect the new name effective 25 August 2013, and public announcement of the change made on 22 September 2013.[525]

319.   It is undisputed that during this time, the name Orascom continued to be referenced in various ways in connection with Orascom Telecom, including in financial reports, press

---

[523] SoDC ¶¶ 327-330, 344; Rejoinder ¶¶ 434-436; *see also* Reply ¶¶ 358-359, 419; Rejoinder-CC ¶¶ 109-111.
[524] Reply ¶¶ 318-319; CE-249, CE-251, CE-257.
[525] Reply ¶¶ 278, 323 (citing documents).

releases and website domain names.[526]   The Parties disagree about how prominent or incidental these references were.

**b.**     Reasonable expectation of Material Loss

320.   VimpelCom's contentions regarding its expectation of a material Loss in Egypt are set out against the backdrop of the country's broader situation in 2012.  It notes that "the Egyptian government was deposed" in early 2011 and "the following 18 months were characterized by mass protests, unsuccessful elections and several short-lived governments."  As part of this upheaval, "[t]he Minister overseeing the [EFSA], the regulatory body charged with approving the demerger, changed several times in the course of the political turmoil in 2011 and it was unclear at times who was responsible for EFSA."  This turnover at EFSA is said to have compounded the legal uncertainty arising from the fact that "the demerger mechanism was novel under Egyptian law" and that "a decree allowing spin-offs of assets from Egyptian-listed companies had been passed only in November 2010, and had never been applied in practice."[527]  One of the consequences of this turmoil is that while Wind Telecom and VimpelCom had jointly predicted in late March 2011 that EFSA's approval of the demerger would be "a formality" requiring about one week "to stamp the minutes" of Orascom Telecom's shareholder meeting approving the demerger, in practice the demerger did not close until nine months later, in January 2012. VimpelCom contends that until the closure of the demerger was a done deal, it would not have been logical for it to move forward with a company name change and rebranding efforts for Orascom Telecom.[528]

321.   VimpelCom contends that from January 2012 Orascom Telecom undertook numerous steps to move the rebranding forward, culminating in the Board and shareholder approvals in October and November 2012 and the submission of EGM minutes to EFSA for ratification on 11 December 2012.[529]  VimpelCom contends that Orascom Telecom "expected that ratification would be no more than an administrative formality that could be

---

[526] *See, e.g.*, RE-96, RE-97, and RE-101 through RE-104.
[527] Reply ¶ 292.
[528] Reply ¶¶ 299-300.
[529] Reply ¶¶ 314-319.

completed relatively expeditiously," allowing it to achieve the 31 December 2012 deadline agreed in the Closing Memorandum.[530]

322.    As it turned out, however, EFSA did not complete the ratification until 21 August 2013.[531] VimpelCom contends that Orascom Telecom followed up regularly with EFSA to try to move the ratification along,[532] but ultimately it had no choice but to wait for EFSA to complete this process.  Had it attempted to use a new corporate name in the course of business, before EFSA amended the commercial register accordingly, the company would have been in violation of Egyptian law.[533]   According to VimpelCom it could have faced both monetary penalties and potential imprisonment of company officials.[534]

323.    OTMTI conceded at the hearing that VimpelCom *believed* it could face a "material Loss" in Egypt.[535]  As a result, there is no dispute between the Parties regarding the *subjective* requirement of Article 11, namely that there have been an *actual* "expectation" of a material loss.  OTMTI did not, however, concede that VimpelCom's expectation was *objectively* reasonable – *i.e.,* that a reasonable third party would consider a Loss to be both likely and "material."  Regarding the issue of materiality, OTMTI suggests the objective standard would not be met, because any fines that the EFSA might have imposed would have been modest at best.[536]

324.    The Tribunal accepts that it was reasonable for VimpelCom to worry about adverse consequences of proceeding to implement a corporate name change, without waiting for the EFSA approval required by law.  As for the "materiality" of those consequences, the

---

[530] Reply ¶ 319.

[531] Reply ¶ 323; CE-251.

[532] Reply ¶ 322.

[533] Reply ¶¶ 321, 370, 375-376; *see also* CLA-135, Article 5 (requiring registered companies to include their commercial name "in any correspondence, letterhead and/or documents related to his business").

[534] Reply ¶ 377 (quoting CLA-135, Article 18, regarding penalty for violating the applicable Egyptian Commercial Register Law).

[535] Hearing Tr. (5) 1488-1489 (OTMTI stating that "we'll take [VimpelCom] at their word that *they thought* in both Egypt and Algeria they were facing a material loss situation....") (emphasis added); O-PHB ¶ 292.

[536] Rejoinder, ¶¶ 477-479.

Parties' agreements do not contain any definition of the word "material." A plain language definition of the term requires a consequence of some significance and magnitude.

325.   According to the text of the relevant Egyptian law, a company violating the requirement of including its registered company name on business documents may face a fine of "no more than five hundred [Egyptian] pounds."[537] It is not clear if this would be calculated per use, per copy of document distributed, or in some other fashion. However it is calculated, though, it does not appear that the quantum of these potential penalties – standing alone – would have been particular onerous, much less prohibitive, in the overall context of the company's operations. If VimpelCom could have been assured that there could be no other consequences beyond these relatively modest penalties, then the question of objective materiality might arise.

326.   However, the notion of "materiality" does not call for solely a quantification exercise, without any assessment of potential *qualitative* risks, including risks to legal rights and legal security – and to the relationships with local officials upon which the effective maintenance of such legal rights and legal security may depend. Such qualitative risks have the potential also to contribute, indirectly, to additional quantitative risks. The Tribunal is unable to exclude the possibility that proceeding with a change to the company's name in Egypt, without waiting for official approval and thereby in defiance of local law, potentially could have had repercussions beyond a proverbial "slap on the wrist" through imposition of modest penalties.

327.   First, the relevant Egyptian law also expressly references "imprisonment for a period of no less than three months and no more than two years."[538] While no expert testimony was offered to demonstrate how substantial the risk of such prosecution might be,[539] the fact that the relevant law provides for this consequence cannot be overlooked. Nor is it irrelevant that the country in question was undergoing a period of significant turmoil, with

---

[537] CLA-135, Article 18.

[538] CLA-135, Article 18.

[539] *See* Rejoinder ¶ 479 (contending that "it does not appear" that simply minimizing use of the Orascom name "could result in possible imprisonment," because the potential penalty of imprisonment applies only to the affirmative step of mentioning a trade name that has not been registered or that has been registered to someone else).

substantial turnover in Government personnel and therefore a degree of uncertainty generally, regarding how new regimes and new personnel in future might choose to exercise any discretion provided by the law.  In these circumstances, the "materiality" requirement does not require a company to take chances, no matter how large or small, regarding the explicit risk of imprisonment of its officials.

328.  More generally, compliance with applicable law almost by definition is a material obligation of a company doing business in a foreign land.  The Tribunal has some difficulty interpreting the Parties' agreement as requiring VimpelCom to pursue actions in open defiance of local law, simply because the company it acquired in the jurisdiction may have operations sizeable enough to absorb the cost of potential monetary penalties, or because prosecutors may be relatively unlikely to concentrate their resources on such an infraction. This would be a perverse interpretation, which essentially commands a company to be an intentional lawbreaker in its host jurisdiction, in order to comply with contractual obligations to the former owner of that company.[540]  The Tribunal is not willing to accept that proposition.

329.  For these reasons, the Tribunal concludes that VimpelCom's undisputed subjective expectation of "the loss of a material Permit" or "any material Loss" was also objectively reasonable.  The conditions of Article 11 were therefore putatively satisfied with respect to the situation in Egypt, unless OTMTI can show that VimpelCom should be precluded (by virtue of its own conduct) from invoking the Article 11 exception.  This issue is discussed below.

c.     Entitlement to invoke Material Loss Provision

330.  As discussed above, OTMTI seeks to preclude VimpelCom from relying on the Material Loss Provision in Article 11, in part by emphasizing that VimpelCom already had reason to know *before* the Closing Memorandum that it might be difficult for it to complete the

---

[540] Rejoinder-CC ¶ 134 (contending that "OTMTI's suggestion that [Orascom Telecom] should have knowingly violated the law because the penalty might not be severe and because the law might not be enforced hardly merits a response.…  No reasonable business would operate in that fashion, especially when the company is publicly-listed and owes fiduciary duties to its shareholders").

name change in Egypt on time, but nonetheless failed to disclose this prospect to OTMTI.[541]   The Tribunal has concluded that, in the absence of a claim for fraudulent inducement, or any demonstration of material detrimental reliance, the non-disclosure issue is of more atmospheric than legal relevance.

331.   However, OTMTI also argues that VimpelCom bears significant *responsibility* for the delays it encountered.  Specifically, OTMTI argues that VimpelCom had delayed holding the EGM of its shareholders to approve the name change, beyond the date (1 September 2012) that had been suggested to it as the deadline for assuring necessary action by the Egyptian financial regulatory agency before the end of the year.[542]  The EGM was not held until 12 November 2012, and VimpelCom did not submit the Minutes of the EGM to the EFSA for ratification until 11 December 2012.  OTMTI contends that VimpelCom should have moved more diligently with each of these steps.[543]  It further argues that VimpelCom should have known that objections from a dissident minority shareholder might precipitate unusual delays in the approval process, as apparently turned out to be the case.[544]  As a result, OTMTI argues, it was "VimpelCom's own omissions and lack of diligence" that resulted in the EFSA approval not being secured before the contractual deadline.[545]

332.   VimpelCom responds that it acted in a commercially reasonable way in preparing to comply with the legal formalities necessary to change the Orascom name in Egypt.[546]  The advice that OTMTI invokes about needing to schedule the EGM by the beginning of September was from a local manager in Egypt, and Orascom Telecom's then-General Counsel (subsequently the senior VimpelCom in-house lawyer in charge of the renaming process) explains that this advice rested on a misunderstanding about the status of all of the *other* preparatory work that already had been pursued and completed as part of the name change process.[547]  Moreover, VimpelCom's witnesses insist that they sincerely

---

[541] *See, e.g.,* O-PHB ¶ 301.
[542] Rejoinder ¶¶ 460-463 (citing CE-241); O-PHB ¶ 296.
[543] Rejoinder ¶¶ 465-466.
[544] Rejoinder ¶ 471; O-PHB ¶ 304.
[545] Rejoinder ¶ 383.
[546] Rejoinder-CC ¶ 68.
[547] Reply ¶ 273, Rejoinder-CC ¶ 81 and V-PHB ¶ 299 (citing testimony from Mr. Dobbie).

believed they would be able to obtain, by the end of the year, what they considered a purely ministerial and *pro forma* approval of the Minutes.[548]   There were legitimate business reasons to try to combine seemingly more significant business decisions within a single EGM and thus to delay, somewhat, the scheduling of that meeting rather than holding a standalone EGM on an earlier date, simply to address the name change issue.[549]   In any event, VimpelCom ultimately *did* proceed to hold a special EGM, with all of the dislocation and logistical challenges that involved, for the sole purpose of obtaining approval of the change of name.[550]   Thereafter, VimpelCom representatives did follow up with the Egyptian authorities in an effort to get them to approve the Minutes,[551] even though these efforts were not successful until 21 August 2013.[552]

333.   The Tribunal has considered the positions presented by both Parties, as summarized above. It concludes, as a threshold matter, that there was no bad faith on VimpelCom's part in delaying the scheduling of the EGM or in submitting the EGM Minutes for Egyptian government approval.   At most, the record could support a finding that VimpelCom was negligent in failing to appreciate the risk of delays by a dissident shareholder, or the risk that the Egyptian regulatory authorities might delay an approval that VimpelCom believed to be a merely *pro forma* task.   The Tribunal is reluctant to find such negligence in 20-20 hindsight, based simply on its subsequent knowledge of the delays that in the end materialized.

334.   More fundamentally, negligence alone would not be a basis for forfeiting the contractual benefits of Article 11, without a demonstration that alternate conduct – of a sort that it would be reasonable to demand from VimpelCom – would have *obviated* the risk of the same reasonable expectation of material Loss that VimpelCom eventually faced.   OTMTI has not made this showing.   Even if VimpelCom had credited the local manager's prediction that it would take 90 days to complete the process of scheduling and holding the

---

[548] *See, e.g.,* Dobbie I ¶ 39; Dobbie II ¶¶ 23, 26, 29; Hearing Tr. (7) 2308-2309 (Dobbie).
[549] Rejoinder-CC ¶ 80.
[550] V-PHB ¶ 299(e).
[551] *See, e.g.,* RE-85 (referring to "over a dozen meetings and other communications with EFSA and the Egyptian Commercial Register between 12 December 2012 and 19 April 2013).
[552] CE-251.

EGM, submitting the Minutes to the regulators and obtaining their approval, this would not have required holding the meeting by 1 September 2012 (as the manager mistakenly calculated),[553] but rather by 1 October 2012, given the deadline of 31 December 2012. Second, and more important, it actually took the Egyptian authorities more than eight months to perform the ostensibly perfunctory function of approving the Minutes, from the submission date of 11 December 2012 to the approval date of 21 August 2013. A delay of that length was not reasonably predictable, and on this time scale, VimpelCom would not have been able to obtain the necessary approval by the contractual deadline of 31 December 2012 in any event, even if it had held a special EGM on 1 September 2012.

335.    In other words, even accepting that VimpelCom may have delayed somewhat initiating the EGM and EFSA name change process in Egypt, the actual delay by Egyptian authorities in processing the name change was so unforeseeably long that even an earlier start to the process would have resulted in VimpelCom's facing the *same* predicament it did as of 31 December 2012. In these circumstances, the Tribunal sees no basis to preclude VimpelCom from relying on the Material Loss Provision with respect to continued use of the Orascom name in Egypt. Accordingly, there was no breach of contract regarding continued use of the Name Rights in Egypt.[554]

### (2)    *Algeria*

#### a.    Background facts

336.    As with Egypt, the key dates regarding the corporate name change of OTA in Algeria are not disputed. By September of 2012, the company had selected a new name that it wished to use, Omnium Telecom Algérie. However, based on certain legal advice about the potential ramifications of a corporate name change (discussed below), VimpelCom decided in November 2012 that for the time being OTA should not proceed with the name change.[555] It was not until January 2015, when a deal closed for VimpelCom to sell a

---

[553] CE-241.

[554] The separate alleged breach of contract, regarding good faith negotiation of appropriate modifications to the Name Rights, is addressed below.

[555] CE-256.

controlling stake in the business to the Algerian State, that the name change became effective.

337.    It is undisputed that during this time, the name Orascom continued to be referenced in various ways in connection with OTA, including in press releases, website references and certain customer invoices.[556]  The Parties disagree about how prominent or incidental these references were.  They agree, however, that OTA continued at the same time to sell its products and services under the brand name "Dzezzy," which was not subject to any Name Rights restrictions.

**b.**    Reasonable expectation of material Loss

338.    VimpelCom's contentions regarding its expectation of a material Loss in Algeria are linked to a background history dating back well before OTMTI's sale of Wind Telecom to VimpelCom.  By the time that transaction was negotiated, the Orascom Group already was embroiled in serious disputes with the Government of Algeria related to its treatment of OTA's mobile telecom business, operated under the brand name "Dzezzy."  That dispute intensified in March 2012, with the imposition of a US$ 1.3 billion fine on the company, and a suspended criminal sentence on an executive, in connection with certain foreign exchange regulations and currency rules.  In April 2012, Orascom Telecom initiated arbitration against Algeria.  In November 2012, OTMTI filed its own investment treaty claim against the State, seeking some US$5 billion dollars in damages in connection with its treatment of Dzezzy.[557]

339.    In the broader context of this dispute, a concern arose about a 2010 Algerian law that limited foreign ownership of Algerian companies to 49% and required 51% Algerian ownership (the "**49/51% Rule**").  VimpelCom describes the relevant law as giving the State "a pre-emption right over any sale of an Algerian company or its direct parent, subject[ing] the sale of the parent of any Algerian company to prior consultation with the State, and require[ing] 'prior examination' by the State of the registration of any foreign

---

[556] *See, e.g.,* RE-104 through RE-118.

[557] Reply ¶¶ 279-283, 310-312.

156

ownership in an Algerian company."[558]  In September 2010, Orascom Telecom's outside Algerian counsel (Gide, Loyrette Nouel, or "**Gide**") provided a memorandum to *both* VimpelCom and OTMTI, addressing the possible risk that the Government would use this law to expropriate Dzezzy in the event of any relevant sale of company shares.[559] According to VimpelCom, this particular risk in Algeria – together with the regulatory uncertainty in Egypt – was what led to the original "material Loss" negotiations between the Parties.[560]  These risks were subsequently explored again in late 2012, and ultimately impacted VimpelCom's decision about when to apply to change OTA's company name.

340.  Specifically, VimpelCom contends that as in Egypt, "Algerian law required OTA to use its full corporate name, as recorded in the commercial register, on all letterhead and documents from the company toward third parties."[561]  In October 2012, Gide was asked to prepare the necessary corporate resolutions for a change of OTA's name, but on 24 October 2012, it responded that submitting such a request to Algerian authorities "should trigger" the State's invocation of the 49/51% Rule, because "[a]ny change to the corporate registry triggers" the rule and a change of corporate name was not listed in the official exceptions. Gide suggested a possible OTA inquiry to the Algerian Trade Register (known as the "**CNRC**") to determine whether the 49/51% Rule "is effectively applied (or if there is a tolerance since it is a minor change).  Our experience shows that the CNRC's position fluctuates:  sometimes they allow the change without problem; other times, they require the compliance with the 49/51% rule."[562]

341.  On 20 November 2012, OTA's in-house counsel advised that she had been "informed verbally" by the CNRC that the corporate name change "will not require the application of the 49/51% Rule." However, she expressed "skeptic[ism]" about relying on such oral assurances, "as it is not clearly provided for in the law, fact that may have as a consequence

---

[558] Reply ¶ 282.

[559] Reply ¶ 282; CE-184.

[560] Reply ¶ 381.

[561] Reply ¶ 326 (citing CLA-133).

[562] CE-256.

the fluctuation of the CNRC's position," about which Gide also had warned.[563]  Based on these concerns, VimpelCom's associate general counsel advised other VimpelCom officials on 21 November 2012 that "[t]here are certain risks involved if we change the OTA name." In weighing these risks, counsel considered that the consequences of a misstep in this regard were serious, namely that "the risk would involve losing control over the entire operation."[564]  Based on this advice, and in the broader context of "the continuing hostility of the Algerian Government," it appears that VimpelCom "put the corporate change of name of OTA … on hold."[565]

342.   Following eventual objections by OTMTI, VimpelCom asked counsel to revisit the issue the following year.  On 29 August 2013, Gide advised that the risks remained unchanged, namely that "the change of the corporate name is not listed in the … exceptions, and under a strict interpretation … the change … shall trigger the implementation of the 49/51% rule to OTA's shareholding."  Gide repeated that "CNRC's practice fluctuates," noted the oral assurances OTA's in-house counsel had received from the CNRC in November 2012, and advised that "OTA should contact again the CNRC to confirm such position, and obtain more information on the current practice…."[566]  Meanwhile, on 18 October 2013, VimpelCom discussed internally the potential downsides to asking the Ministry of Finance for a formal derogation from the law, "particularly as it relates to the very issue that we are at loggerheads over (the ownership of OTA and the 49/51% rule."[567]  On 4 September 2013, OTA's in-house counsel referred to her prior "skeptic[ism]" about relying on any "oral answer" from the CNRC, but promised that "we are going to ask the CNRC the

---

[563] CE-256. OTMTI contends that OTA's in-house counsel nonetheless advised proceeding with the formal name change. *See, e.g.,* Rejoinder ¶¶ 494, 497, 500. To the contrary, her suggestion appears to have been one about internal company formalities, namely that the name change proposal be maintained on the agenda of the shareholders' meeting, so that "at least we will not have to re-schedule another shareholder'[s] meeting for this sole purpose in any case afterwards." CE-256. A suggestion of obtaining provisional shareholder consent for logistical reasons is not the same as advising the company to proceed with a formal name change in the Algerian commercial register, much less advising that there was no real legal risk from doing so.

[564] CE-256.

[565] Reply ¶ 330; *see also* CE-262 (internal VimpelCom note of 3 February 2013, recording that "we have been advised not to proceed with the change of name at this time and have been advised that regulatory approval for the name change would not be forthcoming at this time").

[566] CE-273.

[567] CE-285.

possibility of having a written answer about it."[568]   It appears that in October 2013, certain additional inquiries were made with the assistance of an Algerian notary, resulting in a "clarification" that based on the letter of the law, the name change seemed likely to trigger implementation of the 49/51% Rule, and the "CHRC currently rejects any record with respect to the change of corporate name except by derogation of the ministry."[569]   This presumably was the formal derogation process that VimpelCom already had concluded was unrealistic, at a time when the company was embroiled in a major arbitration claim against the Algerian State.

343.   In June 2014, after an agreement was reached to sell 51% of Dzezzy to the Algerian State, VimpelCom revisited the possibility of changing the company name before the closing of that sale.[570]   Gide's advice regarding the potential triggering of the 49/51% Rule apparently remained the same, however.[571]   VimpelCom received similar advice from the Ministry of Finance and other Algerian officials, who cautioned not to proceed with the name change until the deal had closed.[572]   On 29 January 2015, OTA's name change finally became effective, and the next day VimpelCom publicly announced the name as well as that the deal with the Algerian State had finally closed.[573]

344.   As with Egypt, OTMTI does not contest that VimpelCom subjectively *believed* it could face a "material Loss" in Egypt.[574]   Based on the evidence presented, the Tribunal has no difficulty concluding that this subjectively held belief was objectively reasonable, *i.e.,* that VimpelCom reasonably expected that it would have faced material Loss, had it applied to change OTA's name by the 31 December 2012 deadline referenced in the Closing Memorandum or at any time thereafter before it actually applied for the change.   There is

---

[568] CE-284.

[569] CE-284.

[570] Reply ¶ 333.

[571] CE-333 ("On our side, we have discussed on an[] anonymous and informal basis with the CNRC in order to inquire about its current practice.   It appears that the CNRC retains today a strict interpretation of the above [law] and hence, refuse to proceed to the change of the corporate name companies that do not comply with the 49/51% rule.   In any event, the 49/51% rule is mandatory.   This means that it should not be possible to be exempted from such rule....").

[572] Dobbie I ¶ 57.

[573] Reply ¶ 335; CE-340, CE-339.

[574] Hearing Tr. (5) 1488-1489 (OTMTI stating that "we'll take [VimpelCom] at their word that *they thought* in both Egypt and Algeria they were facing a material loss situation....") (emphasis added); O-PHB ¶ 292.

no real dispute that the threatened expropriation of its investment in the Algerian telecommunications business would have risen to the level of a "material" Loss. As to the likelihood of such an outcome, the messages sent by Algerian counsel were sufficiently cautionary, particularly in the broader context of apparently changeable regulatory interpretations and a serious pending dispute with the Algerian State, that VimpelCom had a commercially reasonable basis for its decision not to apply to change the company name, until it neutralized the risk under the 49/51% Rule by selling its controlling stake in the business to the Algerian Government.

c.      Entitlement to invoke Material Loss Provision

345.    As discussed above, OTMTI argues that VimpelCom should not be entitled to invoke the Material Loss Provision in Article 11, because it did not disclose to OTMTI, at the time of the Closing Memorandum, that it already had decided not to pursue an immediate name change in Algeria.[575]   The evidence suggests that at least by 21 November 2012, management apparently had concluded that the risk of even initiating the process for changing the name of the Algerian company was too great.[576]  This is shortly after (not before) the 15 November 2012 signing of the Closing Memorandum, but the issue had been under consideration by VimpelCom since at least 24 October 2012, when Gide expressed concerns about triggering the 49/51% Rule.[577]   The Tribunal sees no reason why these concerns could not have been shared with OTMTI before the Closing Memorandum.  On the other hand, for the reasons the Tribunal already has explained, the non-disclosure is of limited legal relevance, absent a claim for fraudulent inducement or any demonstration of material detrimental reliance.

346.    OTMTI also argues that VimpelCom did not move aggressively enough to check with Algerian authorities to see whether merely changing the Orascom name would trigger the consequence VimpelCom feared, namely the Government's invocation of the "49/51% rule" to trigger expropriation. OTMTI notes that Algerian counsel at one point suggested

---

[575] *See, e.g.,* O-PHB ¶ 307.
[576] CE-256.
[577] CE-256.

such an inquiry.[578] VimpelCom counters, based on the record above, that it did check with the authorities through various channels and at various times.[579]

347.   On closer examination, however, this dispute about the timing of any inquiry to Algerian authorities appears beside the point, as any delay in the inquiry was not what created the underlying uncertainty leading to a reasonable expectation of a Material Loss.  The evidence suggests that inquiries eventually were made to the CNRC about the potential consequences of initiating a name change, resulting in responses that fell far short of removing residual concerns about material risk.  Local Algerian counsel repeatedly emphasized the continuing uncertainty to VimpelCom, and VimpelCom concluded that the only other potential avenue – asking for special dispensation from the Ministry of Finance to derogate from the law – was not realistic in light of the much larger pending dispute with the State.  It was reasonable for VimpelCom in these circumstances to adopt a cautious approach, particularly in light of the potentially extreme adverse consequences (expropriation) that otherwise could result.  There is no persuasive evidence that any earlier inquiry would have led to any reliable assurance that VimpelCom could proceed with changing the name without incurring substantial risk of a material Loss.  Therefore, VimpelCom's decisions about when to pursue the change of name did not forfeit its right to rely on the Material Loss Provision.

### E.   Breach of Contract by Not Negotiating Appropriate Modifications in Good Faith

348.   The final issue relevant to OTMTI's Name Rights counterclaim is whether VimpelCom breached Article 11 by not negotiating in good faith appropriate modifications to the Name Rights.  As discussed above, this is an alternate theory of breach, which OTMTI asserts only in the event that its principal theory of breach is not accepted, namely that VimpelCom had no right of continued use of the Orascom name under the Material Loss Provision.

349.   The Tribunal already has addressed OTMTI's argument that there could be no good faith attempt to negotiate without VimpelCom's agreeing, at least at the level of principle, to

---

[578] *See, e.g.,* Rejoinder ¶ 383 ("VimpelCom failed to comply with its Algerian counsel's advice about obtaining approval of the name change before the December 31, 2012 deadline.").
[579] Rejoinder-CC ¶¶ 94, 100, 102.

OTMTI's entitlement to a license fee, royalty, or some other form of monetary compensation.   The Tribunal has concluded that compensation was not the *sine qua non* of a good faith negotiation, and therefore that good faith could be found by other means, such as a demonstrated willingness to discuss other potential modifications to the otherwise sweeping contours of the Name Rights definition.  This could include potential narrowing of the scope of any continuing Name Rights, both geographically and in terms of specific types of use.  It could also include discussions of duration, for example the imposition of a specific timetable by which further reports, negotiations or consequences might ensue.

350.   The question therefore turns to whether OTMTI has demonstrated that VimpelCom failed to negotiate in good faith *any* appropriate modifications to the Name Rights.  Here, the analysis can be combined for the Egyptian and Algerian situations, as the Parties engaged in a single combined set of exchanges covering both territories.

351.   The first question is whether VimpelCom declined to discuss "appropriate modifications" at all, or did so without any genuine intent to negotiate.   The record does not support such a finding.  Rather, although VimpelCom can be faulted for failing to take the initiative for inviting negotiations as the 31 December 2012 deadline approached or immediately after it had passed, the issue of negotiations was placed on the table shortly thereafter.   On 31 January 2013, OTMTI complained about the continued use of the Orascom name,[580] and over the ensuing ten months, the Parties exchanged numerous communications about both the fact and the consequences of continued use of the Orascom name in Egypt and Algeria.[581]  Although much of the correspondence focused on whether VimpelCom was

---

[580] *See* RE-81.

[581] *See, e.g.*, RE-82 (VimpelCom response of 12 February 2013, stating that "we look forward to working with you on reaching a mutual understanding with respect to the Name Rights," and proposing a "conference call to discuss how to proceed"); RE-83 (OTMTI response of 20 March 2013, requesting a "high level meeting to discuss this issue as well as other outstanding issues"); CE-265 (VimpelCom response of 21 March 2013, stating that it "would be happy to meet to see if we can find a resolution to the name change problem," and proposing a call to arrange the meeting); RE-84 (OTMTI response of 11 April 2013, requesting further information regarding the situation in Egypt and Algeria, but not following up on the possibility of a meeting); RE-85 (VimpelCom response of 19 April 2013, referencing "VimpelCom's repeated attempts to work out a resolution of the Name Rights issue with OTI," specifically on 12 Feburary 2013 and 21 March 2013); RE-86 (OTMTI's 31 July 2013 formal notice of dispute about Name Rights issue, offering "senior executive" meetings for 10 days to "discuss a mutual understanding with respect to modification of the Name Rights, should one be required"); RE-87 (VimpelCom response of 8 August 2013, alleging OTMTI's failure to respond to VimpelCom's prior requests for a meeting); RE-88 (OTMTI response of 15 August 2013, proposing dates for a negotiation meeting); Hupert ¶ 88, Lemke II ¶¶ 51-52 and Dobbie I ¶¶ 74-75 (testifying about a 22 August 2013 meeting, during which OTMTI requested payment of US$10 to extend the Name Rights for one year); RE-80

(or was not) justified in continued use of the name, VimpelCom on several occasions did indicate a willingness to hold discussions, except on the issue of monetary consideration.[582] In fact, the final step in the Parties' interchange appears to have been a November 2013 offer from VimpelCom to meet again, following the one unsuccessful meeting in August 2013,[583] and it was OTMTI that apparently declined to follow up on that invitation.[584] Thus, at least on the surface, VimpelCom manifested a good-faith desire to enter into discussions and to participate in negotiations.

352.   A separate question of course, is whether VimpelCom's actions were merely a pretense, suggesting a willingness to negotiate without actually doing so.  As previously noted, a requirement of good faith negotiations means more than simply responding to letters or suggesting or participating in meetings; it requires some genuine openness to looking for a solution.  At the same time, there is no requirement that a party agree with the other party's position, or even that it agree with the other party's view of the appropriate focus of the negotiation.  That seems to be the situation here.  From the very outset, OTMTI staked out the position that the only issue to be discussed was the size of a "licensing fee" or "royalty" that VimpelCom allegedly was obliged to pay for the continuing use of the Orascom name.  While OTMTI may have had a good faith basis for requesting that this be *a* subject of negotiation, VimpelCom cannot be found to have acted in bad faith by rejecting this as the *sole* focus or as a precondition for any other discussions.  As discussed above, this would

---

(several email exchanges between 26 August 2013 and 29 September 2013, in whch OTMTI insisted on payment of a license fee and VimpelCom ultimately advised that its "management is not minded to pay a fee for a name it does not want and is committed to changing"); RE-91 (OTMTI response of 10 October 2013, revising its license fee proposal to US$5 million "for the Algerian market alone," following EFSA's approval of Orascom Telecom's name change in Egypt, but insisting that VimpelCom "compensate OTMTI for the use of this intellectual property"); RE-132 (VimpelCom response of 29 October 2013, rejecting demand for compensation and suggesting a meeting with OTMTI for "negotiations focus[ed] on the timing and practicability of terminating the Name Rights," that "the Name Rights might be modified so that, going forward, they only apply to OTA's continued use of the Orascom name in Algeria" and for "formal purposes only"); RE-92 (OTMTI response of 8 November 2013, insisting that "appropriate modifications" should include a license fee and that OTMTI "inten[ded] to offset the fee against any amounts to be paid to VimpelCom in the future"); RE-93 (VimpelCom response of 27 November 2013, stating that "we ... do not believe that any license fee or offset is appropriate, necessary or reasonable," but reiterating that VimpelCom "remain[ed] more than willing to meet and discuss this issue further with you").

[582] *See, e.g.,* RE-82, CE-265, RE-132.

[583] RE-93.

[584] It appears that in the summer of 2014, the senior principals of the Parties held a meeting in the summer of 2014 to discuss various issues relevant to this dispute.  Reply ¶ 352.  VimpelCom claims that OTMTI did not "formally raise the name change issue again" until its pleadings in this case.  Reply ¶ 352.

be a different case if either the text of Article 11 or its necessary implication made a licensing fee or royalty payment a mandatory subject of negotiation; if that were the situation, then a refusal to entertain discussions about the amount of such payment could be viewed as a bad-faith refusal to negotiate. That, however, is not this case. The Tribunal has concluded, for the reasons set forth already, that there was at least a plausible basis for concluding that Article 11 did not contemplate payment of a licensing fee or royalty payment, but rather anticipated negotiations about issues of scope and duration. Therefore, the mere fact that VimpelCom declined to accept OTMTI's specified terms for negotiation did not manifest bad faith.

353.   Finally, bad faith also might be inferred if VimpelCom had refused to suggest any *other* topics for negotiation after making it clear to OTMTI that it was unwilling to discuss a licensing fee or royalty. The evidence here is somewhat closer. As OTMTI stresses, VimpelCom never proposed a *specific* set of possible modifications to the Name Rights. But it did at least suggest a different focus for discussions in general terms, suggesting that the Parties could talk about the further period for use and the possible limitations on use.[585] Arguably, the time for detailed proposals to narrow the scope or duration of Name Rights never came, given OTMTI's response that only a license fee or royalty would an acceptable basis for any agreement.

354.   On this basis, the Tribunal concludes that while VimpelCom was not necessarily being proactive in suggesting concrete solutions to the problem that the Parties faced, the record does not support a finding that it effectively declined to participate in good faith negotiations at all. VimpelCom had a legitimate basis for adopting a different view than OTMTI of the appropriate focus of negotiations, and it was not guilty of bad faith in urging negotiations about issues other than compensation. OTMTI bears the burden of demonstrating a failure to negotiate in good faith, and it has not sustained that burden.

---

[585] *See, e.g.*, RE-132.

### F.        Potential Non-Contractual Claims

355.   For the reasons stated above, OTMTI has not met its burden of proof in establishing a breach of contract by VimpelCom, either by continued use of the Orascom Name without a reasonable expectation of material Loss, or by failing to negotiate in good faith appropriate modifications to the Name Rights.  Because the Tribunal has found no liability for breach of contract, there is no need to reach the issue, separately briefed by the Parties, regarding the proper remedy for contract damages in the event of a finding of breach.

356.   OTMTI does, however, contend that it should be entitled to compensation for VimpelCom's continued use of the Orascom name even *absent* a breach of contract, either as a matter of "unjust enrichment" or under the doctrine of *quantum meruit*.[586]  The Tribunal finds that neither of these theories succeeds where breach of contract fails.

357.   As a threshold matter, OTMTI never pleaded these additional theories in its Statement of Defense and Counterclaim, which constituted its official statement of the legal claims it wished to pursue.  Nor did it ever seek permission under Article 22.1 of the LCIA Rules to "supplement, modify or amend" its pleading to add additional legal claims beyond one for breach of contract.  As a matter of procedure, therefore, the Tribunal arguably would be warranted in finding these late-stated non-contractual claims to be formally outside the four corners of the case.  VimpelCom has not, however, raised such an objection.

358.   More importantly, the Tribunal has no need to (and therefore does not) rest on such formalities.  By OTMTI's own framing, these alternate theories come into play only in the event the Tribunal were to find the "appropriate modifications" clause of Article 11 unenforceable under New York law.[587]  The Tribunal has made no such finding.  Rather, it has found that "modifications to the Name Rights" do not necessarily have to involve monetary compensation in order to be "appropriate," and consistent with that view, that VimpelCom did not fail to negotiate in good faith when it declined to consider monetary compensation but indicated its openness to discuss other potential modifications to the

---

[586] Rejoinder ¶¶ 388, 659.
[587] Rejoinder ¶ 659; O-PHB ¶¶ 214, 330-331.

Name Rights.  In these circumstances, the trigger OTMTI itself describes as relevant for entertaining unjust enrichment or *quantum meruit* theories simply does not arise.

359.    However, even at a more basic level, the non-contract theories fail as a matter of law.  The premises for each theory are straightforward: in the absence of a negotiated fee for VimpelCom to continue using the Orascom name after 31 December 2012, VimpelCom allegedly appropriated the benefits of intellectual property otherwise owned by OTMTI and derived benefit from that use, specifically the opportunity to avoid civil penalties or imprisonment in Egypt and the ability to escape potential expropriation in Algeria.[588]  But New York law disfavors attempts to fall back on such generalized notions of equity, when parties to a commercial agreement actually have negotiated an arrangement that addresses the issues at hand.[589]

360.    Here, the Parties established in Article 11 the circumstances under which VimpelCom would be entitled to continue using the OTMTI name.  They agreed on a process for attempting to negotiate the consequences of that conditional right.  If VimpelCom failed to comply with its obligations as laid out in the contract, its conduct would give rise to a claim for breach of contract.  If, however, its conduct did not breach the contract – because a reasonable expectation of material Loss conferred the right to continue using the Orascom name, and because VimpelCom sought in good faith to negotiate "appropriate modifications to the Name Rights" – then it was legally entitled to continue using the name without further obligations.  In other words, any right to compensation that OTMTI may claim must be evaluated by focusing on the Parties' respective rights and obligations under the Closing Memorandum.  Neither "unjust enrichment" nor *quantum meruit* provides an independent basis for re-examining the Parties' rights and obligations regarding the

---

[588] Rejoinder ¶¶ 661-662.

[589] **CLA-169**, *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (internal citations omitted); **CLA-182**, *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (N.Y. 2009) ("The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned.") (internal citations omitted).

continuing use of the Name Rights, which VimpelCom was entitled to use under the circumstances spelled out in the Closing Memorandum and established on this record.

## VI.   ARBITRATION COSTS AND LEGAL COSTS

361.   Under Article 13.7(a) of the SSEA, the Tribunal is commanded to "act[] under the LCIA Rules …, save that any provision of the Rules which … is otherwise invalid, void or unenforceable under English law shall not apply…."

362.   Pursuant to Article 28.1 of the LCIA Rules, "[t]he costs of the arbitration other than the legal or other expenses incurred by the parties themselves) (the '**Arbitration Costs**') [have been] determined by the LCIA Court" to be as follows:

| | | |
|---|---|---|
| a.   Registration fees: | £ | 1,750.00 |
| b.   LCIA's administrative charges: | £ | 31,798.17 |
| c.   Tribunal's fees and expenses: | £ | <u>387,013.34</u> |
| **Total Arbitration Costs**: | £ | 420,561.51 |

Towards these costs, the Claimant has paid £210,505.76, which includes the Registration fee, deposits lodged, and interest accrued, and the Respondent has paid £210,055.76, which includes deposits lodged and interest accrued.

363.   Pursuant to Article 28.2 of the LCIA Rules, the Tribunal "shall decide the proportions in which the parties shall bear such Arbitration Costs." Pursuant to Article 28.3 of the LCIA Rules, the Tribunal "shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the '**Legal Costs**') be paid by another party."

364.   While the Tribunal has full discretion under the LCIA Rules with regard to cost allocation, those Rules – unlike the rules of many other arbitration institutions – nonetheless establish certain presumptions. In particular, the Tribunal is instructed under Article 28.4 of the LCIA Rules to:

make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-cooperation resulting in undue delay and unnecessary expense.

365.   As Article 28.4 expressly reflects, tribunals are to follow a "general principle" that cost allocation should follow the outcome of the claims, "*except* where it appears to the Arbitral Tribunal that in the circumstances the application of such a general principle would be *inappropriate under the Arbitration Agreement or otherwise*" (emphasis added). In this case, nothing in the arbitration clause of the SSEA suggests that approach would be "inappropriate." It would have been easy for the Parties, had they wished (and as parties to other transactions often do), to stipulate that each party was to bear its own costs in the event of any dispute requiring arbitration. They did not do so, but simply incorporated a reference to the LCIA Rules as such. That necessarily includes the "general principle" of allocation reflected in those rules.

366.   Nor are there any other unusual circumstances in this case that warrant a departure from the presumptive approach reflected in the LCIA Rules. OTMTI notes that "[t]his is a highly complex international commercial arbitration involving unique transactions between sophisticated parties operating in numerous countries around the world, represented by two prominent international law firms."[590] This is certainly true, but the complexity of disputes arising from the SSEA could have been anticipated by the Parties at the time of their agreement. Indeed, a substantial component of this dispute was precisely of the nature that the SSEA anticipated, when it provided for particular rules of indemnification regarding Italian tax audits and for particular rules of conduct regarding Name Rights. There is nothing about this case that can be said to be *more* complex than the type of disputes the Parties could have foreseen at the time of the SSEA. Nor would it have been unexpected that in the event of any eventual dispute, both Parties would be represented by leading law

---

[590] O-TS ¶ 66.

168

firms.   While both of these eventualities – complex disputes, to be litigated among sophisticated lawyers – certainly have consequences for the *quantum* of Arbitration Costs and Legal Costs incurred, both were certainly foreseeable.  The Parties nonetheless did not incorporate into their arbitration clause any stipulated exception to the "general principle" established as a presumption in the LCIA Rules.

367.   The Tribunal notes that Article 28.4 of the LCIA Rules permits it "to also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-cooperation resulting in undue delay and unnecessary expense."   In this regard, VimpelCom makes various contentions about "OTMTI's conduct of these proceedings."[591]   The Tribunal sees no need to review these contentions in detail.  On the whole, it considers that *both* Parties have litigated the complex issues in this case in good faith, and have conducted themselves professionally and with respect for the Tribunal, the process, and opposing counsel.  However, in the Tribunal's view, such appropriate conduct should be the norm in arbitration, not the exception.  As such, confirmation of its existence does not give grounds for upending any particular presumptions about cost allocation to which the Parties *ex ante* agreed, in this case through adoption of the LCIA Rules.  Otherwise the normal confirmation of appropriate conduct, to be expected in most cases, would render the presumptive cost allocation approach rather the *reverse,* as an approach to be followed only in exceptional circumstances where parties have not behaved properly.  While that may be the general custom under other regimes that begin from an "each side bears its own costs" presumption (to be varied only in the event of bad behavior), it is decidedly *not* the approach reflected in the LCIA Rules.

368.   Because the applicable LCIA Rules establish the "general principle" that costs should follow the outcome of the claims, there is likewise no need to resolve the Parties' dispute about whether the SSEA *separately* contemplates recovery of costs associated with enforcing disputed rights to indemnification.  VimpelCom argues that the SSEA does this, by providing in Article 10.6 that indemnification is "the sole and exclusive remedy for any claim for monetary damages arising under this Agreement, absent fraud."[592]   OTMTI

---

[591] V-TS ¶ 67.
[592] Reply, ¶ 259; V-TS ¶ 61.

argues that the SSEA does not do this, contending that Article 10.2's definition of indemnifiable "Losses" (as including "costs and expenses, including … reasonable attorneys' and accounting fees") refers to the underlying costs of defending the Italian Tax Audits, not of litigating a disputed right to indemnification.[593] The Parties have not entirely joined issue on these points, which were briefed simultaneously rather than consecutively. Each cites New York law cases regarding allocation of attorneys' fees for enforcing an indemnity.[594]  However, it does not appear that these cases grapple specifically with the implications of *an agreement to the LCIA Rules*, which unlike other arbitral rules, create their own express "general principle" regarding cost allocation.  Indeed, OTMTI describes its cited cases as "consistent with the so-called '*American rule*' against fee shifting generally,[595] not as necessarily consistent with the presumptive approach reflected in the LCIA Rules.

369.   Whatever the proper reading of Article 2 and Article 6 of the SSEA, and whatever approach to fee-shifting might be applied by New York courts in other contexts, neither these SSEA provisions nor the New York cases cited command the Tribunal to set aside the analysis that otherwise would apply under the LCIA Rules.  Moreover, as noted above, the SSEA expressly instructs the Tribunal to "act[] under the LCIA Rules" except to the extent that "any provision of the Rules … is otherwise invalid, void or unenforceable *under English law* …."[596]  The SSEA nowhere suggests, by contrast, that the LCIA Rules' provision of a "general principle" should be set aside in preference to an "American rule."

370.   For these reasons, the Tribunal considers it appropriate to adopt a "costs follow the outcome" approach, which – as per Article 28.4 of the LCIA Rules – "reflect[s] the parties' relative success and failure in the award or arbitration or under different issues."  With respect to legal *claims*, VimpelCom has prevailed on all three of its indemnification claims,

---

[593] O-TS ¶¶ 48, 70-73.

[594] Compare V-TS ¶ 61 (reiterating citations from Reply ¶ 259) with O-TS ¶¶ 73-82 (distinguishing the cases VimpelCom cited in Reply ¶ 259, and citing alternative cases).  Given the single round of simultaneous briefs on this issue, VimpelCom did not have a subsequent opportunity to address the alternative cases upon which OTMTI relies.

[595] V-TS ¶ 73 (emphasis added).

[596] Article 13.7(a) of the SSEA (emphasis added).  Neither Party has suggested that the "general principle" regarding cost allocation reflected in the LCIA Rules is invalid under English law.  To the contrary, the principle appears broadly consistent with the "loser pays" or "costs follow the event" approach generally followed by the English courts.

and also on its defense to OTMTI's Name Rights counterclaim.  If assessed by reference to *issues*, as envisioned alternatively by Article 28.4, VimpelCom has also prevailed on almost all issues presented.  OTMTI has prevailed only to the extent that (a) it correctly insisted that under the SSEA, Losses are eligible for indemnification only to the extent there are no offsets for the value of Tax savings achieved or available to be achieved (a proposition that VimpelCom's original claim had not acknowledged),[597] and (b) that interest should be awarded not at VimpelCom's alleged WACC rate, but rather at a rate pegged roughly to VimpelCom's actual cost of borrowing.[598]  While neither of these issues required extensive briefing in the overall context of the other briefing in this case, nor was the briefing entirely negligible.  The tax savings issue involved supplemental expert reports on Italian law, and the interest rate issue involved consideration by both sides' quantum experts; both issues were addressed by counsel in their submissions, and both issues required the Tribunal's attention to resolve.  The Tribunal considers it appropriate to make some proportionate allowance for these two issues, in allocating "both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration *or under different issues*," pursuant to Article 28.4.

371.    Neither of the Parties has suggested a methodology for apportioning costs by issue, and the LCIA Rules leaves the cost allocation methodology entirely to the Tribunal's discretion.  The Tribunal considers it reasonable to look at least *roughly* to the quantum of the offsets resulting to VimpelCom's damages claim, as a result of the Tribunal's decisions with respect to the tax offset and interest rate issues.  In consequence of its ruling on these issues, the Tribunal has awarded VimpelCom €139,618,964 in damages, or roughly 88% of the €158,594,690 which would have resulted if its submissions had been accepted in full, with compound interest updated through the date of this Award.[599]  The Tribunal considers it appropriate to award VimpelCom recovery of a similar 88% of its reasonable Arbitration Costs and Legal Costs.  In this case, the Parties have stipulated that the costs sought by

---

[597] *See* Section IV.G.2 above.

[598] *See* Section IV.G.3 above.

[599] Calculated by adapting CE-359 (as submitted) solely for compound interest, at the rate sought by VimpelCom, running through an Award date of 30 September 2017.

both sides were both actually incurred and objectively reasonable.[600]   VimpelCom is therefore entitled to be compensated for 88% of its contributed share of the total Arbitration Costs, and for 88% of its Legal Costs incurred in this case.

372.   VimpelCom's contributed share of the total Arbitration Costs of this case was £210,505.76. OTMTI must reimburse VimpelCom for 88% of such Arbitration Costs, or £160,038.37.

373.   VimpelCom's total Legal Costs, based on the schedule provided on 26 May 2017, were $11,753,258.[601]   OTMTI must reimburse VimpelCom for 88% of such Legal Costs, or £10,342,867.

## VII.   AWARD

374.   Accordingly, based on the foregoing findings, we the undersigned Arbitrators hereby FIND and AWARD as follows:

   a.   VimpelCom's claims against OTMTI for breach of contract, in connection with OTMTI's refusal to indemnify VimpelCom under the SSEA for 72.65% of Losses arising out of or resulting from the Wind Telecom Audit, the WAHF Audit and the Wind Telecomunicazione Audit, are GRANTED.

   b.   VimpelCom is AWARDED damages of €139,618,964 in connection with these breaches of contract, inclusive of pre-award interest at a rate of 3% compounded annually.

   c.   OTMTI's counterclaim against VimpelCom, in connection with alleged breach of the Name Rights provisions of the SSEA, is DENIED.

---

[600] V-TS ¶¶ 2, 75; O-TS ¶ 3.  Because VimpelCom has calculated its legal fees entirely on an hourly rate basis (notwithstanding its apparent shift to a partial contingency fee basis for legal fees incurred from 1 July 2016), there is no need to consider here the reasonableness of recovering for contingency fee arrangements.  *See* V-TS ¶ 73 & n.101 (explaining that its cost schedules reflect "a fair measure of the value of the time worked by counsel during the period in which the contingency fee arrangement applied, by using the hourly rate in effect as of 30 June 2016).

[601] V-Costs (categories 1.B, 1.C, 1.D, 2.A and 2.B).  Category 1.A referred to VimpelCom's "LCIA Fees & Deposits" as of 26 May 2017, in the amount of US$260,578.15 (converted from GBP).  The Tribunal instead adopts the LCIA's more recent summary of total Arbitration Costs and of VimpelCom's contributions thereto.

172

d.  Pursuant to Articles 28.1 and 28.2 of the LCIA Rules, VimpelCom is AWARDED recovery of £160,038.37 towards its contributed share of the total Arbitration Costs of this proceeding.

e.  Pursuant to Article 28.3 of the LCIA Rules, VimpelCom is AWARDED recovery of £10,342,867 towards its Legal Costs in this proceeding.

f.  Post-award interest on the amounts awarded herein shall accrue at a rate of 3% compounded annually, from the date of issuance of this Final Award until the Award is paid or is reduced to judgment, and in the latter event the accrual of additional interest at any different rate will be governed by the law applicable to judgments in the jurisdiction in which judgment is entered confirming or enforcing the Award.

375.  This Final Award is in full settlement of all claims submitted to this Arbitration.

376.  This Final Award may be signed in counterparts, collectively forming one composite signed document.

377.  Pursuant to Paragraph 51 of the LCIA Notes for Arbitrators, the Tribunal has executed seven identical originals; the LCIA Secretariat will transmit one original each to the Parties, retain two for its files, and distribute one for each member of the Tribunal.

378.  We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is deemed made in London, England, the formal seat of this arbitration.

30 September 2017
Date

*Jean E. Kalicki*

Jean E. Kalicki (Presiding Arbitrator)

Philip Allen Lacovara

Kenneth Kramer

173

d.  Pursuant to Articles 28.1 and 28.2 of the LCIA Rules, VimpelCom is AWARDED recovery of £160,038.37 towards its contributed share of the total Arbitration Costs of this proceeding.

e.  Pursuant to Article 28.3 of the LCIA Rules, VimpelCom is AWARDED recovery of £10,342,867 towards its Legal Costs in this proceeding.

f.  Post-award interest on the amounts awarded herein shall accrue at a rate of 3% compounded annually, from the date of issuance of this Final Award until the Award is paid or is reduced to judgment, and in the latter event the accrual of additional interest at any different rate will be governed by the law applicable to judgments in the jurisdiction in which judgment is entered confirming or enforcing the Award.

375.  This Final Award is in full settlement of all claims submitted to this Arbitration.

376.  This Final Award may be signed in counterparts, collectively forming one composite signed document.

377.  Pursuant to Paragraph 51 of the LCIA Notes for Arbitrators, the Tribunal has executed seven identical originals; the LCIA Secretariat will transmit one original each to the Parties, retain two for its files, and distribute one for each member of the Tribunal.

378.  We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is deemed made in London, England, the formal seat of this arbitration.

30 September 2017
Date

_____
Jean E. Kalicki (Presiding Arbitrator)

_____
Philip Allen Lacovara

_____
Kenneth Kramer

173

    d.  Pursuant to Articles 28.1 and 28.2 of the LCIA Rules, VimpelCom is AWARDED recovery of £160,038.37 towards its contributed share of the total Arbitration Costs of this proceeding.

    e.  Pursuant to Article 28.3 of the LCIA Rules, VimpelCom is AWARDED recovery of £10,342,867 towards its Legal Costs in this proceeding.

    f.  Post-award interest on the amounts awarded herein shall accrue at a rate of 3% compounded annually, from the date of issuance of this Final Award until the Award is paid or is reduced to judgment, and in the latter event the accrual of additional interest at any different rate will be governed by the law applicable to judgments in the jurisdiction in which judgment is entered confirming or enforcing the Award.

375.    This Final Award is in full settlement of all claims submitted to this Arbitration.

376.    This Final Award may be signed in counterparts, collectively forming one composite signed document.

377.    Pursuant to Paragraph 51 of the LCIA Notes for Arbitrators, the Tribunal has executed seven identical originals; the LCIA Secretariat will transmit one original each to the Parties, retain two for its files, and distribute one for each member of the Tribunal.

378.    We hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is deemed made in London, England, the formal seat of this arbitration.


30 September 2017
Date

_____

Jean E. Kalicki (Presiding Arbitrator)


_____

Philip Allen Lacovara


_____

Kenneth Kramer

173

ANNEX A

*VimpelCom v. OTMTI*
LCIA Case No. 153077

**TRIBUNAL INTEREST CALCULATOR**
**Inputs for Pre-Award Interest**

Submitted 6-6-2016 with
Meyer Expert Report

1)   **Date of Award**                    | 9/30/17 |

Note: Select a date of February 22, 2017 or later in the format MM/DD/YYYY.

2)   **WT Settlement:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

3)   **WAHF Settlement:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

4)   **WIND – 2008 Settlement:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

5)   **WIND – 2009 Settlement:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

6)   **WIND – 2010 Settlement:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

7)   **Costs Related to Attorney's Fees:**

   a)   **Pre-Award Interest Rate**     | 3.00% |

   b)   **Type of Interest**          |        |

Submitted 4-6-2016 with
Meyer Expert Report

EmpriCon v. O.T.e.T?
LCIA Case No. 153877

## TRIBUNAL INTEREST CALCULATOR
### Summary of Indemnified Amounts and Pre-Award Interest

| | Total Indemnified Amount | Pre-Award Interest on Indemnified Payments | Total Indemnified Amount + Interest |
|---|---|---|---|
| **Settlement Payments** | | | |
| Wind Telecom Settlement Payments | € 22,859,017 | € 2,264,452 | € 25,123,470 |
| Wind Acquisition Holdings Finance Settlement Payments | € 60,858,341 | € 3,690,631 | € 64,548,972 |
| **WIND Settlements** | | | |
| WIND Settlement Payments - 2008 | € 21,578,807 | € 1,305,829 | € 22,884,636 |
| WIND Settlement Payments - 2009 | € 14,072,239 | € 851,573 | € 14,923,812 |
| WIND Settlement Payments - 2010 | € 9,217,138 | € 537,765 | € 9,754,902 |
| WIND Settlement Payments - Total | € 44,868,184 | € 2,715,171 | € 47,583,355 |
| **Settlement Payments - Subtotal** | € 128,585,553 | € 8,670,254 | € 137,255,807 |
| Costs Related to Attorney's Fees | € 2,291,385 | € 234,657 | € 2,526,042 |
| **Total** | € 130,876,938 | € 8,904,911 | € 139,781,849 ** |

** As per note (5) in the Pre-Award - Settlements tab, the Tribunal deducts a further Euro 162,285 from the sum above, for the impact of a hypothetical tax deduction for 2015 deferred interest.

CONFIDENTIAL

HoganCorn v. GNATI
LCIA Case No. 153577

Submitted 6-6-2016 with
Meyer Expert Report

**TRIBUNAL INTEREST CALCULATOR**
**Pre-Award Interest on Indemnified Wind Settlement Payments**

| | | A | B | C = A * B | D | Z | F = $\frac{Smith_i}{C*(1+d)^n(d_{day})}$ Compounded $F = C*(1+d)^z - 1)$ | G = C + F |
|---|---|---|---|---|---|---|---|---|
| Installment No. | Payment Date | Total Amount Paid | Indemnification % | Indemnified Amount | Award Interest Rate | # of Days from Payment Date to Award Date | Interest on Indemnified Amount | Indemnified Amount + Interest |
| **WT Settlement** | | | | | | | | |
| 1 | 15-Oct-13 | $ 5,900,000 | 72.05% | $ 10,892,500 | 3.00% | 1,431 | $ 1,338,396 | 12,230,296 |
| 2 | 15-Jan-14 | 1,651,787 | 72.05% | 1,034,759 | 3.00% | 1,369 | 122,326 | 1,175,014 |
| 3 | 15-Apr-14 | 1,465,660 | 72.05% | 1,061,370 | 3.00% | 1,280 | 114,654 | 1,176,024 |
| 4 | 16-Jul-14 | 1,496,612 | 72.05% | 1,067,763 | 3.00% | 1,178 | 106,073 | 1,173,376 |
| 5 | 15-Oct-14 | 1,478,743 | 72.05% | 1,074,383 | 3.00% | 1,086 | 98,982 | 1,173,569 |
| 6 | 15-Jan-15 | 1,497,834 | 72.05% | 1,080,913 | 3.00% | 992 | 92,418 | 1,171,320 |
| 7 | 15-Apr-15 | 1,496,727 | 72.05% | 1,087,532 | 3.00% | 904 | 82,391 | 1,169,963 |
| 8 | 15-Jul-15 | 1,505,739 | 72.05% | 1,093,905 | 3.00% | 813 | 74,166 | 1,168,351 |
| 9 | 9-Oct-15 | 1,514,807 | 72.05% | 1,092,510 | 3.00% | 722 | 66,265 | 1,166,775 |
| 10 | 15-Jan-16 | 1,523,981 | 72.05% | 1,057,114 | 3.00% | 629 | 57,826 | 1,164,940 |
| 11 | 16-Apr-16 | 1,513,893 | 72.05% | 1,111,047 | 3.00% | 538 | 49,593 | 1,160,240 |
| 12 | 16-Jul-16 | 1,543,888 | 72.05% | 1,133,779 | 3.00% | 447 | 41,943 | 1,152,492 |
| **Total** | | $ 35,464,604 | | 22,887,087 | | | $ 2,243,487 | 25,324,674 |
| | | | | | | | | |
| **WLH Settlement** | | | | | | | | |
| 1 | 26-May-14 | 6,881,874 | 72.05% | 5,003,544 | 3.00% | 1,239 | $ 522,514 | 5,526,058 |
| 2 | 28-Aug-14 | 6,861,170 | 72.05% | 5,061,553 | 3.00% | 1,147 | 483,312 | 5,488,865 |
| 3 | 29-Nov-14 | 6,555,526 | 72.05% | 5,027,762 | 3.00% | 1,045 | 444,008 | 5,471,570 |
| 4 | 23-Feb-15 | 6,897,882 | 72.05% | 5,062,171 | 3.00% | 953 | 404,404 | 5,464,275 |
| 5 | 25-May-15 | 6,804,672 | 72.05% | 5,052,569 | 3.00% | 864 | 366,186 | 5,418,795 |
| 6 | 28-Aug-15 | 6,872,218 | 72.05% | 5,065,178 | 3.00% | 772 | 326,578 | 5,391,966 |
| 7 | 26-Nov-15 | 6,906,584 | 72.05% | 5,077,787 | 3.00% | 680 | 287,868 | 5,365,251 |
| 8 | 23-Feb-16 | 7,006,763 | 72.05% | 5,090,396 | 3.00% | 588 | 248,228 | 5,338,654 |
| 9 | 24-May-16 | 7,023,719 | 72.05% | 5,102,732 | 3.00% | 498 | 209,997 | 5,312,729 |
| 10 | 29-Aug-16 | 7,041,271 | 72.05% | 5,115,341 | 3.00% | 406 | 170,963 | 5,286,304 |
| 11 | 26-Nov-16 | 7,058,431 | 72.05% | 5,127,950 | 3.00% | 314 | 132,609 | 5,260,559 |
| 12 | 23-Feb-17 | 7,075,767 | 72.05% | 5,140,559 | 3.00% | 222 | 94,174 | 5,234,853 |
| **Total** | | 83,769,324 | | 60,858,341 | | | $ 3,890,839 | 64,649,972 |

VimpelCom v. OTMT
LCIA Case No. 153077

**TRIBUNAL INTEREST CALCULATOR**
**Pre-Award Interest on Indemnified Wind Settlement Payments**

Submitted 6-6-2016 with
Meyer Expert Report

| Installment No. | Payment Date | Total Amount Paid (A) | Indemnification % (B) | Indemnified Amount (C = A*B) | Annual Interest Rate (D) | # of Days from Payment Date to Award Date (E) | Interest on Indemnified Amount (F) | Indemnified Amount + Interest (G = C + F) |
|---|---|---|---|---|---|---|---|---|
| **WIND 2008 Settlement:** | | | | | | | | |
| 1 | 23-May-14 | € 2,441,533 | 72.65% | € 1,773,774 | 3.00% | 1,227 | € 185,307 | € 1,959,081 |
| 2 | 22-Aug-14 | 2,447,647 | 72.65% | 1,778,204 | 3.00% | 1,135 | 171,195 | 1,949,440 |
| 3 | 21-Nov-14 | 2,453,841 | 72.65% | 1,782,716 | 3.00% | 1,044 | 157,277 | 1,939,993 |
| 4 | 20-Feb-15 | 2,459,995 | 72.65% | 1,787,186 | 3.00% | 953 | 143,391 | 1,930,577 |
| 5 | 22-May-15 | 2,465,948 | 72.65% | 1,791,511 | 3.00% | 863 | 129,529 | 1,921,040 |
| 6 | 21-Aug-15 | 2,472,102 | 72.65% | 1,795,982 | 3.00% | 771 | 115,712 | 1,911,694 |
| 7 | 20-Nov-15 | 2,478,236 | 72.65% | 1,800,453 | 3.00% | 680 | 101,939 | 1,902,387 |
| 8 | 22-Feb-16 | 2,484,410 | 72.65% | 1,804,974 | 3.00% | 586 | 87,520 | 1,892,644 |
| 9 | 23-May-16 | 2,490,431 | 72.65% | 1,809,298 | 3.00% | 496 | 74,154 | 1,883,452 |
| 10 | 22-Aug-16 | 2,496,585 | 72.65% | 1,813,769 | 3.00% | 404 | 60,323 | 1,874,092 |
| 11 | 22-Nov-16 | 2,502,739 | 72.65% | 1,818,240 | 3.00% | 312 | 46,526 | 1,864,766 |
| 12 | 23-Feb-17 | 2,508,893 | 72.65% | 1,822,710 | 3.00% | 220 | 32,765 | 1,855,475 |
| **Total** | | € 29,702,419 | | € 21,578,807 | | | € 1,305,839 | € 22,884,636 |
| **WIND 2009 Settlement:** | | | | | | | | |
| 1 | 23-May-14 | € 1,592,203 | 72.65% | € 1,156,735 | 3.00% | 1,227 | € 120,849 | € 1,277,580 |
| 2 | 22-Aug-14 | 1,596,216 | 72.65% | 1,159,651 | 3.00% | 1,135 | 111,642 | 1,271,293 |
| 3 | 21-Nov-14 | 1,600,229 | 72.65% | 1,162,566 | 3.00% | 1,044 | 102,565 | 1,265,131 |
| 4 | 20-Feb-15 | 1,604,242 | 72.65% | 1,165,482 | 3.00% | 953 | 93,510 | 1,258,992 |
| 5 | 22-May-15 | 1,608,125 | 72.65% | 1,168,303 | 3.00% | 862 | 84,470 | 1,252,773 |
| 6 | 21-Aug-15 | 1,612,138 | 72.65% | 1,171,218 | 3.00% | 771 | 75,460 | 1,246,678 |
| 7 | 20-Nov-15 | 1,616,151 | 72.65% | 1,174,134 | 3.00% | 680 | 66,471 | 1,240,605 |
| 8 | 22-Feb-16 | 1,620,164 | 72.65% | 1,177,049 | 3.00% | 586 | 57,205 | 1,234,254 |
| 9 | 23-May-16 | 1,624,090 | 72.65% | 1,179,902 | 3.00% | 496 | 48,359 | 1,228,261 |
| 10 | 22-Aug-16 | 1,628,104 | 72.65% | 1,182,817 | 3.00% | 404 | 39,338 | 1,222,155 |
| 11 | 22-Nov-16 | 1,632,117 | 72.65% | 1,185,733 | 3.00% | 312 | 30,341 | 1,216,074 |
| 12 | 23-Feb-17 | 1,636,130 | 72.65% | 1,188,649 | 3.00% | 220 | 21,367 | 1,210,016 |
| **Total** | | € 19,369,909 | | € 14,072,239 | | | € 851,573 | € 14,923,812 |

Simple: $F = (C*D) * (E/365)$
Compounded: $F = C*((1+D)^{E/365} - 1)$

*VimpelCom v. OTMT*
LCIA Case No. 153077

**TRIBUNAL INTEREST CALCULATOR**
Pre-Award Interest on Indemnified Wind Settlement Payments

Submitted 8-8-2016 with
Mayer Expert Report

*Simple:*
$F = (C * i/i) * (E/365)$
*Compounded:*
$F = C * i * (I/i) \cdot Di^{(I/365)} - 1)$

| Installment No. | Payment Date | A<br>Total Amount Paid | B<br>Indemnification %[2] | C  A*B<br>Indemnified Amount | D<br>Annual Interest Rate | i<br># of Days from Payment Date to Award Date | F  C*@i  Di[i/365] -1)<br>Interest on Indemnified Amount | G  C + F<br>Indemnified Amount + Interest |
|---|---|---|---|---|---|---|---|---|
| WIND 2010 Settlement: | | | | | | | | |
| 1 | 22-May-14 | €     1,042,870 | 72.65% | €     757,647 | 3.00% | 1,221 | €          79,152 | €     836,799 |
| 2 | 22-Aug-14 | 1,045,501 | 72.65% | 759,557 | 3.00% | 1,135 | 73,124 | 832,681 |
| 3 | 21-Nov-14 | 1,048,130 | 72.65% | 761,466 | 3.00% | 1,044 | 67,179 | 828,645 |
| 4 | 20-Feb-15 | 1,050,758 | 72.65% | 763,376 | 3.00% | 953 | 61,248 | 824,624 |
| 5 | 22-May-15 | 1,053,201 | 72.65% | 765,223 | 3.00% | 862 | 55,327 | 820,550 |
| 6 | 21-Aug-15 | 1,055,930 | 72.65% | 767,133 | 3.00% | 771 | 49,425 | 816,558 |
| 7 | 20-Nov-15 | 1,058,558 | 72.65% | 769,043 | 3.00% | 680 | 43,538 | 812,581 |
| 8 | 22-Feb-16 | 1,061,187 | 72.65% | 770,952 | 3.00% | 586 | 37,468 | 808,420 |
| 9 | 22-May-16 | 1,063,759 | 72.65% | 772,821 | 3.00% | 496 | 31,674 | 804,495 |
| 10 | 22-Aug-16 | 1,066,387 | 72.65% | 774,730 | 3.00% | 404 | 25,766 | 800,496 |
| 11 | 22-Nov-16 | 1,069,016 | 72.65% | 776,640 | 3.00% | 312 | 19,873 | 796,513 |
| 12 | 22-Feb-17 | 1,071,644 | 72.65% | 778,550 | 3.00% | 220 | 13,995 | 792,545 |
|  | **Total** | €   12,687,045 |  | €   9,217,138 |  |  | €          557,769 | €     9,774,907 |

Notes:
[1] The Amended and Restated Share Sale and Exchange Agreement, April 15, 2011: RE-1 (p. 52); Request for Arbitration, July 8, 2015. pp. 9, 23.
(2) The Tribunal has adjusted cell F18 to reflect VimpelCom's correction to the last Wind Telecom Audit installment payment.
(3) The Tribunal notes its finding that VimpelCom could have achieved savings of Euro 212,897 by taking deductions for 2015 deferral interest. Treating that hypothetical savings as accruing on 31 December 2015, and applying the 72.65% allocation and the same interest rate, the resulting offset to OTMT is Euro in Euro 162,885

CONFIDENTIAL

Page 5 of 6

Vinçott'Com v. OTMT
Case #153077

Submitted 6-6-2016 with
Meyer Expert Report

# TRIBUNAL INTEREST CALCULATOR
## Pre-Award Interest on Indemnified Costs Related to Attorney's Fees

| | | A | B | C = A * B | D | E | Simple: $F = C * D * E$ Compounded: $F = C * ((1 + D/4)^{(...)} - 1)$ | G = C + F |
|---|---|---|---|---|---|---|---|---|
| Invoice Date | Payment Date | Total Amount Paid | Indemnification %[1] | Indemnified Amount | Annual Interest Rate | # of Days from Payment Date to Award Date | Interest on Indemnified Amount | Indemnified Amount + Interest |
| 18-Sep-13 | 18-Oct-13 | € 686,460 | 72.65% | € 498,670 | 3.00% | 1,443 | € 61,815 | € 560,485 |
| 31-Mar-14 | 30-Apr-14 | 54,464 | 72.65% | 39,558 | 3.00% | 1,249 | 4,212 | 43,780 |
| 14-May-14 | 14-May-14 | 49,650 | 72.65% | 36,066 | 3.00% | 1,235 | 3,793 | 39,849 |
| 26-May-14 | 25-Jun-14 | 83,200 | 72.65% | 60,445 | 3.00% | 1,193 | 6,131 | 66,576 |
| 23-Jun-14 | 23-Jul-14 | 583,650 | 72.65% | 424,022 | 3.00% | 1,165 | 41,952 | 465,974 |
| 4-Aug-14 | 3-Sep-14 | 69,784 | 72.65% | 50,698 | 3.00% | 1,123 | 4,827 | 55,525 |
| 8-Aug-14 | 7-Sep-14 | 1,605,032 | 72.65% | 1,166,056 | 3.00% | 1,119 | 110,604 | 1,276,660 |
| 16-Dec-14 | 15-Jan-15 | 21,854 | 72.65% | 15,870 | 3.00% | 989 | 1,321 | 17,191 |
| **Total** | | € 3,154,095 | | € 2,291,385 | | | € 234,657 | € 2,526,042 |

Notes:
[1] The Amended and Restated Share Sale and Exchange Agreement, April 15, 2011; RE-1 (p. 52); Request for Arbitration, July 8, 2015; pp. 9, 23.
[2] Column A adjusted by the Tribunal as per V-TS Table 2, to include additional taxes paid by the Wind Group on professional fees, and to deduct subsequent tax savings.

CONFIDENTIAL.

LCIA Arbitration No. 153077

IN THE MATTER OF AN ARBITRATION UNDER THE
2014 RULES OF ARBITRATION OF THE
LONDON COURT OF INTERNATIONAL ARBITRATION

BETWEEN

VimpelCom Ltd

Claimant

and

Orascom TMT Investments S.à.r.l

Respondent

---

**MEMORANDUM**

---

*Members of the Tribunal*
Jean Kalicki, Presiding Arbitrator
Philip Allen Lacovara
Kenneth Kramer

7 November 2017

1. This Memorandum is made pursuant to Article 27.1 of the LCIA Rules (the "**Rules**") to amend the Final Award dated 30 September 2017, made by this Tribunal in respect of LCIA Arbitration No. 153077 (the "**Award**") between VimpelCom Ltd. ("**VimpelCom**") as Claimant and Orascom TMT Investments S.à.r.l ("**OTMTI**") as Respondent.

2. On 26 October 2017, VimpelCom wrote to the Registrar of the LCIA to seek correction, pursuant to Article 27.1, of several alleged typographical, computational and clerical errors in the Award (the "**Application**"). The Tribunal invited OTMTI's comments, which were submitted on 3 November 2017. The Tribunal has considered the Application and the Parties' respective comments, and decided to issue this Memorandum to correct the Award as requested.

3. First, the second sentence of paragraph 65 of the Award inadvertently transposes two references to provisions of the SSA. This sentence should be amended to read as follows: "By its plain terms, it makes no reference either to rights of participation in or control of the defense (as in Article 10.7(b)), *or* to coordination and reasonable efforts of inclusion in meetings and material telephone calls with the third party presenting the underlying claim (as in Article 10.7(h)(ii)."

4. Second, the final sentence of paragraph 236 erroneously refers to OTMTI rather than VimpelCom in the final clause. The sentence should be amended to read as follows: "The SSEA does not require the Parties to reach *agreement* on issues of strategy, only that reasonable efforts be made to coordinate with OTMTI, while VimpelCom retained the ultimate right to decide in good faith whether to reach a reasonable settlement."

5. Third, paragraphs 372 and 374(d) refer to a sum of £160,038.37, which is an erroneous calculation. The references shall be amended to read £185,245.07, which is a correction of the calculation in accordance with the methodology originally adopted in the Award.

6. Finally, paragraphs 373 and 374(e) of the Award refer to a sum of £10,342,867 (with the currency symbol for Pounds Sterling), which shall be amended to read $10,342,867 (with the currency symbol for U.S. Dollars).

7. In accordance with Article 27.1 of the Rules, this Memorandum shall become part of the Award for all purposes.

Deemed made in London, England, the seat of the arbitration.

7 November 2017

_____
Jean E. Kalicki (Presiding Arbitrator)


_____
Philip Allen Lacovara


_____
Kenneth Kramer

Deemed made in London, England, the seat of the arbitration.

7 November 2017

_____

Jean E. Kalicki (Presiding Arbitrator)

_____

Philip Allen Lacovara

_____

Kenneth Kramer

Deemed made in London, England, the seat of the arbitration.

7 November 2017

Jean E. Kalicki (Presiding Arbitrator)

Philip Allen Lacovara

Kenneth Kramer